# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**LYMAN-CUTLER, LLC,**<br><br>          **Debtor**<br><br>**LYMAN-CUTLER, LLC,**<br>**ALEX FILIPPOV, and**<br>**NICKOLAY LIPETSKER,**<br><br>        **Plaintiffs/Defendants-in-Counterclaim**<br><br>**v.**<br><br>**VADIM KAGAN,**<br>**TATIANA KAGAN,**<br>**KAGAN DEVELOPMENT KDC, CORP., and**<br>**PROEXCAVATION CORP.,**<br><br>        **Defendants/Plaintiffs-in-Counterclaim** | **Chapter 7**<br>**Case No. 15-13881-FJB**<br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 16-1120** |

## MEMORANDUM OF DECISION

This is the bankruptcy case of a limited liability company whose bankruptcy filing was

necessitated by an attempt by one of its three members to block sale of the LLC's assets—two single-

family homes the LLC had been formed to develop—unless the other two acceded to his demands to

improve his position at their expense. In the above-entitled  adversary proceeding and in related

proceedings in the bankruptcy case, (i) the debtor, Lyman-Cutler LLC ("the Debtor") and two of its three

members, Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") (collectively, "the Plaintiffs"),

object to claims filed in the case by the third member Vadim Kagan ("Kagan"), his wife, Tatiana Kagan

("Tatiana"), and their two wholly-owned corporations, Kagan Development KDC, Corp. ("KDC") and

ProExcavation Corp. ("ProEx") (collectively, "the Kagan Parties"); (ii) the Debtor asserts counterclaims

against the Kagan Parties; (iii) Filippov and Lipetsker assert cross-claims against the Kagan Parties; (iv)

the Kagan Parties assert counterclaims against Filippov, Lipetsker, and the Debtor; (v) the Kagan Parties

object to a secured claim asserted by Filippov; (vi) the Kagan Parties object to an unsecured claim

asserted by the law firm of O'Connor, Carnathan, & Mack LLC for services rendered prepetition to the

Debtor; (vii) Filippov and Lipetsker object to the proof of interest filed by Kagan; and (viii) Kagan objects

to the proofs of interest filed by Filippov and Lipetsker. After a trial on the merits on all of the above, the

Court now enters the following memorandum of decision, which includes the Court's findings of fact and

conclusions of law.

**PROCEDURAL HISTORY**

       1.  **In the Bankruptcy Case**

On October 7, 2015, the Debtor, a Massachusetts limited liability company, filed a petition for

relief under chapter 11 of the Bankruptcy Code. On October 25, 2015, the Court ordered the

appointment of a chapter 11 trustee, who soon moved to convert the case to one under chapter 7. On

December 7, 2015, the Court granted that motion and converted the case to one under chapter 7. David

Madoff, who had been the chapter 11 trustee, was appointed chapter 7 trustee in the case (as chapter 7

trustee, "the Trustee"), and he has continued in that position to date. On January 27 and March 11,

2016, the Trustee sold the Debtor's two principal assets, each a parcel of real estate on which the

Debtor had constructed a single-family home; the gross sale prices totaled $8.8 million. He continues to

hold the net sale proceeds. Depending on the disposition of the objections to claims presently being

adjudicated, the net proceeds may well be sufficient to pay all allowed claims in full and return a

substantial surplus to the Debtor for distribution to its members. The Trustee has abandoned the

Debtor's interests in the counterclaims that the Debtor (through Filippov and Lipetsker) now assert

against the Kagan Parties in Adversary Proceeding No. 16-1120.

### A. Kagan Party Claims

In the Debtor's bankruptcy case, the Kagan Parties filed the following five proofs of claim:

- KDC filed proof of claim ("POC") #1-2 for a secured claim in the amount of $2,396,914.66, stating that the claim was secured by mechanics liens on the two homes that the Debtor had brought into bankruptcy.  The claim, based in contract, purports to be based on a construction contract between the Debtor and KDC.

- KDC also filed POC #4-1 for an additional claim, a nonpriority unsecured claim whose amount was specified as "undetermined." The basis of the claim was identified therein as indemnification rights that KDC has as an agent of a member of the Debtor under the Debtor's organizational and operating documents and agreements.

- Tatiana filed POC #5-1, a nonpriority unsecured claim whose amount was specified as "undetermined." The basis of the claim was identified therein as indemnification rights that Tatiana has as an agent of a member of the Debtor under the Debtor's organizational and operating documents and agreements.

- Kagan filed POC #6-1, a nonpriority unsecured claim whose amount was specified as "undetermined." The basis of the claim was identified therein as indemnification rights that Kagan has under the Debtor's organizational and operating documents and agreements.

- ProEx filed POC #7-1, a nonpriority unsecured claim whose amount was specified as "undetermined." The basis of the claim was identified therein as indemnification rights that ProEx has as an agent of a member of the Debtor under the Debtor's organizational and operating documents and agreements.

On July 21, 2016, the Debtor, Filippov, and Lipetsker jointly objected to these five claims. After a preliminary hearing on these Objections, the Court issued a pretrial and scheduling order, doc. #222.

### B. Filippov Claim

Filippov filed POC #9-1, asserting a secured claim in the amount of $200,000 plus interest for a prepetition loan to the debtor, secured by a mortgage on its real property, and the Kagan Parties have jointly objected to the claim. After a preliminary hearing on this objection, the Court ordered that it be subject to and governed by the same pretrial and scheduling order as was issued for the objections to the Kagan Party claims, doc. #222.

### C.   O'Connor, Carnathan & Mack Claim

The law firm of O'Connor, Carnathan & Mack LLC ("OC&M") filed POC #2-2, asserting a

nonpriority unsecured claim in the amount of $35,329.95 for prepetition services it rendered to the

Debtor, and the Kagan Parties have jointly objected to the claim. After a preliminary hearing on this

objection, by inadvertence, the Court neglected to schedule this objection for evidentiary hearing with

the other matters that are the subject of this memorandum, and consequently it was not tried during

the omnibus 13-day evidentiary hearing/trial (the "Trial") held as to those matters. After the trial, the

Court convened a status conference to address this oversight. All parties indicated that they believed

that the Trial had concerned (among many other things) this objection. Accordingly, except as discussed

below, the parties agreed that no further proceedings would be necessary to decide this objection and

that it could be decided on the evidentiary record they created at the Trial.

The sole exception was that the Claimant, the firm of O'Connor, Carnathan & Mack, LLC, sought

to introduce into evidence its proof of claim [POC No. 2] and its response to the objection to its proof of

claim [doc. #223], including all exhibits to both. The Kagan Parties objected on the sole basis that the

evidence was closed. The Court determined that the evidence had not been closed; in fact no

evidentiary hearing on the objection had even been commenced (notwithstanding that both parties had

believed otherwise). The Court therefore overruled the objection, admitted the documents in question

into evidence, and took the objection under advisement on the record thus completed.

### D.   Interests in the LLC

The Court established July 22, 2016 as the deadline for filing proofs of interest ("POI"). The

members of the debtor LLC filed the following proofs of interest: Lipetsker filed POI #10-1, asserting a 10

percent interest; Filippov filed POI #11-1, asserting an 87.11 percent interest; and Kagan filed POI 12-1,

asserting an interest of "at least 10 percent," adding: "In the event that any payments made on behalf of

the Debtor (e.g., carrying costs or other payments) are considered to be capital contributions by Mr.

Kagan then his equity interest would increase. Additionally, the Operating Agreement provides that Mr. Kagan will receive 50% of the profits upon liquidation of the Debtor (Section 8.1)." Kagan objected to Filippov's and Lipetsker's proofs of interest. Filippov and Lipetsker jointly objected to Kagan's proof of interest. After considering its subject matter jurisdiction to adjudicate these objections to proofs of interest, the Court determined that it did have jurisdiction[1] and that it would not abstain as to the objections to proofs of interest, and the Court ordered that the objections to interests, too, would be governed by the pretrial and scheduling order that the Court had issued with respect to the objections to claims, doc. #222.

### ii.  In the Adversary Proceeding

On July 5, 2016, the Debtor filed the complaint commencing Adversary Proceeding No. 16-1120, asserting counterclaims against the Kagan Parties. At that time, the claims that the Debtor sought to assert remained assets of the estate in this bankruptcy case, such that only the Trustee had standing to prosecute them. On April 7, 2017, the Trustee filed in the bankruptcy case a notice of abandonment as to "all of the Debtor's interest in any and all claims or potential claims that the Debtor may have against" (among others) the Kagan Parties. No objection having been filed to the notice of abandonment, per 11 U.S.C. § 554(a) and Fed. R. Bankr. P. 6007(a), the proposed abandonment became final and effective on April 21, 2017, revesting the abandoned claims in the Debtor and obviating the Debtor's standing problem. Around the same time, the Court granted a joint motion by Filippov and Lipetsker for leave to intervene as parties plaintiff, whereupon they and the Debtor jointly filed the eight-count Amended Complaint [doc. #52]. The Kagan Parties answered and filed counterclaims in eighteen counts [doc. #106].

The Court's pretrial order required that, in their Rule 26(f) Conference Report, the parties include a statement as to the bankruptcy court's authority to enter a final order as to each matter in

---

[1] See orders of November 1, 2017.

dispute and a statement as to whether the parties consent to the entry of a final order by this court as

to each matter in dispute. In their Rule 26(f) Conference Report, the parties responded only: "The

Parties consent to the Court's jurisdiction to enter a final order on all controversies between the

Parties." The parties accordingly have consented to the entry of final judgment by the bankruptcy judge

as to each matter in controversy (provided the court has subject matter jurisdiction over the matter).

In their Answer and Counterclaim, the Kagan Parties demanded a jury trial as to all counts so

triable, but they had already filed in the Adversary Proceeding a Rule 26(f) Conference Report [doc. #23]

in which they and the Debtor, Filippov, and Lipetsker had indicated that they were not demanding a trial

by jury. No party has pressed a jury demand, and all claims and counterclaims in this adversary

proceeding were tried by agreement to the Court without a jury.

### iii. Consolidated Trial and Evidentiary Hearing

The court consolidated the trial of the claims and counterclaims in the adversary proceeding

with the evidentiary hearing on the objections to claims and interests in the bankruptcy case. The

trial/evidentiary hearing was conducted over thirteen days. The parties then submitted proposed

findings and conclusions and posttrial briefs. The Court then heard final arguments and took the matter

under advisement.

**SUBJECT-MATTER JURISDICTION and AUTHORITY TO ENTER FINAL JUDGMENT**

As to each matter before it, a bankruptcy court must determine (i) whether the matter is within

the Court's subject-matter jurisdiction under 28 U.S.C. § 1334(b), (ii) whether the matter is a core

proceeding as to which a bankruptcy judge may enter final judgment, see 28 U.S.C. § 157(b), and (iii) if

the matter is within the Court's subject matter jurisdiction but not a core proceeding, whether the

parties have consented under 28 U.S.C. § 1334(c)(2) to the Court's entry of final judgment as to it. As to

all matters before the Court, all parties have consented to this court's entering final judgment; this

satisfies the Court's third obligation and makes the second moot. Consent, however, cannot confer

subject matter jurisdiction. Nor do I understand the Kagan Parties to have intended for their consent to do so: the parties were responding to an inquiry about the bankruptcy judge's authority to enter final judgment, not about subject matter jurisdiction, and the Kagan Parties have, in earlier proceedings as to these matter, taken the position that the Court lacks subject matter jurisdiction as to the objections to proofs of interest and as to every claim and counterclaim in the adversary proceeding.

### 1.   Objections to Claims

As to one subset of the matters now before the Court, specifically the various objections to claims filed in the bankruptcy case, it is clear and undisputed that this court does have subject-matter jurisdiction. Subject to exceptions not applicable here, the bankruptcy jurisdiction of the districts courts extends to "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). An objection to claim arises not only in a bankruptcy case but under title 11 (the Bankruptcy Code), see 11 U.S.C. § 502(b) (authorizing court to adjudicate objections to claims), and it concerns and relates to the distribution of the assets of the estate. It therefore falls squarely in the bankruptcy jurisdiction conferred on the district courts by § 1334(b) and, pursuant to 28 U.S.C. § 157(a), referred by the district court for this district to the bankruptcy court for this district by a standing order of reference. Moreover, objections to claims are core proceedings within the meaning of § 157(b)(1) and (2). See 28 U.S.C. § 157(b)(2)(B) (core proceedings include allowance or disallowance of claims against the estate). Accordingly, the Court may hear and finally determine them. 28 U.S.C. § 157(b)(1).

### 2.   Objections to Interests

The next subset of matters before me consists of the objections by members of the debtor LLC to each other's interests. At an earlier stage in this proceeding, the Court determined that it has subject matter jurisdiction to adjudicate these.

### 3.   Claims and Counterclaims in Adversary Proceeding

At an earlier stage in the adversary proceeding—when the Amended Complaint had not yet

been filed, the Debtor remained the only plaintiff, and the Trustee had recently abandoned the claims in

the complaint back to the Debtor—the Court ordered the parties to show cause why it should not

dismiss the claims asserted in this adversary proceeding without prejudice for lack of subject matter

jurisdiction. The order stated:

> On April 7, 2017, the chapter 7 trustee filed a notice of
> abandonment as to "all of the Debtor's interest in any and all claims or
> potential claims that the Debtor may have against (among others) the four
> defendants" ("the Claims"). No objection having been filed to that notice of
> abandonment, the claims are now deemed abandoned to the Debtor, and
> consequently the Debtor now has standing to prosecute the claims it asserts
> in this adversary proceeding.
>
> For the following reasons, however, the abandonment casts in doubt
> the Court's continuing subject matter jurisdiction over such Claims. The
> abandonment, by definition, has removed the claims from the bankruptcy
> estate. Their adjudication can neither increase nor decrease the estate, the
> distribution to creditors, or the surplus for return to the Debtor. Adjudication
> of the claims would have no effect on the estate or this bankruptcy case. The
> claims therefore fall outside the outer limits of the bankruptcy court's
> "related to" jurisdiction as set forth in 28 U.S.C. § 1334(b) as construed in the
> widely-accepted test set forth in *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir.
> 1984) (related to jurisdiction extends to any matter that conceivably may
> have an effect on the estate in bankruptcy).
>
> For these reasons, the parties are hereby ordered to show cause in
> writing [. . .] why the Bankruptcy Court should not dismiss the claims
> asserted in this adversary proceeding without prejudice for lack of subject
> matter jurisdiction.

Order of April 28, 2017 [Doc. #29 in AP 16-1120]. The Debtor, Filippov, and Lipetsker argued in

response that the Court had subject matter jurisdiction, and the Kagan Parties argued for the opposite

conclusion.

The Court ruled in two parts.  As to the count for equitable subordination that Filippov and

Lipetsker were then intending to assert if permitted to intervene, the Court held that subject matter

jurisdiction existed because the count arises in the bankruptcy case and is in fact a core proceeding,

necessary to determine the priority of claims and interests. As to the remaining counts in the complaint,

all of which were asserted by the Debtor and had been abandoned by the Trustee, the Court stated that

it had subject matter jurisdiction at least to the extent that such claims might operate as defenses in the

nature of setoff to the claims asserted by the Kagan Parties' claims in the bankruptcy case. The Court

reasoned that the adjudication of the Debtor's claims, insofar as the same were being used as setoffs

against the Kagan Parties' claims in the case, was intrinsic to the adjudication of the objections to the

Kagan Parties' claims, which objections are themselves core proceedings. The Court added, however,

that insofar as a particular claim was asserted for an affirmative recovery, over and above what is

necessary to wholly setoff the claim of a particular Kagan Party, subject matter jurisdiction was "less

certain," and the Court reserved judgment as to the same until the close of the evidence.[2] The Court did

not determine at that juncture the extent to which the Debtor *was* advancing its claims for purposes of

setoff, much less that it *could* do so.

The Court then permitted Filippov and Lipetsker to intervene, whereupon they and the Debtor

filed the Amended Complaint, and eventually the Kagan Parties filed their counterclaims. The result is

many additional claims, some involving new parties, that did not exist when the Court initially addressed

its subject matter jurisdiction. And such rulings as the Court did make were not final. I therefore revisit

the subject as follows.

### A.  Equitable Subordination

In Count VIII of the Amended Complaint, Filippov and Lipetsker seek, pursuant to 11 U.S.C. §

510(c)(1), equitable subordination of the claims of the Kagan Parties to the claims of Filippov and

Lipetsker[3]; and in their objection to Kagan's POI, Filippov and Lipetsker seek equitable subordination of

Kagan's equity interest to their own equity interests. The cited § 510(c)(1) provides that subject to

exceptions not applicable here, and after notice and a hearing, "the court may—under principles of

---

[2] The decision had virtually no effect on the length and scope of the parties' presentations at trial.
[3] As Lipetsker has not filed a proof of claim in the case, I regard this request as asserted by Filippov alone.

equitable subordination, subordinate for purposes of distribution, all or part of an allowed claim to all or

part of another allowed claim or all or part of an allowed interest to all or part of another allowed

interest." 11 U.S.C. § 510(c)(1). The Bankruptcy Code thus expressly contemplates and authorizes the

conduct of proceedings for equitable subordination; and the subordination of one claim or interest to

another for purposes of distribution would self-evidently have an effect on an estate being administered

in bankruptcy. Accordingly, as the Court earlier concluded, Count VIII falls squarely within the

bankruptcy jurisdiction established by 28 U.S.C. § 1334(b), both as "arising in" and "related to" a case, if

not also as "arising under" the Bankruptcy Code.[4]

### B.  All Other Counts

The remaining counts of the Amended Complaint and the counterclaims are tort and contract

claims between, on the one side, Filippov, Lipetsker, and the Debtor and, on the other, the Kagan

Parties. All seek relief only in the form of damages. All arise under state law, not under the Bankruptcy

Code. Therefore they do not "arise under" title 11 within the meaning of § 1334(b). And all arose before

this bankruptcy case was commenced, not in the case. Therefore they do not "arise in" a case under title

11 within the meaning of § 1334(b). Lastly, none of these counts can conceivably have an effect on the

estate and its distribution in this bankruptcy case. The recovery of damages by any one of the parties

would inure to the benefit of that party and would not enrich the estate. This is true even of claims

propounded by the Debtor; the Debtor is not the estate administrator, and it may propound the claims

in question only because the Trustee has abandoned them back to the Debtor and thereby removed

them from the estate. For these reasons, none of the remaining counts is even "related to" the

bankruptcy case within the meaning of § 1334(b). I therefore conclude that, with the limited exception

---

[4] The Bankruptcy Code, in § 510(c), permits subordination "under principles of equitable subordination" but is not itself the source of those principles. Does a count for equitable subordination then "arise under" the Bankruptcy Code within the meaning of § 1334(b)?  In view of the clear "arising in" and "related to" jurisdiction for equitable subordination, I need not decide the issue.

of the count for equitable subordination, the claims and counterclaims in the adversary proceeding must be dismissed for lack of subject matter jurisdiction.[5]

**FINDINGS OF FACT**

    **A.  The Parties and their Agreement**

    1.    Kagan emigrated to the United States from Russia in 1995. Since 1997, he has worked in general contracting, exclusively of residences, and has concentrated his business in the development of high-end residences in Brookline and Newton, Massachusetts.

    2.    Since at least 2012, and at all times relevant to this proceeding, Kagan has plied his trade through KDC, a corporation of which he and Tatyana, his wife, have at all relevant times been the sole owners.  Notwithstanding that he shares ownership of KDC with Tatyana, and that at times she has held a greater share of the ownership than he, de facto control of KDC has at all times rested in him alone.

    3.    In the fall of 2012, Kagan, while building a home at 10 Lyman Street in Brookline, became aware that a neighboring property, at 77 Lyman, was for sale. He saw it as a development opportunity and made a $4 million offer to purchase it that was accepted.  He bound the offer with a $1000 deposit and, knowing that he could not finance the project alone, began looking for investors to help fund it. His plan was to demolish the existing house, subdivide the lot, and build two identical luxury homes on spec.

    4.    Lipetsker is a dentist who emigrated to the United States from Russia in 1990. He met Kagan in 1995 or 1996. Eventually they became friends and even vacationed together. By October 2012,

---

[5] In my earlier rulings, I indicated that the Court might yet have jurisdiction over the complaint insofar as its various counts were asserted as part of a defense of setoff to the claims of the Kagan Parties in the bankruptcy case. Jurisdiction would then exist by virtue of the Court's jurisdiction over the claims to which they are advanced as affirmative defenses.  In the Amended Complaint, however, the Debtor, Filippov, and Lipetsker have not advanced the defense of setoff and now seek no rulings of that nature. Therefore, I need not address issues of setoff or of jurisdiction over claims advanced by way of setoff.

Lipetsker had invested in several of Kagan's home development projects, including the development of

10 Lyman Street. In each instance, his experience was positive.

5.        Kagan asked Lipetsker whether he might be interested in the project at 77 Lyman, for

which Kagan believed he would need investment of $2.5 million. Lipetsker, though interested in

participating on a much smaller scale, responded that he didn't have that kind of money. Kagan asked if

he knew anyone who did.

6.        Filippov, who runs a small telecom company, was born in Russia and emigrated to the

United States in 1989. He and Lipetsker have been friends since 1989. They socialize together and have

mutual friends.

7.        At a social gathering in October 2012, Lipetsker told Filippov about the opportunity to

invest in Kagan's project, and Filippov expressed interest.

8.        Lipetsker then introduced Kagan to Filippov. Filippov met with Kagan at the 10 Lyman

Street site on which he was then working, and Kagan, Filippov, and Lipetsker also met after that at the

office of attorney Boris Maiden ("Maiden"). On the basis of these meetings, the three discerned enough

interest among them to proceed to discuss the goals and terms of the project.

9.        They first did this at another meeting at Maiden's office, this one held on October 25,

2012. In attendance were Filippov, Lipetsker, Kagan, Maiden, and Dimitriy Zhukovskiy ("Zhukovskiy").

10.        Maiden, another native Russian speaker, came to the United States in 1980. His legal

practice is focused on conveyancing, real estate, and residential and commercial closings. As of this

meeting, he had known Kagan for roughly a decade, considered him a friend,  and had many times

assisted Kagan in forming limited liability companies through which Kagan and various outside investors

acquired and developed residential real estate for resale at a profit. Maiden had also known Filippov as

a social acquaintance for about a decade, and he had represented him between five and ten times in

purchasing and refinancing his properties. Maiden had known Lipetsker for about fifteen years,

considered him a friend—their offices were near to each other's—and had also done legal work for him.

Maiden had also served many times as a closing attorney for Rockland Trust Company ("Rockland

Trust"), the bank that would eventually make the purchase and construction loans on this project. I

found his testimony to be credible.

11.     Zhukovskiy, also a native Russian speaker, came to the United States in 1993 at age 17.

He is an actuary who in October 2012 had known Kagan for a couple of years, considered him a friend,

and was involved as an investor in another project with Kagan, being developed through the Hyde

Avenue LLC.  Kagan knew him to be good with numbers and spreadsheets. Zhukovskiy is also Lipetsker's

nephew, a long-time acquaintance of Filippov, and husband of an attorney employed in Maiden's office.

I found Zhukovskiy to be a credible witness.

12.     In anticipation of the October 25 meeting, Kagan asked Zhukovskiy to help him update a

presentation that he (Kagan) had routinely provided to his investors in the past, and Zhukovskiy agreed.

Kagan supplied Zhukovskiy with the presentation he'd used in the past. Zhukovskiy updated the format

and inserted numbers—estimates of construction and carrying costs and projected profits—pertinent to

the Lyman-Cutler project. Kagan supplied the numbers: the investment allocation inputs, the project

start and end dates, the lot purchase price, the construction budget, and the anticipated interest rate

for the purchase and construction loans. The only numbers he did not supply were those that could be

extrapolated from those that he had supplied (such as anticipated profits at varying sale dates and sale

prices).  The construction costs he inserted, $1.3 million per house, were numbers that Kagan had given

him.  A night or two before October 25, after completing the updated materials, Zhukovskiy emailed

them to Kagan and asked whether he'd gotten the numbers correctly and if that's what he'd expected,

and Kagan answered yes.

13.     The Court discredits Kagan's testimony denying that he worked with Zhukovskiy to

create the presentation and denying especially that he'd provided the construction cost numbers for the

presentation. The documentary evidence and Zhukovskiy, Filippov, Lipetsker, and Maiden, all credible witnesses, contradict him.

14.      On this issue, many others, and in general, I find Kagan to be wholly lacking in credibility. I hesitate to credit his testimony on any point, save where it is corroborated (and then only on the strength of the corroboration) or when contrary to his interest.

15.      At the October 25 meeting, Kagan presented to Filippov and Lipetsker the presentation he and Zhukovskiy had created. The presentation projected total construction and carrying costs of $1.5 million per home, comprised of $1.3 million in construction costs and $200,000 in carrying costs. Kagan presented numerous different profit scenarios, varying based upon the time to sell the property and the selling price. Every one of the scenarios was based on the same cost of construction, $1.3 million per home.

16.      The consistent testimony of the four other attendees at the October 25 meeting, which I credit, was that Kagan assured Filippov and Lipetsker at that meeting that he knew how much it would cost to build each home and that they could rely on his estimated costs of construction.

17.      Kagan denied this. He testified that it would have been impossible for him to know at that juncture—when they did not know whether they'd be permitted to subdivide the property and the size and shape limitations that would be dictated in part by the manner of subdivision (if permitted), and when no construction plans had yet been drawn—what the costs of construction would be. I find that many variables were yet uncertain, but I further find that Kagan nonetheless assured Filippov and Lipetsker that they could rely on the $1.3 million figure. Zhukovskiy testified credibly: "I remember Mr. Filippov asked a question: how do we know that we can build it at $1.3 million?"  "Mr. Kagan essentially repeated what he told to me. He said, I built many houses and I know how much it costs. And he said, yeah, I know all projects are different, so there will be a little variation here, but nothing that would drastically change these results." Maiden testified that "the numbers were very intrinsic to the whole

negotiations from whether Filippov is going to go into it or not to go into it—that was what they were

deciding." And Maiden further testified that, to get Filippov on board, Kagan gave him "assurances" that

the construction numbers they were working with at that meeting were reliable. I credit the testimony

of Maiden and Zhukovskiy and discredit Kagan's denial that he made assurances regarding the costs of

construction.

18.     Also, at the October 25 meeting, Kagan told Filippov that the carrying costs for the

project—especially the interest payments on the purchase and construction loans—would be paid from

the construction loan, and that they would get enough to do this by inflating by $200,000 the

construction budget that they would submit to the lending bank. Kagan indicated that this was common

practice—every developer did it—and that he himself had done this on many of his other projects.

Maiden was present for this. No one expressed concern about this being proper practice. The parties

accordingly went forward on the understanding that they would borrow $1.5 million for each home,

which sum would fund construction costs of $1.3 million and carrying costs of $200,000. Kagan's denials

that he made these statements and that he proposed and agreed to paying carrying costs from loan

proceeds is flatly not credible. The evidence shows that it had been the consistent practice of the

various LLCs through which he had previously developed homes to pay carrying costs from the

construction loan. The operating agreements—ten were adduced—for these LLCs consistently and

expressly provided that carrying costs would be funded from their construction loans. There was no

evidence of any operating agreement in which a Kagan LLC did not borrow the carrying costs. Kagan

nonetheless testified that despite the language in these various operating agreements obligating the

companies to fund carrying costs from construction loans, none of them actually did fund carrying costs

from construction loans. This testimony was not credible and not corroborated.

19.     On the basis of Kagan's presentation at this meeting, Filippov, Lipetsker, and Kagan next

proceeded over the next three weeks to negotiate an operating agreement to form a limited liability

company through which they would execute their project. The negotiations occurred primarily between Filippov and Kagan—Lipetsker mostly deferred to them—and were conducted through Maiden.

20.     Maiden had many times represented Kagan in the drafting and formation of the operating agreements for the limited liability companies that he had formed with various investors. Throughout the period of negotiating the Lyman-Cutler operating agreement, Filippov understood Maiden to be representing Kagan in the negotiations. Maiden testified that he operated as nothing more than a glorified scribe, essentially a go-between.

21.     The negotiations began with a form of operating agreement that Maiden had routinely used in the formation of other limited liability companies for Kagan.  Maiden would email drafts to Filippov, who would respond by email. Sometimes they would converse by telephone. Most of the email between Maiden and Filippov was sent also to Kagan, but some was not. In any event, Maiden testified credibly that he vetted with Kagan each and every change that Filippov sought (or that was otherwise made) in the operating agreement. Kagan's contention that he was unaware of various terms in the operating agreement when he ultimately signed it is not credible.

22.     Kagan would have the Court find that Maiden and Filippov negotiated key terms of the Operating Agreement in private and deliberately, or at least effectively, conspired to and did keep him out of the loop about them. The evidence shows, and I find, that as to the vast majority of the terms, Kagan received all the relevant communications in the forms of emails with attached revisions of the Operating Agreement. There were a few emails Kagan was not copied on; and there were telephone conversations between Filippov and Maiden to which Kagan was not a party. None of these were deliberate attempts to hide anything from Kagan. And I further find (as above) that Maiden informed Kagan of each and every relevant development—each request by Filippov to change a term.  Maiden testified credibly that Kagan visited him in his office almost every day and that, during these visits and also in telephone conversations, he would vet the proposed changes with Kagan. Filippov was not

present for these discussions (but does not complain that they somehow kept *him* out of the loop). If anything, Kagan enjoyed a great deal more private discussion with Maiden, the intermediary/scribe, about the terms than Filippov did. There is no substance to Kagan's allegation of being kept in the dark about changes and terms in the Operating Agreement. His contention to the contrary is disingenuous and, I find, an attempt to create a false narrative.

23.     On November 14, 2012, Kagan, Lipetsker, and Filippov signed the operating agreement (the "Operating Agreement") and thereby created a Massachusetts limited liability company to be known as Lyman-Cutler, LLC ("the LLC" or "the Company"). Its terms included the following:

    a.     **Capital Contributions:**  As set forth in Schedule A to the Operating Agreement, the members and their respective capital contributions and percentage interests were:

| | | | |
|---|---|---|---|
| i. | Filippov | $2,000,000 | 80% |
| ii. | Lipetsker | $250,000 | 10% |
| iii. | Kagan | $250,000 | 10% |

    b.     **Managing Member:** By designation in the signature block, Filippov was named the managing member; no other member was named a managing member.

    c.     **Maintenance of Capital Accounts:** "To the extent consistent with such regulations [under the Internal Revenue Code of 1986], there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company[.]" Operating Agreement, § 4.4.

    d.     **Duty and Compensation of Mr. Kagan:**  "It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member. The construction shall be substantially completed no later than March 30, 2014. It is specifically understood by all members

that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below." Operating

Agreement, § 5.2.

    i.  The "plans" to which this paragraph refers, and the only plans approved by

        Filippov as managing member, were the financial plans consisting of the

        maximum construction budget of $1.3 million per home (as adjusted to $1.4

        million for maximum construction costs per home in May 2013) plus $200,000 in

        carrying costs per home.

e.  **Payment of Carrying Costs through Month 23:** "Purchase Money Loan and Construction

    Loan shall be taken from Rockland Trust Company to pay for construction and carrying

    costs until the issuance of Certificates of Occupancy (hereinafter "CO") but in no event

    more than 23 months after the date of acquisition." Operating Agreement, § 4.1.

    i.  "Carrying costs shall be defined to include but not limited to mortgage

        payments, taxes and insurance for the subject property 77 Lyman Road,

        Brookline, Massachusetts." Operating Agreement, § 4.2.

    ii.  "'Date of Acquisition' shall refer to deed recording date for Lyman Road

        Brookline property into the Company." Operating Agreement, § 1.1(e).

f.  **Payment of Carrying Costs after Month 23:**

    i.  "In the event that a CO for each lot is not issued within twenty three (23)

        months from the date of acquisition then Mr. Kagan will be responsible for all

        carrying costs until such time as CO's are issued." Operating Agreement, § 4.2.

    ii.  "In the event that the property is not sold within twenty three (23) months from

        the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs

        until such time as the property is sold. If Mr. Kagan fails to pay monthly carrying

        costs, then Mr. Filippov shall be responsible to contribute the necessary carrying

costs, and subsequently his capital contribution and percentage interest in the company shall increase by the same amount and percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the company." Operating Agreement, § 8.1.

g. **Distribution to Members:** "The distribution to members shall be in accordance with their respective Capital Contributions first, however, an additional five (5%) percent per annum based upon Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition." Operating Agreement, § 8.2.  The "five percent" clause in this section was inserted at Filippov's request. He testified at trial that the phrase "for each day" should have read "for each year," such that the distribution on account of member's contributions would be augmented by five percent, paid out of Kagan's share of profits, for each *year*, not day, that the property is not sold after twenty-three months of acquisition.

h. **Allocations of Profits:** "The net profits, net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (40%), Mr. Nickolay Lipetsker (10%), and Mr. Kagan (50%)." Operating Agreement, § 8.1.

i. **Winding Up of the Company:** "Upon dissolution of the Company, the remaining Member or, if more than one Member remains, the member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2.  The assets shall first be applied to the payment of the liabilities of the

Company (other than any loans that may have been made by Members to the Company) and to the expenses of liquidation. [. . .]  The remaining assets shall next be applied to the repayment of any loans made by the Members to the Company. All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods." Operating Agreement, § 9.2.

j.  **Listing with Tatiana:** "The Managing Member hereby agrees to list the properties with Tatiana Kagan. In order to remove Tatiana Kagan as a listing broker by December 31, 2014 will require a written consent of at least eighty-one percent (81%) of the Percentage Interests in the Company. After December 31, 2014, no such consent shall be required." Operating Agreement, § 6.1(b)(6).

k.  **Term:**  "The term of the Company shall commence on the date of the filing of the Certificate of Organization in the Commonwealth of Massachusetts Secretary of State's Office and shall continue until November 30, 2015 unless dissolved before such date in accordance with the provisions of this Agreement."  Operating Agreement, § 2.3.

l.  **Indemnification:**  "The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable (sic) believed to be within the scope of authority conferred by this Agreement, except that no Member, employee or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct[.]" Operating Agreement, § 10.2.

m. **Governing Law:** "The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts." Operating Agreement, § 11.1.

n. **Authority of Managing Member:** "[T]he powers of the Managing Member shall include, but not be limited to, the following: (1) to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as may be deemed necessary or advisable by Managing Member; (2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters; . . . [and] (5) to take such other action and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company." Operating Agreement, § 6.1(b)(1), (2), & (5).

24.     The Operating Agreement gave Kagan a disproportionate share of the profits: though his equity contribution was only ten percent of the whole, he was to receive fully fifty percent of profits. This was a negotiated term to which Filippov assented, because it constituted compensation to Kagan for constructing the homes, and because it incentivized Kagan to complete the project timely. Filippov wanted the Operating Agreement to reflect that in exchange for his fifty percent share of profits, Kagan was assuming the responsibility for constructing the homes, and that his compensation for doing so was limited to his fifty percent share of profits. Kagan agreed to this, and this term was added as § 5.2 of the Operating Agreement. On the basis of the Operating Agreement and the discussions that preceded it, it is clear that Filippov and Kagan mutually understood that they were agreeing that Kagan would be responsible for constructing the homes and that the LLC would fund and remunerate him for this in two

ways: by making available to him $1.3 million per home in construction funding (later increased to $1.4

million by agreement), and by allocating to him fifty percent of net profits, as provided in § 8.1.

25.    Kagan seeks findings that the members agreed (i) that they would borrow $1.6 million

per home for construction funding (no portion of which would be dedicated to carrying costs) and (ii)

that the LLC's commitment to fund the effort was open-ended, not limited to these two components. I

reject both proposed findings as contrary to a strong preponderance of the evidence and the terms of

the Operating Agreement.

**B.    The Purchase and Construction Loans**

26.    After execution of the Operating Agreement, Filippov, as managing member, arranged

for the LLC to obtain a $1.6 million purchase loan from Rockland Trust and to acquire the property at 77

Lyman Road for $4 million. The closing occurred on December 28, 2012; Maiden conducted the closing

on behalf of the lender.  The deed into the LLC was recorded on December 31, 2012, which, by virtue of

being the recording date, became the "date of acquisition" as that term is used in the Operating

Agreement.  As Kagan acknowledged, the LLC borrowed $1.6 million so that, after using their total

equity contributions of $2.5 million and purchase loan proceeds of $1.5 million to pay the $4 million

purchase price, $100,000 would remain in the LLC's coffers to fund carrying costs and other expenses in

the early months.

27.    Filippov opened a bank account at Rockland Trust for the LLC (the "LLC Account"). Bank

statements and copies of all checks written on the account were sent directly to him at his home

address. Filippov also had online access to the LLC Account. Kagan had authority to write checks against

the LLC Account.

28.    In February 2013, Filippov, as managing member, began the process of applying to

Rockland Trust for the construction loans. The loan officer told Filippov that the LLC would need to

submit, as part of the application process, construction plans and a construction budget for each house.

He also said that to keep matters clean, the Bank would treat the application as one for two separate construction loans, one for each house, which would make it "much easier to match draw down requests with work completed."

29.    For the construction plans and construction budgets, Filippov, on February 19, 2013, turned to Kagan, saying it's in your hands; Kagan emailed a response the next day, saying that he was working on the plans. No plans were forthcoming for some time.

30.    On April 9, 2013, Filippov, Lipetsker, Kagan, and Maiden had a meeting at Maiden's office so that Kagan could update them on his progress. At this meeting, Kagan proposed increasing the construction budget for each house from $1.3 to $1.4 million. His idea was that by increasing the construction budget, they would be able to significantly raise the price at which they hoped to sell each house, rendering the project more profitable.  The proposal was not immediately accepted by the other members. Filippov was especially concerned that the increase in borrowing costs would leave them $16,000 short for each home, for little extra return. On April 13, 2013, he sent the following email to Kagan: "Kolya [Lipetsker], Borya [Maiden], and I discussed the issue of how much we should loan from the bank. All three of us agree that we should be going by the numbers we agreed when we formed the LLC, and apply for 1.5 million for each house: 1.3 million construction, and .2 million carrying costs. " After consulting Zhukovskiy, however, Filippov came to understand that the increased borrowing would not in fact put them out of budget; and he, Lipetsker, and Kagan agreed to modify their agreement, such that they would now borrow $1.6 million per house, including $1.4 million for construction and $200,000 for carrying costs.

31.    To support the loan application, Kagan forwarded to Rockland Trust a rudimentary construction budget for each of the two homes, each in the total amount of $1,600,000.  The amounts for the various line items were inflated by Kagan to include, in addition to the budgeted $1.4 million per home for construction costs, $200,000 for carrying costs, so that a one-eighth fraction of each

disbursement by the lender would be available to fund closing costs. These budgets were included among the closing documents when these loans finally closed.

32.     Filippov arranged to borrow $1.6 million for the construction of each home from Rockland Trust. The three members all understood and agreed that this sum included $200,000 per home for carrying costs. The closing of the construction loans occurred on June 18, 2013. Maiden acted as the closing attorney for the lender.

33.     The Rockland Trust loan documents contain a term prohibiting the borrowing of carrying costs, but Filippov was unaware of it and had no reason to believe the LLC could not borrow the carrying costs. To the contrary, both Kagan and Maiden, who had represented this same lender in numerous similar construction loan closings, told him that this was standard practice. There was no deception of the lender: Maiden was the closing attorney for the lender in this very transaction and knew the LLC intended to use $200,000 of the proceeds of each loan to fund carrying costs. Where Maiden had told Filippov that he could borrow the carrying costs, Filippov had no reason to believe there was anything wrong with doing so. Kagan's argument to the contrary, especially where he (i) regularly borrowed carrying costs in the limited liability companies of which he was a member, (ii) inserted a requirement that he do so in the Operating Agreement (that term was part of the standard form that Maiden used for Kagan-related operating agreement), and (iii) urged Filippov to borrow carrying costs in this very instance, is more cause to find him wholly lacking in credibility.

34.     Rockland Trust required a fully-executed construction contract to support the construction loan application. Maiden, who had a form construction contract that he had used for other Kagan projects, used that form contract as part of the loan application that he prepared for the Lyman-Cutler project. The form contract that he used was for a company that Kagan had previously owned and operated, known as Classic Homes Development & Construction, Inc. ("Classic Homes"). The Classic Homes contract is a contract to build two homes, at 55 Lyman and 88 Cutler in Brookline, between

Classic Homes as builder and Lyman-Cutler LLC as owner. It obligates the builder to build two homes in

accordance with plans that it leaves unspecified, so query whether it actually imposes any obligation at

all.  At the closing, Filippov signed it for the LLC, having been told by Maiden that it was just a formality

required by the lender; and Kagan signed it for Classic Homes, without any knowledge whatsoever of

what it was he was signing or even that such a contract might be among the closing-related documents

that Maiden told him to sign.

35.    All parties agree that at the time of these events, Classic Homes was defunct. Maiden

used this form contract with a defunct company as a dummy contract, to satisfy the lender's pro forma

requirement in a situation where there was no construction contract (other than the Operating

Agreement itself, through which the LLC effectively hired Kagan himself as the contractor). It is

undisputed that Classic Homes performed no services on the Lyman-Cutler project and has not filed a

proof of claim in this case; no member of the LLC, even Kagan, ever intended to employ Classic Homes

on the Lyman-Cutler project.

36.    The Classic Homes contract is a not a fixed-price contract but a cost contract, one whose

cost to the owner is dependent (at least in part) on the extent of the costs incurred by the contractor in

completing the project. The contract price is specified simply as follows: "As consideration for the

builder constructing the house, the owner agrees to pay the builder's contractors and trades, full costs

and expenses on a weekly basis." Kagan seeks a finding that the open-ended nature of this agreement is

"consistent with the parties' understanding that the total construction costs were still unknown." In

other words, he would have the Court find that Filippov's signing of this contract is evidence that he and

Kagan understood the Operating Agreement to be open-ended, not fixed, as to construction costs. I

reject that finding, because the Classic Homes contract was signed by Filippov with the understanding

that it was an inconsequential formality, with a defunct entity, and signed by Kagan without any idea of

what he was signing. It discloses nothing about Filippov's and Kagan's understandings of the Operating Agreement.

### C.  Construction of the Homes

37.    Upon the LLC's acquisition of the property in late December 2012, Kagan's first responsibility, from a construction standpoint, was to obtain permission from the Town of Brookline to subdivide the property. The members had expected this to be done by early March, but it was not completed until May or early June, 2013.

38.    Kagan applied to the Town of Brookline for a permit to demolish 77 Lyman Road on April 26, 2013, and the Town issued the permit on May 2, 2013.

39.    The architectural plans for the property, some 14 separate pages, are dated on diverse dates from as early as May 3 to as late as May 23, 2013. Kagan had them in hand well before the closing of the construction loans.

40.    Upon Kagan's application, the Town issued building permits for the properties on July 23, 2013.  Construction started shortly thereafter.

41.    As Kagan conceded, the foundations for both properties were inspected and approved by the Town on August 23, 2013.

42.    Kagan testified that on many occasions during construction, while Filippov or Lipetsker was visiting the construction site, Kagan indicated to them that he was considering upgrading various features of the homes and, to accommodate these upgrades, increasing the LLC's construction budget, and that Filippov and Lipetsker then routinely approved each and every such upgrade and budget increase, aggregating at least $100,000 and perhaps $200,000 per house. Kagan contends that in this way he upgraded absolutely every element of both homes. Both Filippov and Lipetsker denied that Kagan asked them, separately or together, even once about proposed upgrades, construction cost increases, or cost overruns. Kagan concedes that he never had written specifications for the project, and

Kagan does not contend that any agreement to increase the LLC's construction funding beyond $1.4 million per home was ever put in writing. I credit the testimony of Filippov and Lipetsker and find Kagan's not credible. At no time after Filippov approved the increase in the maximum construction budget to $1.4 million did Kagan ever again ask Filippov or Lipetsker to approve a project upgrade or construction cost increase.

43.    Neither house was substantially completed by March 30, 2014.

44.    In July 2014 (the precise date is not in evidence), Filippov visited the properties. He found that the 55 Lyman was far from done; among other things, its floors were not done and interior walls were not painted. He said 88 Cutler was "closer to finishing."

45.    Kagan himself reported, in an email to Filippov of Friday, July 25, 2014: "88 Cutler:  Sod installation is scheduled for next Friday and final cleaning also scheduled for next Friday. It means the project will be done on 98% [sic] and we will have only some touch-ups. 55 Lyman: Right now we are doing Hardwood Floor. It'll be completed in 10 days. When the floor will be finished we'll be completed on 90% [sic] with this house. Driveway will be done next week. Sod is going to be done in two weeks. Estimated complete time between 3-4 weeks."

46.    Three weeks later, Filippov asked Kagan for another update. Kagan responded through Kristina Brusenkova on Friday, August 15, 2014: "88 Cutler is 100% complete. There is staging in the house and it is open for showing. . . .  55 Lyman Rd will be on 98% [sic] complete at the end of next week, including landscaping."

47.    I find that the properties were no more advanced than Kagan reported them in these emails of July 25 and August 15, 2014; I do not find, on the strength of these reports, that they were necessarily as advanced as Kagan reported. Filippov had asked for weekly updates from Kagan in this period, from the last week of July going forward. These are the only reports Kagan sent him. I understand the lack of reports after August 15 to be an indication that progress on 55 Lyman was slow.

48.     Filippov testified that 88 Cutler was completed at the end of July or beginning of August. On the basis of the detail in the emails above, I find that 88 Cutler was completed in the first two weeks of August 2014 but substantially complete as of the very end of July. 55 Lyman was substantially complete no sooner than the end of August 2014.

49.     The Town of Brookline issued certificates of occupancy for 55 Lyman Road and 88 Cutler Lane on October 2, 2014.

50.     Upon issuance of the certificates of occupancy, Kagan applied to Rockland Trust for disbursement of the last of the construction loan proceeds, and Rockland Trust did disburse the remaining loan proceeds.

51.     As if to suggest that after completing the homes he had delayed for some time in obtaining the certificates of occupancy, Kagan testified at trial that he usually applies for a certificate of occupancy on a project just before the closing, and that he does so for two reasons: once the certificate is issued, (i) the property is assessed for real estate taxes at its improved value, and (ii) any further work on the property—such as for custom changes requested by a prospective purchaser—would require the time and expense of obtaining a new permit. Kagan did not testify that he delayed obtaining the certificates of occupancy for the Lyman and Cutler homes for these reasons or any other, and I find that he did not. On October 2, 2014, no sale of either home was in prospect, and the LLC would continue to own and pay real estate taxes on the properties for many months to come.

52.     The late completion of the houses—Kagan was obligated under the Operating Agreement to complete construction by March 30, 2014—caused the LLC to miss the bulk of the 2014 selling season.

**D.  KDC**

53.     KDC is a Massachusetts corporation of which Kagan and Tatiana have at all relevant times been the sole owners.  Any profits it makes flow straight to them.

54.     KDC does all of its construction work through subcontractors. KDC employs no construction workers and does none of the construction work on its projects.

55.     The only employee of KDC who was involved in construction in any way was Kagan himself, who provided the services of a general contractor. On each of KDC's projects, he would oversee the project from beginning to end: procure the plans, secure the necessary permits, purchase the materials, hire, supervise, and pay the subcontractors, and obtain the certificate of occupancy.

56.     On the Lyman-Cutler project, Kagan was obligated by the Operating Agreement to provide these general contracting services to the LLC. He understood that for his work as a general contractor on the Lyman-Cutler project, he was not being paid for his time and efforts except by his share of the profits.

57.     The only other employees of KDC whom KDC alleges performed work on the Lyman-Cutler project of any kind were an office manager, Ryan O'Grady, whom Kagan alleges was in KDC's employ on August 21, 2013; bookkeeper Kristina Brusenkova, who started providing services to KDC as an employee of KDC's outside accountant, Agronovich Accounting, in June or July of 2013, then was hired as KDC's in-house bookkeeper in November 2013 and remained in its employ through October 25 or 26, 2014, after construction was complete; and later Dan Gersh, who was hired in December 2014 as a bookkeeper with the title chief financial officer and remained in KDC's employ as of the dates he testified in this matter in 2019. Brusenkova testified that during her employ, KDC also employed another bookkeeper, whom she identified only as Marsha, for four months, I have no evidence that KDC had other employees than these during the Lyman-Cutler project.

58.     The work done by the employees other than Kagan was in the nature of accounting for and filing the invoices of material suppliers and subcontractors, sending payments to the same for their work on the project (this is not a finding that it used monies of its own to make these payments—the

payments were made from funds supplied by the LLC), and occasionally handling correspondence or communications for Kagan in conjunction with the project.

59.    KDC also contributed to the project by using its credit, an American Express credit card account that Kagan testified was dedicated to and used exclusively for the Lyman-Cutler project.

60.    KDC also contributed funds to the project by funding the LLC Account when and as necessary to enable the LLC to pay carrying costs.  My findings on the manner and extent of this funding are set forth below.

61.    KDC contends that Kagan, Filippov, and Lipetsker understood from the beginning that KDC would be doing the construction on the Lyman-Cutler project.  The evidence does not support such a finding.

> a.    Lipetsker testified that he understood that Kagan, "through his company, Kagan Development, was to serve as the general contractor for the project."  He clarified, however, that this was an assumption he made, on the basis of his knowledge of Kagan's usual practice; Lipetsker had invested in other Kagan projects. Lipetsker, however, did not actively participate in the negotiation of the Lyman-Cutler Operating Agreement, at least not nearly as extensively as did Filippov and Kagan, and his assumption cannot be taken as indicative of the negotiations and representations made concerning this project.

> b.    Filippov testified credibly that he had not ever had discussions with Kagan about Kagan's hiring KDC as a general contractor on the Lyman-Cutler project. Much less had he and Kagan ever discussed the possibility of the LLC's paying various fees and charges for such services.

> c.    KDC cites an email from Maiden to Filippov in November 2012, during the negotiation of the Operating Agreement, as evidence that Filippov knew that KDC would be doing the

construction.  In the email in question, Maiden stated: "In the past, the bank required

that LLC to sign contract with Kagan Development. Do you want to handle it the same

way? I'm in the office. Please give me a call." There is no evidence of the ensuing

discussion. It is clear, however, that the closing documents did not include a contract

with Kagan Development, only the dummy Classic Homes contract. And Maiden's

statement about what Rockland Trust had required in the past is not evidence of the

understanding among the members.

d.  I find that, upon their entry into the Operating Agreement, there was no agreement

among the members that KDC would be doing the construction work on the Lyman-

Cutler project. I further find that Kagan had not even broached the subject with Filippov

and Lipetsker.  Nor did he do so at any time after the signing of the Operating

Agreement or during the project.

62.    KDC asks the Court to find that Kagan, on behalf of both the LLC and of KDC, signed and

thereby committed both the LLC and KDC to a construction agreement entitled Construction

Management/General Contractor Agreement for the construction of the homes at 55 Lyman Road and

88 Cutler Lane [the "KDC Contract"], the document admitted into evidence as Exhibits 37 and 211. This

alleged contract is the basis of the claim asserted in KDC's Proof of Claim #1-2. The document recites, in

its opening sentence, that "[t]his agreement is made and entered into June 24, 2013," but after each of

his signatures at the end of the document, Kagan indicated that his date of signature was July 24, 2013.

Perhaps for this reason, KDC does not ask the Court for a finding as to precisely when this alleged

contract was executed; KDC does however seek a finding that a signed version of this contract was

circulated by email to Filippov and Lipetsker on August 21, 2013. Filippov, Lipetsker, and the Debtor

maintain and seek a finding that the KDC Contract was fabricated, executed, and deliberately back-dated

much later, only in June of 2015, long after construction had been completed; and the evidence to

support their position is strong, extensive, and persuasive. By a clear preponderance of the evidence,

which I will set forth below, at the chronological point where this document was fabricated, I find that

the KDC Contract did not exist during the construction of the Lyman-Cutler homes.

63.     KDC would further have the Court find that Filippov and Lipetsker knew while the homes

were being built that KDC was building the homes and did not object. This proposed finding requires

proof first that KDC did build the homes, and then that Filippov and Lipetsker were aware of its efforts.

The homes were built by a general contractor, Kagan, and the subcontractors he hired. Kagan was

obligated to do the work by the Operating Agreement.  When Filippov and Lipetsker saw Kagan working

on the homes, they saw Kagan, not KDC, doing what he was obligated by the Operating Agreement to

do. That Kagan was at the time the principal of KDC did not make his work KDC's. The subcontractors,

who did all of the actual construction, were independent contractors; none of them were employees of

KDC. Their presence on the site was no more evidence that KDC was doing the building than that Kagan

was. There was evidence that Kagan had placed KDC signage on the site. The mere placing of a sign did

not make the work KDC's. So the premise of this proposed finding, that KDC did the work, is not proven.

Kagan built the homes with the help of subcontractors. KDC's role in the effort was limited to provision

of bookkeeping, clerical help, and funding.

64.     Filippov was aware, to a limited extent, that Kagan was using KDC's bookkeeping staff

on Lyman-Cutler related work. He was also aware that Kagan was contributing funds to the LLC Account

when necessary to enable the LLC to pay carrying costs; it is not established that he knew the source of

these funds was the KDC Account and not a personal account belonging to Kagan himself. KDC has not

established that Lipetsker was aware during the construction of the homes of the efforts of KDC's

bookkeeping staff or of funding contributions from KDC.

65.     During the construction of the homes, neither Kagan nor KDC kept an accounting, a

running tally, of the construction costs for 55 Lyman and 88 Cutler or the project as a whole.  Kagan had

no accounting system other than that maintained by KDC, and KDC's bookkeeping system was, during the construction of the Lyman-Cutler homes, not set up to account for work on a project-by-project basis. Rather, invoices from subcontractors for their work on various projects were kept in paper form in files grouped by subcontractor.

66.     During this project, and starting in 2013, KDC began keeping some of its books and accounts electronically, by employment of QuickBooks bookkeeping software.  The QuickBooks software was introduced by KDC's outside accountant, who supplied one of its employees each week (not always the same employee) to enter data through the software. Brusenkova first did accounting work for KDC as one of these employees. She continued this work as an employee of KDC from November 2013 through later October 2014. At no time during her tenure were the QuickBooks software, and the data entered through it, and the persons using it—mostly just Brusenkova—capable of  accounting for the Lyman-Cutler project as a whole, or the construction of either 55 Lyman or 88 Cutler separately. Kagan had no facility with QuickBooks or other computer software and relied entirely on his staff in this regard.

67.     When, in May and June 2015, it became necessary for KDC to provide an itemized accounting of the costs and charges that it contended it had incurred in the course of the Lyman-Cutler project, Kagan had his chief financial officer, Dan Gersh, work on providing the accounting and documentation. The effort was largely remedial because records had not been properly kept in the first instance. Aside from a few weeks of vacation in late-May, Gersh worked almost full time on the project from May through September 2015. He estimated that he spent 790 hours on Lyman-Cutler, the vast majority of it during these five months.

**E.    Payments of Carrying Costs, and Transfers Between KDC and the LLC Account: First 23 Months**

68.     The members agreed in the Operating Agreement that the "carrying costs" that would be funded with construction loan proceeds include but are not limited to mortgage payments, taxes, and insurance for the subject property. The members also intended to include other unspecified costs

33

that the LLC would need to fund that were not directly related to construction of the home. In addition to debt service, taxes, and insurance, I find, these included loan closing costs, bank service charges, accountant's fees, the secretary of state's fee for the LLC's annual report, and utility charges incurred before construction began and after it ended (but utility charges incurred during construction served the construction effort and therefore are counted as construction costs).

69.     In the first twenty-three months of the project, from the Date of Acquisition through November 2014, debt service on the purchase and construction loans was paid by the LLC from the LLC Account. These payments were made by Arina Rudyakova, Filippov's wife, whom Filippov had asked to handle this responsibility on his behalf.  The payments from the LLC Account through November 28, 2014, totaled $147,777.66 on the Purchase Loan, $61,724.16 on Construction Loan #8800, and $56,687.59 on Construction Loan #8900, for total debt service payments through month 23 of $266,189.71.

70.     Also in the first 23 months of the project, the LLC made payments from the LLC Account totaling $115,923.56 on other carrying costs. These included $105,443.76 for real estate taxes, $6,732.00 for property insurance, $2,000.00 for accountant's fees, $35.80 for service charges to Rockland Trust, $1,192.00 in preconstruction utilities, and $520.00 to the Massachusetts Secretary of State in conjunction with the LLC's annual report.

71.     In addition, at the very beginning of the project, the LLC paid $41,977.17 from the proceeds of the Purchase Loan for closing costs (points, legal fees, title insurance, title search, and recording fees). These funds were disbursed at the closing before the proceeds could even reach the LLC Account.  KDC seeks a determination that a further $42,466.59 was paid in additional "settlement charges," probably for closing costs related to the closing of the construction loans, but no evidence has been adduced of this payment or amount.

72.     Carrying costs in the first twenty-three months of the project thus totaled $424,090.44

[$266,189.71 + $115,923.56 + $41,977.17 = $424,090.44].

73.     In its Proof of Claim #1-2, KDC seeks compensation for, among other things, "[t]otal

Carrying Costs advanced by KDC from July 1, 2013 through June 10, 2015: $665,545.49." In support of

this item, the proof of claim includes a list of Carrying Costs, broken down by 17 different categories but

without an itemization of the individual advances, totaling $665,545.49. The evidence shows, and I find,

that KDC did not make the vast majority of the payments of carrying costs in this list. In particular, KDC

did not pay even a single item in the following 12 categories:

| Category | Amount | Payment |
|---|---|---|
| LLC Annual Report | $1,040.00 | Both payments made by LLC. |
| Bank Service Charges | $5,298.18 | No evidence adduced of these payments. |
| Insurance Expense | $17,051.56 | All payments made by LLC. |
| Interest on Purchase Loan | $186,199.99 | All payments made by LLC. |
| Interest on First Const. Loan | $99,903.51 | All payments made by LLC. |
| Interest on Second Const. Loan | $94,905.12 | All payments made by LLC. |
| Office Expenses | $47.06 | All payments made by LLC. |
| Professional Services | $2,000.00 | All payments made by LLC. |
| Settlement Charges | $84,380.17 | LLC paid $41,977.17.  No evidence of further payment. |
| Property Taxes | $132,265.19 | All payments made by LLC. |
| Disposal | $763.44 | All payments made by LLC. |
| Water | $4,133.23 | LLC paid $3,973.23. No evidence of further payment. |

Regarding the remaining five categories, I make the following findings:

a)  KDC contends that it made advances of carrying costs to National Grid, a natural gas

utility, totaling $5,820.51.  The evidence shows that the LLC made all but $408.27 of

these payments and that KDC paid only $408.27.  This payment was not a carrying cost

because it was made during construction and served construction purposes.

b)  KDC contends that it made advances of carrying costs to NSTAR, an electrical utility,

totaling $6,701.60.  The evidence shows that the LLC paid $5,542.27 of this sum, that

KDC paid only $500.00, and that there is no evidence of payment of the balance.  The

$500.00 paid by KDC was a carrying cost, as it pertained to the period before the start of

construction.  The ledger sheet by which KDC accounts for this and the other NSTAR

payments it contends it made indicates, with respect to this payment, that KDC has

already been reimbursed for it by a check it wrote to itself against the LLC Account,

Check # 1078 of October 1, 2013.  The records of the LLC Account show that this check

was in the amount of $28,697.00 and bore the notation "reimbursement." I find that

KDC has already been reimbursed for this advance.

c) KDC contends that it made advances of carrying costs to VIS Home Photography in the

amount of $648.50. As to these, KDC has adduced evidence that payment was received

by the vendor, but no evidence as to the source of the payments made. The evidence is

an email sent by the vendor to Tatiana. I have received testimony from both Kagan and

Tatiana that she had no role in the Lyman-Cutler project except as a broker employed by

Century 21. Therefore, it is not clear even that KDC was the party with whom the vendor

contracted. Where I have already found that KDC has sought credit for over $600,000 in

payments it did not make, I am not inclined to give it the benefit of any doubt as to

whether it retained this vendor and made the payments in issue. For these reasons, I

find that KDC has failed to carry its burden as to these alleged advances.

d) KDC contends that it made advances of carrying costs to Affordable Home Sprinklers in

the amount of $315.00. The payments in question appear from the invoices submitted

into evidence to be for turning on sprinklers and installing sprinkler heads, spray heads,

and nozzles, all on May 6, 2015.  No testimony was provided as to this work or the bill

and payment. I find and rule that the service in question is a construction expense, not a

carrying expense. In addition, the only proof of KDC's payment of this item indicates

that payment was made by a Visa credit card, but I have evidence that KDC used an

American Express account for all its credit card expenditures on its projects, so I doubt the veracity of the evidence of payment and find that KDC has not carried its burden as to this item.

e) KDC contends that it made advances of carrying costs to a vendor, Instant Interiors, in the amount of $24,072.73. The documents submitted in support of this item indicate that this alleged payment is for the rental of furniture for the staging of the houses, first 88 Cutler (from August 2014 to April 2015) and then 55 Lyman (from April to October 2015). No testimony was offered regarding these alleged advances or to explain or authenticate the documents. Of the 13 documents submitted as evidence of these advances, only one, which amounts to an invoice for $6,768.75, bears any evidence of payment. I have no evidence as to the balance of the alleged payments. The one "invoice" for $6,768.75 has a number of irregularities. It identifies the client as "Kagan Development," but the only evident contact information is for Tatiana Kagan. Again, Kagan and Tatiana both have testified that she had no role in the Lyman-Cutler project except as a broker employed by Century 21. Therefore, I am not persuaded that Kagan Development was the true client here or that any payment made on this invoice was made by KDC. The evidence of payment is a single line typed onto the form: "Paid in full 8/20/14 with AMEX". This inscription is unsigned and undated, and it is not clear whether it was placed there by the vendor or by the payor. In other instances where KDC paid an item by a charge to its AMEX account, it supplied evidence of that charge from its AMEX statements; in this instance, no such evidence has been offered. I conclude that KDC has failed to carry its burden as to any one of the alleged advances to Instant Interiors.

    f)    In summary, of the $665,545.49 in carrying cost advances that KDC claims to have made, it has proven that it made only two advances totaling $908.27, one of which, for $408.27 was for construction costs, not carrying costs, and the other of which, for $500.00, though a carrying cost, has already been reimbursed.

74.    The LLC had budgeted and reserved $500,000 for payment of carrying costs, $200,000 from each of two construction loans plus $100,000 from the purchase loan. The LLC thus fully funded its carrying costs for this period, with $75,909.56 to spare.

75.    Once in the first twenty-three months, on May 24, 2013, when funds in the LLC Account were insufficient to meet an upcoming debt service obligation, Filippov deposited $1,000 of his own funds into the LLC Account to  permit the LLC to meet its debt service obligation timely. On June 28, 2013, when the LLC Account had received an infusion of funding from the construction loans, Filippov wrote himself a check for $1,000 to repay the short-term loan.

76.    Neither Kagan nor KDC wrote checks or otherwise made payments to Rockland Trust for debt service in the first twenty-three months, either from the LLC Account or from any other source.

77.     From time to time in the first twenty-three months, however, when funds in the LLC Account were insufficient to meet an upcoming carrying cost obligation, Filippov or Arina would notify Kagan of the shortage and ask him to deposit funds. In response, Kagan caused KDC to deposit over the first twenty-three months a total of $126,100 into the LLC Account to permit the LLC to meet its debt service obligations timely. The deposited funds always came from KDC, never from Kagan himself.

78.    Kagan and KDC ask the Court to find that Kagan caused KDC to make these advances to the LLC under the mistaken impression that it was his obligation to fund carrying costs for the duration of the project, not solely after the first twenty-three months. He also alleges that Filippov knew that Kagan was under this misimpression and did not correct him but rather exploited it to cause Kagan to fund the debt service that the LLC was obligated to fund. The evidence does not support any of this.

a. Kagan knew from the signing of the Operating Agreement that the members' agreement was that the LLC would fund the carrying costs over the first twenty-three months and that it would do so, in part, by using $200,000 of the proceeds of each construction loan for that purpose. He further clearly knew—because Maiden had informed him of this term and Kagan himself had agreed to this negotiated term—that the Operating Agreement required that he fund (or at least be responsible for) carrying costs that arose *after* the first twenty-three months. This feature of the Operating Agreement would not have been necessary if Kagan had been obligated to fund carrying costs from the inception of the project.

b. Kagan's representation that he believed he was obligated to pay carrying costs is further belied by his conduct:

   i. He did not advance a single dollar to the LLC to cover debt service or taxes until July 23, 2013, almost seven months into the project, and even that advance was for only $3,500.00, not nearly enough to cover the $19,471.47 in obligations (for loan interest and real estate taxes) that the LLC needed this advance to cover. It is clear that Kagan knew this because the evidence shows that Filippov had sent him an email on July 18, 2013, saying: "To cover payments till August 1st, we need you to put $3,500.00 [sic]." And in the same email, Filippov went on to detail the need: the total amount needed to be paid (and an itemization of the component amounts), the amount in the LLC Account to cover it, and the amount that Kagan needed to add to cover the shortfall. Kagan received this email and deposited $3,500.00 into the LLC Account on July 23, 2013, because he had received it and understood he was being asked to fund not the full obligation but to cover a temporary insufficiency in the LLC Account.

ii.  In addition, the full amount that KDC advanced to aid the LLC in covering

carrying costs over the first twenty-three months was just $126,100.00, less

than a third of what would be necessary over that period to cover debt service

and taxes. Kagan surely appreciated the vast discrepancy between, on the one

hand, the amounts he was being asked to advance and the  irregularity of the

requests and, on the other hand, the full amounts of debt service and taxes

needing to be funded and the regularity with which those obligations needed to

be paid.  Indeed virtually every advance was prompted by an email indicating

not the amount that needed to be funded but that the amount on hand to meet

the obligation appeared to be insufficient.

iii.  Kagan's position is further belied by the fact that he himself treated the monies

he advanced not as permanent contributions to the effort but temporary loans

to cover cash flow issues.  During the first 23 months of the project, Kagan, who

had check writing authority on the LLC Account, wrote checks from the LLC

Account to the order of KDC in the aggregate amount of $1,372,442.83. (This is

in addition to numerous other payments he made from the LLC Account directly

to subcontractors and vendors, also aggregating in amount much more than

KDC's advances to cover carrying costs.) That is, KDC more than recouped the

amounts it contributed to help cover temporary shortfalls in cash flow.

c.  In sum, I find that Kagan's testimony—that he made these advances under the

misunderstanding that he was obligated to fund carrying costs over the first twenty-

three months—was false, knowingly so, and intended to deceive.

79.   I find by a clear preponderance of the evidence that Kagan caused KDC to make these

advances, and that Filippov asked for them, as short-term loans only to cover temporary shortfalls in

cash flow. Filippov had given Kagan check-writing authority on the LLC Account.  When Rockland Trust

began making advances on the construction loans, Kagan began writing checks against the LLC Account

to cover construction costs. The advances of loan proceeds were intended to cover both construction

costs and carrying costs. Though the LLC had in fact budgeted enough to cover carrying costs in full,

Kagan's appropriations for construction obligations sometimes left insufficient funds on hand when

carrying cost obligations came due.  Kagan understood that his access to the LLC Account for

construction funding came with an obligation to refund monies when and to the extent necessary to

smooth out cash flow issues. Kagan advanced only what was needed, and only when needed, to address

cash flow deficiencies, and he recouped these advances with checks to KDC. Kagan and Filippov both

understood this.

80.      Kagan and KDC further maintain that, at the end of the day, KDC funded $126,100.00 in

carrying costs that the LLC should have funded, and that consequently KDC is in the hole by this amount.

This is untrue for three reasons.  First, KDC more than recouped every dollar of these advances through

the numerous checks, aggregating $1,372,442.83, that Kagan wrote from the LLC Account to KDC; any

debt arising from these advances has been satisfied. Second, even if Kagan's transfer of $1,372,442.83

did not enable KDC fully to recoup these advances (because, KDC maintains, these monies were fully

consumed in paying other construction obligations), the advances had the effect of transforming

$126,100 of LLC funds that otherwise would have been reserved for carrying costs into funds available

for construction; and by the end of the month 23, KDC had fully drawn down all funds remaining in the

account.

81.      And third, the LLC borrowed $500,000 to cover its carrying costs in the first twenty-

three months, but it incurred and paid carrying costs totaling only $421,410.27, leaving a surplus of

$75,909.56, which Kagan appropriated for construction purposes. That is, he used for construction

purposes not only the $2.8 million that had been budgeted and borrowed for that purpose, but also an additional $75,909.56 that had been borrowed for another purpose.

**F.    Retention of Broker and Listing of 88 Cutler**

82.    In the Operating Agreement at § 6.1(b)(6), the members agreed that the LLC would initially retain Tatiana as the broker to market and sell the properties, but it further provided that she could be removed at any time by an 81% vote of the members and could be removed by the Managing Member unilaterally after December 31, 2014.  Both parts of this provision—the initial retention of Tatiana, and the ability to remove her—were negotiated among the members, especially Filippov and Kagan, and Kagan at all relevant times had actual knowledge of these terms.

83.    88 Cutler was the first of the LLC's two properties to be ready to market. The parties were in agreement that, as the two homes were identical and next door to each other, only one house should be marketed at a time; otherwise, each would tend to depress the value of the other.

84.    On August 12, 2014, Kagan, on behalf of the LLC, signed a listing agreement with Century 21 Commonwealth ("Century 21") for 88 Cutler.  The agreement identified Tatiana as the designated agent.  The listing agreement specifies that "[t]he period of this Agreement shall be from August 20, 2014 to and including March 1, 2016."  Kagan did not discuss this term or any part of the agreement with Filippov or Lipetsker before he signed it.  He signed the agreement with knowledge that the duration of the commitment was in violation of the right of Filippov as managing member to discontinue the relationship for any reason after December 31, 2014. Kagan committed this act in bad faith toward the LLC and Filippov and Lipetsker.

85.    Tatiana began to list 88 Cutler on August 20, 2014. The initial listing price was $5,499,000.

### G. Payments of Carrying Costs from November 2014 to May 2015

86.    The first twenty-three months from the date of acquisition ended on November 30,

2014, as of which date the construction loans had been fully disbursed, the balance in the LLC Account

was $1,298.04, neither property had sold, and carrying costs continued to accrue.

87.    Kagan did not pay any portion of the carrying costs himself, but he did cause KDC to

deposit $175,515.26 into the LLC Account. KDC did this through a series of fifteen deposits beginning on

December 17, 2014 and concluding on May 13, 2015. After that date, neither Kagan nor KDC made any

further deposit into the LLC Account or otherwise paid or funded any carrying cost of the LLC.

88.    Of the $175,515.26 that KDC deposited after November 30, 2014, most but not all was

intended and used for carrying costs. The balance was deposited by KDC and intended by Kagan for use

on construction costs; and, by checks written by Kagan against the LLC Account, Kagan diverted this

balance to pay construction obligations. These include the following obligations that Kagan paid from

the LLC Account, totaling $30,340.00:

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 1/19/2015 | Ernesto Espidola | $2,080.00 |
| 1/23/2015 | Décor Art | $3,350.00 |
| 2/18/2015 | Décor Art | $6,000.00 |
| 3/19/2015 | Décor Art | $3,600.00 |
| 4/17/2015 | Décor Art | $3,000.00 |
| 4/22/2015 | Dream Flooring | $12,210.00 |
| 4/22/2015 | Campbell Construction | $100.00 |
| | **TOTAL** | $30,340.00 |

89.    I therefore conclude that, after November 30, 2014, KDC, on Kagan's behalf, paid

$141,175.26 [$175,515.26 - $30,340.00 = $145,175.26] to the LLC for carrying costs accrued after that

date.

90.    These contributions enabled the LLC to pay carrying costs that accrued through April

and into May 2015, leaving a balance in the LLC Account at the end of May of $7,328.89. This balance,

though insufficient to fund the lion's share of the carrying costs in May and June (which Filippov himself

paid from his own personal funds—the findings on this are set forth below), was used by the LLC to pay

various carrying costs in June and July, 2015, with the last $2,768.33 of Kagan's contributions being

consumed in partial payment of the first of two loan payments on July 20, 2015. The balance of that loan

payment, and all payments of carrying costs thereafter, were funded with advances by Filippov.

**H.  Listing of 55 Lyman**

91.     In April 2015, with 88 Cutler still unsold, Tatiana notified Filippov, by text message, that

"we have to put 55 Lyman on the market and take 88 Cutler off." Tatiana and Kagan began to insist that

Filippov sign a listing agreement with Tatiana's agency, Century 21 Commonwealth, for 55 Lyman, and

to that end they forwarded to him a proposed listing agreement. Filippov, who was in Florida at the

time, did not understand the urgency.

92.     Kagan testified that Filippov authorized him to sign the agreement, but Filippov denied

this. I credit Filippov's testimony and disbelieve Kagan's.

93.     Without Filippov's consent, Kagan nonetheless did sign the agreement on behalf of the

LLC. This agreement, too, designated Tatiana as the designated agent. Though dated April 24, 2015, it is

not clear when Kagan signed it; Kagan did not date his signature. The agreement is for a six-month

exclusive agency, from April 26, 2015, to October 27, 2015. This agreement, too, does not preserve the

right of Filippov as managing member, under the Operating Agreement, to terminate the relationship.

Kagan committed this act in bad faith toward the LLC, Filippov, and Lipetsker.

94.     On April 28, 2015, Kagan had Dan Gersh, a KDC employee, send an email to Filippov,

notifying him that he had signed the listing agreement for 55 Lyman. Notwithstanding that he had not

authorized the signing of this agreement, Filippov did not object at the time because he was very busy,

he didn't want to start a fight with the Kagans, and he believed, albeit incorrectly, that his right to fire

Tatiana at any time was not violated by this agreement.

## I.    The May 7 Letter

95.    Kagan next retained attorney Alexander Pyle, who, on behalf of Kagan and KDC, sent a

letter dated May 7, 2015 (the "May 7 Letter") concerning Lyman-Cutler LLC. Though addressed to all

three members of the LLC, its real addressees were Filippov and Lipetsker. Through the letter, the

attorney made the following points on behalf of his clients:

a.    that the LLC should reduce the asking price from $5.5 million to $5.25 million and then

to $5.199 million if they do not sell within a month, but that Filippov had refused to

approve a price change;

b.    that a price reduction is particularly important given the November 30, 2015 dissolution

of the Company, which would trigger liquidation in the winter months thereafter;

c.    that Kagan and KDC had incurred unreimbursed construction costs as of the date of the

letter totaling $758,025.56, with approximately $50,000 of additional vendor costs

anticipated, all of which "will be payable after repayment of the existing bank debt and

before any proceeds are available to the Company's members";

d.    that Kagan had made additional capital contributions totaling over $251,000 to cover

carrying costs, which have the effect of increasing Kagan's capital account;

e.    that Kagan is not prepared to continue paying the carrying costs;

f.    that, if (i) the members agree to the proposed reductions in listing price, (ii) Filippov

pays carrying costs going forward equal to those already funded by Kagan, and (iii) by

that point one or both houses remain unsold, Kagan would be willing to split equally

with Filippov the carrying costs incurred from that point forward; and

g.    that "if you are amenable to the foregoing compromise, I would be happy to prepare an

amendment to the Operating Agreement which reflects this approach, and also extends

the term of the Company until November 30, 2016 and clarifies the economic rights and

obligations of the members."

96.     Attached to the May 7 Letter was an accounts payable aging summary that listed the

accounts allegedly comprising the unreimbursed construction costs discussed in the letter. It showed

$325,000 payable to ProEx and $244,276.56 payable to KDC; fully 75 percent of the alleged

unreimbursed construction costs were due to Kagan-owned entities.

97.     The May 7 Letter was not well-received by Filippov and Lipetsker. This was the first

either of them had heard from Kagan of unreimbursed costs or of his expectation/demand that the LLC

would fund his cost overruns. They disputed the extent of Kagan's contributions for carrying costs and

his position that these contributions increased his capital account for purposes of distribution. Filippov

agreed that the listing price should be reduced but bristled justifiedly at two false statements in the

letter:  (i) the statement that he had refused to approve a reduction, when in fact Kagan himself had just

two weeks earlier signed the listing agreement to market 55 Lyman at the price from which he was now

demanding a reduction, and Filippov had not been consulted since; and (ii) a statement in the letter that

the house had been completed "in accordance with all deadlines specified in the Operating Agreement,"

when in fact Kagan knew well that he had missed the completion deadline by four months on one house

and more on the other. Filippov especially viewed the letter as showing Kagan's business to be fraud,

executing a premeditated and dishonest power play to extort a greater share of the proceeds out of

them than he had agreed to in the Operating Agreement to secure their investments.

98.     Filippov, as managing member, promptly retained on behalf of the LLC the law firm of

O'Connor, Carnathan & Mack LLC ("OC&M") and attorney Sean Carnathan of the firm. Before doing so,

he discussed the retention with Lipetsker, who agreed with the retention. He attempted to discuss the

matter also with Kagan, but Kagan did not return his phone call.

99.    On behalf of the LLC and by letter of May 13, 2015, Carnathan replied to the May 7

Letter and in it, after disputing many of the factual and legal errors he saw in it, (i) demanded that Kagan

and KDC immediately turn over to Filippov the complete books and records of the LLC, (ii) demanded

that Kagan turn over all keys to the properties within 48 hours, (iii) declared that Filippov as managing

member was taking full control of the properties and of the sale of the properties, (iv) declared void

(because unauthorized) the listing agreement Kagan had recently signed concerning 55 Lyman, (vi) put

Kagan on notice of his intent to list the properties with another broker immediately, and (vii) indicated

that he would reduce the listing price as recommended by the new broker.

100.    Kagan arranged to turnover the keys to the properties through Joseph Cohen ("Cohen").

Cohen was at that time either an employee of KDC (as he testified) or an independent contractor (as

Kagan testified).  On May 16, 2015, Filippov and Arina met with Cohen at the properties in order to

obtain the keys from him. During the meeting, Cohen threatened them financially and told them that

unless they met KDC's demands, he and Kagan would put a lien on the properties and they would never

get their investment back. Cohen denies that he made this threat, but I find Filippov and Arina credible

and Cohen not at all.

**J.    Joseph Cohen**

101.    In general Cohen was not truthful unless confronted with a document he could not

deny.  His testimony had no credibility.

102.    The testimony of Filippov and Arina concerning his threat at their May 16, 2015 meeting

is particularly credible because there is persuasive evidence in the record that Cohen made other

threats in his service to Kagan and KDC. First, when Kagan learned that Brusenkova would testify against

him in conjunction with the Lyman-Cutler litigation, Cohen, beginning in November 2015, commenced a

campaign of witness intimidation against her, involving his swearing out of at least three criminal

complaints against her, two with local police and one with the District Attorney.  He made clear that he

did this not out of any personal animus against Brusenkova but solely because Kagan had asked him to

do it and didn't want to do it himself.

103.    Second, an investor in another Kagan project testified that, in December 2014, at the

completion of that project, Kagan presented her with cost overruns and insisted that she agree to fund

them. Kagan wouldn't speak to her directly and dealt with her through Cohen. As a pending sale of that

property was about to close, Cohen told her that if she didn't accede to Kagan's demand, Kagan would

place a mechanic's lien on the property, and then they wouldn't be able to sell. He went on to note that

she "wasn't in a position to go through this," which was a reference to the fact that she was eight

months pregnant and had lost a child a year before. "You don't want anything like that happening

again," he said.

104.    Under another name, Cohen has an extensive criminal history,[6] including two sentences

on five counts of bank fraud, committed over a period of years, followed by another on a child support

matter. He was incarcerated continuously on three consecutive sentences from 2004 into 2011. Upon

his release he changed his name to Joseph Cohen.

105.    Cohen began working for Kagan in 2011 or 2012. By 2015, he held himself out as KDC's

"Strategic Business Manager." He and Kagan described his job as advising and assisting Kagan on KDC's

litigation matters.  They offered no details on what in particular this consisted of. There was no evidence

that he attended law school or is licensed to practice law.  There is evidence that his duties included (i)

helping to intimidate a witness at Kagan's behest, (ii) the drafting and filing of mechanic's liens for KDC

when investors in Kagan's projects did not accede to his demands regarding distribution of the proceeds

at the conclusion of a construction project, and (iii) persuading those same investors at the close of a

construction project to accede to Kagan's demands concerning sharing of the sales proceeds. When

_____

[6] The Court accepted evidence of Cohen's criminal history both to impeach his credibility and, pursuant to Fed. R.
Evid. 404(b)(2), to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake,
or lack of accident.

asked to indicate whether Cohen had a role in keeping KDC's books and records, Kagan was repeatedly

evasive and answered, variously, that Cohen had no role and that he didn't know what role Cohen had

or even who might have known what role Cohen had.

106.     When asked how much he or KDC paid Cohen for his services to them, Kagan was again

evasive but conceded that "it was probably a lot of money" and "a big number." In May 2018, Kagan

testified that the amount he paid Cohen in the first five months of 2018 was less than $5 million but also

that he didn't know whether it was more than $100,000 or $500,000 or even $1,000,000. Kagan here

was lying about the extent of his knowledge, but it is at least clear that he paid Cohen handsomely for

his services, and that his services were important to the profitability of KDC's business. KDC paid Cohen

$70,000 in 2015 for his work relating to the Lyman-Cutler project that year. In comparison, in 2015 KDC

paid its chief financial officer, Dan Gersh, an annual salary of $70,000.

107.     Cohen testified that he ceased working for Kagan and KDC in 2018 and that he now

works as a chief technology officer.

**K. Commencement of State Court Litigation**

108.     Notwithstanding Filippov's demand as managing member, Tatiana and Century 21

Commonwealth refused to terminate the listing agreements that Kagan had signed with them on behalf

of the LLC as to 88 Cutler and 55 Lyman.

109.     On or about June 5, 2015, the LLC, by and through OC&M, filed a verified complaint in

Massachusetts Superior Court against Kagan, Tatiana, and Century 21 Commonwealth (the "LLC Superior

Court Action").  The complaint asserted eight counts for relief, including for (i) breach of contract,

specifically the Operating Agreement, against Kagan, (ii) breach of fiduciary duty against Kagan, (iii)

aiding and abetting Kagan's breach of fiduciary duty against Tatiana and Century 21 Commonwealth, (iv)

fraud against all three defendants, (v) conspiracy against all three defendants, (vi) violation of MASS. GEN.

LAWS ch. 93A against all three defendants, (vii) declaratory judgment, and (viii) preliminary and

permanent injunctive relief, including enjoining Tatiana and Century 21 from any action to prevent the LLC from listing the properties through other brokers.

110.    The decision to file this complaint, and to retain OC&M for that purpose, was made in the first instance by Filippov alone, as managing member and 80 percent interest holder; but after the complaint was filed, a formal meeting of the members was held at which Filippov and Lipetsker, controlling between them 90 percent of the membership, voted to authorize the suit. Kagan, who sent Cohen to the meeting as his proxy, voted against the retention and the filing of the complaint.

111.    On July 10, 2015, Filippov and Lipetsker entered into a retention agreement with OC&M to represent them, as additional plaintiffs and counterclaim or cross-claim defendants in the LLC Superior Court Action.  Filippov also signed the agreement as managing member on behalf of the LLC.

112.    On June 11, 2015, the Superior Court held a hearing on the LLC's request for a preliminary injunction and denied the request. The listing agreements that Kagan had signed with Century 21 remained in place, and the parties agreed that day to lower the listing price from the $5.5 million at which Kagan had set and maintained it.

113.    On a date not in evidence, the LLC, now joined by Filippov and Lipetsker, filed an amended complaint in the LLC Superior Court Action, adding Filippov and Lipetsker as plaintiffs, KDC and ProEx as defendants, and three new counts. The LLC was a plaintiff in each of the new counts.

114.    The defendants moved to dismiss all counts of the amended complaint. On October 2, 2015 the Superior Court allowed the motion without prejudice as to the counts for fraud (because not plead with specificity) and aiding and abetting (because duplicative) and denied the motion as to all other counts.

115.    As of the LLC's bankruptcy filing on October 7, 2015, OC&M was owed in excess of $35,329.95 for the services it had performed in the Superior Court action.

116. The services OC&M rendered in the LLC Superior Court Action were entirely to and for the benefit of the LLC. The LLC was a plaintiff on each the counts asserted in the amended complaint. Filippov and Lipetsker, as members of the LLC, would have benefitted from that representation as members of the LLC. There is no evidence that their participation as additional plaintiffs resulted in billings for work that did not benefit the LLC.

**L. The Mechanics Lien and Construction Contract**

117. No later than upon his receipt of the OC&M letter of May 12, 2015, Kagan instructed Cohen to prepare and file a mechanic's lien on behalf of KDC against the LLC's properties.

118. To that end, Cohen began collecting from Kagan documents from the early days of the LLC. He told Kagan to forward to him whatever he had regarding Lyman-Cutler. "I forwarded everything what I have regarding Lyman-Cutler." On May 14 and June 3, 2015, Kagan forwarded to Cohen (i) an email he had received from Maiden on June 17, 2013, to which were attached numerous documents that Maiden had prepared for the closing of the construction loans, (ii) an email he had received from Filippov on April 11, 2013 to which were attached documents constituting the original proposal and budget for the project, and (iii) an email chain from November 2012, mostly of exchanges between Filippov and Maiden concerning the negotiation of the Operating Agreement.

119. On June 22, 2015, Cohen, on behalf of KDC, filed two notices of contract and two notices of lien in the Norfolk Country Registry of Deeds as to 55 Lyman and 88 Cutler, each signed by Cohen as secretary of KDC. Each notice of contract and notice of lien expressly refers to and purports to be based on "a written contract dated June 24, 2013" between the LLC and KDC. Each notice of claim states that the total amount due under the contract is $5,290,600.23 and that the lien claimant has received payment to date of $3,194,615.00, leaving a balance due of $2,095,985.23. Each notice of claim further states that "[a] final invoice was provided to the Owner itemizing cost of materials and labor"; in fact no such invoice had by that date been provided by KDC to the LLC.

120.    On or about July 2, 2015, KDC, Kagan, and Tatiana filed a verified complaint in

Massachusetts Superior Court (the "Kagan Superior Court Action"), this time in Norfolk County (the LLC

Superior Court Action was brought in Middlesex County), against Filippov and the LLC. The complaint

stated fifteen counts, including counts by KDC against the LLC for breach of the alleged construction

contract of June 24, 2013, and for an order establishing the validity of its mechanic's liens and ordering

that the properties be sold to satisfy the judgment that KDC sought in the same complaint on the

construction contract. The complaint recited that Kagan, on behalf of the LLC, had on June 24, 2013

entered into a written contract with KDC for the construction and construction management of the

project. The complaint specified no details of the contract, and the plaintiffs attached no copy of the

contract to the complaint.

121.    KDC contends that the contract referred to in the mechanic's lien documents, the KDC

Contract, is the document introduced into evidence at trial as Exhibit 37. This 12-page document recites,

in its opening sentence, that "[t]his agreement is made and entered into June 24, 2013." The document

is signed and dated by Kagan in four places: twice on behalf of the LLC and twice on behalf of KDC.  After

each of his signatures, Kagan indicated that the date of signature was "7.24.13": that is, July 24, 2013.

The KDC Contract is a cost-plus contract: the cost of the contract to the LLC is the "Cost of the Work," as

defined in Section 8 of the agreement—including the aggregate cost of subcontracts and certain

"general condition costs"—plus certain add-ons as set forth in Section 7, including a "design phase fee"

of $25,000, a "Construction Phase Fee" of 15 percent (presumably of the Cost of the Work, but the KDC

Contract does not say), and a fee of 17.5 percent for "any capital outlay advanced by [KDC] done in

order to [sic] facilitate the advancement of this agreement or the project."  Per Section 7.1.2, the

Construction Phase Fee is payable monthly as it accrues.

**M. Fabrication of KDC Contract**

122.    KDC contends that the KDC Contract was prepared for KDC by Joseph Cohen in June

2013, that prior to executing the KDC contract, Kagan discussed it with Filippov and provided him with a

copy, that Cohen emailed an execution copy of the document to Kagan on June 24, 2013, that Kagan

signed the contract on behalf of both the LLC and KDC on June 24, 2013, that after the signing Kagan

gave a hard copy of the contract to both Filippov and Lipetsker, and that Kagan had KDC's office

manager, Ryan O'Grady, email a copy of the KDC Contract as executed to Filippov and Liptesker on

August 21, 2013. The LLC, Filippov, and Lipetsker dispute each of these contentions and contend that

the KDC Contract was prepared by Cohen in June 2015 and signed and back-dated by Kagan in June

2015, all to create false evidence of an existing contract, which KDC needed in order to file and support

the mechanic's liens they wanted to and did file that month. As the party claiming to be owed monies

under the KDC Contract, the burden is on KDC to prove that it was signed in June 2013. As the parties

seeking a determination that the document was fraudulently fabricated in 2015, Filippov, Lipetsker, and

the LLC bear the burden of proof on that issue.

123.    For the following reasons, I conclude not only that KDC has failed to carry its burden of

proof but also, by a  preponderance of the evidence that the LLC, Filippov, and Lipetsker have proven

that Exhibit 37 was created and signed—forged—by Kagan and Cohen in June 2015 as false evidence, to

create a contract as the basis for mechanic's liens.

       a.    Filippov testified credibly that he has no memory of Kagan's having discussed the KDC

          Contract with him or of Kagan's having sent him a pre-execution copy before the alleged

          date of signature, June 24, 2013 (or at any time). The KDC Contract was so contrary to

          the deal that the members had negotiated that, had Kagan done these things, or either

          of them, Filippov would surely have reacted vociferously then and would certainly

          remember it now.  Also, the alleged email by which Kagan transmitted the pre-

execution copy to Filippov would have been discoverable not only in Filippov's received email but also in Kagan's or KDC's sent email, but no such email was adduced, either from Filippov's records or even from Kagan's. I find that Kagan never discussed the KDC Contract with Filippov and never sent him a copy of it before he executed it. Kagan's testimony to the contrary is not credible.

b.  Kagan contends that he gave to both Filippov and Lipetsker a hard copy of the KDC Contract as executed. Both Filippov and Lipetsker credibly deny that they ever received a hard copy of the KDC Contract. Kagan's testimony was not credible.

c.  Kagan contends that on August 21, 2013, he had KDC's office manager, Ryan O'Grady, email a copy of the executed KDC Contract to Filippov and Lipetsker, and that O'Grady did email them a copy that day by the email that was admitted into evidence as Exhibit 215. Exhibit 215 purports to be an email that both forwards a string of earlier emails and that sends a new attached document, the KDC Contract. It states: "Hi Joseph, and Alex, at Vadim's request, I am forwarding this conversation and attachments. I have included the GC agreement as Vadim requested. Regards, Ryan[.]" It purports to be sent from vadim@kagandevelopment.com and sent to lymancutlerllc@gmail.com and polysavant@hotmail.com. The latter is an email address of Joseph Cohen; and the former is a distributing email address: email sent to lymancutlerllc@gmail.com is automatically sent to Filippov, Lipetsker, Kagan, and Arina. Filippov and Lipetsker each credibly denied having received this email, and KDC adduced no evidence that it was received by them or Arina or even by Kagan or Cohen. I therefore conclude that this email, if it ever was drafted at all, was never sent. There is also reason to believe it never was drafted at all, at least not on or before August 21, 2013. First, the email address from which this email purports to have been sent,

54

vadim@kagandevelopment.com, is one that Kagan was not using in 2013. KDC adduced

evidence that the kagandevelopment.com domain name was created on March 20,

2013, but even if I were to credit this evidence—I do not, because the source, Cohen, is

not credible on any point—it would at most establish only that the domain name was in

existence, not that in August 2013 Kagan was using an email address that was linked to

it. Second, the email address from which the email purports to have been sent is not

one from or to which the email chain that was being forwarded had been sent.  The

immediately preceding email in the chain, was sent from

kagandevelopment@gmail.com to a representative of Rockland Trust and to

lymancutlerllc@gmail.com. KDC has adduced no explanation as to how an email can be

forwarded from an account that doesn't already have it. Third, an address block at the

very end of the email chain indicates that the telephone number for KDC is  617-610-

1276; but Brusenkova credibly testified that KDC did not use that number in 2013 and

that she herself had obtained it for KDC only in February 2014. Fourth, Exhibit 215 was

not credibly authenticated. Kagan initially testified that he asked Ryan O'Grady to

transmit the KDC Contract to Filippov and Lipetsker, and that Exhibit 215 is the email by

which O'Grady did that, but on cross-examination it became clear that Kagan had no

knowledge, direct or otherwise, of whether and how O'Grady might have generated this

purported email.  And Kagan and KDC did not call Ryan O'Grady to authenticate the

document or testify about its genesis. No testimony was presented about O'Grady's

availability, and therefore I refrain from drawing an adverse inference against KDC.

Nonetheless, for lack of credible authentication, I cannot find that Exhibit 215 is what it

purports to be or was created on or before or around August 21, 2013.  Moreover, on

the basis of the presence on the document of a telephone number that did not come

into existence until six months after the date on this email, and of the fact that it

purports to be sent from an email address that Kagan did not then use, I find by a

preponderance of the evidence that Exhibit 215 was fabricated by Kagan—and probably

by Cohen for Kagan—in or after 2015 to create evidence for use in this and other

proceedings that the KDC Contract was drafted and signed in 2013.

d.   Not only Filippov and Lipetsker, but also KDC's chief financial officer, Dan Gersh, and

KDC's former bookkeeper, Brusenkova, and KDC's outside accountant, Jason Gordon, all

testified credibly, and I find, that they had never seen the KDC Contract before the

commencement of litigation in 2015. During her work at or for KDC, Brusenkova never

saw a document like the KDC Contract on any of the KDC projects for which she served

as a bookkeeper.

e.   Though KDC claims to have earned and to be entitled to a fifteen percent general

contractor fee of $560,838.87 under the KDC Contract for the Lyman-Cutler project,

Gersh testified that he did not know what the basis for such a fee was—he said it was

"above his pay grade" as KDC's CFO—and that he had never entered any such fee on

KDC's books or Lyman-Cutler's books, on this or any other project, because he was

never asked to do so. Also, though KDC is an accrual basis taxpayer, it never recognized

any income on its tax returns from a general contractor fee, for this or any other

project. In addition, although the KDC contract, being a "cost plus" contract, would have

required KDC to account for the costs of the project and to bill the LLC on the basis of

such itemized costs, KDC did not during construction or prior to June 2015 account for

the costs of the Lyman-Cutler project on a project basis; KDC's bookkeeping system was

not set up to do this. KDC organized the records of its obligations to subcontractors only

on a subcontractor-by-subcontractor basis. In short, during the life of this project, and at

least until June, 2015, KDC did not, from an accounting standpoint, act as if the KDC

Contract existed.

f.   The May 7, 2015 Letter, by attorney Alexander Pyle on behalf of Kagan and KDC, though

showing a thorough familiarity with the Operating Agreement, does not mention the

KDC Contract or contend that monies are owing thereunder for any of the percentage-

based charges it authorizes. Kagan testified that this was because he often waives the

contract's percentage-based fees, but that after the rejection of the proposal in the May

7 Letter and the LLC's commencement of litigation, he decided not to waive that fee.

Kagan's testimony is not credible. He has adduced no evidence that he (or KDC) often

waives these fees or that he has ever used this contract (or one like it) on any other

project. It is much more likely that the May 7 Letter did not mention the KDC Contract

because it did not yet exist.

g.   It became necessary for KDC to have a contract only after the LLC, Filippov, and

Lipetsker rejected the demands made in the May 7 Letter. At that point, KDC wanted to

create a mechanic's lien for the leverage it would create, and Cohen knew that under

Massachusetts law KDC needed a written contract to establish that lien.

h.   When Cohen began working on the mechanic's lien documents, he asked Kagan to

forward to him everything he had regarding Lyman-Cutler, especially from the LLC's

formation and early days. Kagan complied. It is undisputed that the KDC Contract was

not among the emails he forwarded in response. When asked whether it was true that

he had not forwarded the KDC Contract to Cohen, Kagan answered: "because he has

this agreement. Why do I have to forward it to him?" One short answer is that it would

have gone a long way toward proving that the KDC Contract existed in 2013, something

that both Kagan and Cohen were clearly interested in establishing. In any event, Kagan

had already testified that he had forwarded to Cohen *everything* he had. I find him not

credible when he suddenly changes his story to say that he was not forwarding

everything but being selective.

i.   Aside from the discredited Exhibit 215, the only documentary evidence in the record

that the KDC Contract existed prior to June 2015 is Exhibit 65, which was placed in

evidence by the Plaintiffs. At the deposition of Joseph Cohen in May 8, 2018, Plaintiff's

attorney Sean Carnathan asked Cohen, as the drafter of the KDC Contract, to send him

the native file for that contract. It took Cohen two weeks to do so.  On May 22, 2018, he

sent to Carnathan the email that is Exhibit 65 (but, to be clear, not the "Properties"

screenshot that was admitted as the last page of this exhibit). In relevant part, it

includes an email and a print-out of the unexecuted KDC Contract. The email purports to

be an email sent by Cohen to Kagan on June 24, 2013 at 11:56 p.m., to which is attached

a copy of the KDC Contract in Word format. In the email, Cohen states: "Vadim I made

the final final corrections. This should be printable. I left it in doc format if you need to

make any edits. Joseph[.]" The next twelve pages are the KDC Contract, unsigned. The

final page of the exhibit was not transmitted by Cohen.  It is a printout, generated by a

paralegal in Carnathan's firm, of the "Properties" page from the Microsoft Word file that

is the transmitted KDC Contract. The Court admitted this printout under Fed. Rule of

Evid. 902(13) over the objection of the Kagan parties. In relevant part, it states: "total

editing time 2 minutes," "Last Modified 6/24/2013 7:51 PM," "Created 6/24/2013 7:50

PM," "Last Printed 6/17/2015 9:45 AM," "Author Vadim Kagan," and "Last Modified By

Joseph Cohen[.]" No testimony was elicited or adduced as to what the entries on the

Properties screen mean, how to interpret them, and, of most concern to the Court—

especially where it took Cohen two weeks to  respond to Carnathan's request—how

they may be controlled or manipulated. Cohen himself testified that the printout was inaccurate as to when the document was last printed out. He also testified that creation of the KDC Contract took a long time, several days; I find that it required more editing time than two minutes. Also, Cohen, not Kagan, was the author of the document. It is thus clear that the data reported in the Properties screenshot cannot be taken at face value. Accordingly, I attribute no evidentiary value to the information in the Properties screenshot. That leaves only the email, which, coming from Cohen, the Court finds to be inherently unreliable, especially where (i) Exhibit 215 and other documents originating with Kagan and Cohen were so clearly fabricated and falsified, (ii) Cohen has a history of financial criminality, including multiple counts over years, and (iii) Cohen testified that he got rid of the computer on which he drafted the KDC Contract, essentially placing it beyond forensic examination.

j.   As evidence that the KDC Contract was drafted in June 2013, the Kagan Parties cite the verified complaint in the present adversary proceeding, specifically (i) Filippov's averment in paragraph 78 that "[The LLC] entered into a contract with Defendant KDC that required, among other things, that KDC perform its work in a good and workmanlike manner" and (ii) the fact that that amended complaint asserts a count for breach of contract on the basis of that allegation. The averment is not evidence that the contract was entered into in 2013. Filippov's averment says nothing about timing, only that a contract exists; and it is undisputed that at some point Kagan signed the KDC Contract for both sides (though not that his doing so bound the LLC). The assertion of the count for breach of this contract is simply a matter of pleading in the alternative. In paragraph 44 of the same complaint, Filippov repeatedly refers to the contract as "the *purported* June 2013 contract" (emphasis added), indicates that prior to the filing of the

mechanic's liens, neither Filippov nor Lipetsker had ever seen or heard of it, and states

that it directly contradicts the Operating Agreement and would never have received his

approval. The contents of this complaint are no evidence that Kagan executed this

contract in 2013.

k.   For all these reasons, I find that the Kagan Parties have failed to prove by a

preponderance of the evidence that Kagan executed the KDC Agreement in June (or

even July) of 2013 or any time prior to June of 2015. And I further find by a strong

preponderance of the evidence that Kagan and Cohen fabricated the KDC Contract in

June 2015 to create false evidence to support mechanic's liens against the properties.

**N.  June to October 2015**

124.   At some point in June 2015, Filippov, as managing member, negotiated with Rockland

Trust an extension of the purchase and construction loans to December 2015.

125.   On June 25, 2015, Cohen, on behalf of KDC, sent to Filippov an email to which was

attached a letter dated June 24, 2015 (the "June 24 Letter") and addressed to both Filippov and

Lipetsker (though the email was not sent to Lipetsker). In relevant part, the letter (i) notified Filippov

that the LLC owed KDC $2,095,985.23 under the KDC Contract, (ii) attached a copy of an invoice for this

balance, and (iii) indicated willingness to enter into a payment plan agreement. No copy of the contract

was attached, and KDC had still never provided a copy of it to Filippov or Lipetsker. The proposed

payment plan agreement, the offer of which would lapse on June 30, would, if accepted, have required

payment of $1,000,000 within ten days, payment of another $500,000 upon sale of the first house, and

payment of the balance upon sale of the second, but in no event later than November 30, 2015.

126.   The invoice attached to the June 24 Letter itemized the alleged debt as follows:

| ITEM | AMOUNT |
|---|---|
| Design Fee | $25,000.00 |
| Total Construction Cost | $3,738,925.82 |
| General Contractor Construction Fee (@15%) | $560,838.87 |
| KDC Office Overhead (790 hours at $75/hr) (net of Vadim Kagan 820 hrs at $200/hr $164,000) | $59,250.00 |
| Total Carrying Costs from July 1, 2013 through June 10, 2015 | $760,771.08 |
| Carry Costs Advance Fee @ 1.459% of total accrued monthly Carry Advance (17.5% divided by 12 months = 1.45833%) (23 .00 months at $5,546.21/month) | $145,814.46 |
| **SUBTOTAL** | $5,290,600.22 |
| **LESS:** Total Construction Payments through June 10, 2015 | ($3,194,615.00) |
| **TOTAL** | $2,095,985.23 |

127.     Four items in this invoice—the design fee, the general contractor fee, the office overhead, and the carrying cost advance fee—arise under the KDC Contract and total $790,903.33. They appear nowhere in the construction budget that the parties used to plan this project and that Kagan submitted to Rockland Trust in support of the construction loans, and by themselves they would consume fully 28.25% of the $2.8 million that the members budgeted for construction costs. Had these costs been contemplated when the members were planning the project, they would have rendered their construction budget—which Kagan had assured Filippov and Lipetsker would be adequate—grossly inadequate.

128.     The LLC did not accept the proposed payoff plan agreement.

129.     On July 16, 2015, the members of the LLC had a meeting in Carnathan's office.  Kagan did not attend but sent Cohen as his proxy. At the meeting, the members voted to ratify the actions that Filippov as managing member had taken to hire OC&M, to bring the LLC Superior Court Action, and to remove Tatiana as the listing broker. In each instance, Filippov and Lipetsker voted to ratify and Kagan voted against, and ratification prevailed because Filippov and Lipetsker between them controlled ninety percent of the membership interest.

130.    On August 19, 2015, after consultation with prominent brokers and a developer in the area, Filippov came to believe that the fair market value of the LLC's homes was $4.5 million each, and as managing member he accordingly lowered the listing price for 55 Lyman to $4,699,000.

131.    By the end of August 2015, Filippov began considering the option of the LLC's filing for bankruptcy relief. He understood that the mechanic's liens on the properties had to be disclosed to prospective purchasers, and that this tended to depress offers.  He also saw the mechanic's liens as impediments to sale, as Kagan was refusing to agree that the net sale proceeds could be placed into escrow until the rights of the parties could be determined. He was mindful of the December 2015 maturity of the LLC's three loans and did not want the properties to be sold at foreclosure by Rockland Trust. He was also mindful that the Operating Agreement provided that the term of the LLC was November 30, 2015; he was concerned that the passage of this date might cause Rockland Trust to foreclose or result in Kagan's petitioning for dissolution and forced liquidation of the properties. Bankruptcy would enable the LLC to sell the properties free and clear of KDC's mechanic's liens.

132.    Filippov discussed the bankruptcy option with Lipetsker, who agreed that the LLC should seek bankruptcy relief; they did not bother to discuss it with Kagan, who they knew would oppose the move and had insufficient membership interest to affect the outcome. As managing member, Filippov caused the LLC to file a petition for relief under chapter 11 of the Bankruptcy Code on October 7, 2015, thus commencing the present bankruptcy case.

### O.  The Funding of Carrying Costs from and after May 2015

133.    In May 2015, when Kagan stopped funding carrying costs, Filippov began to do so by contributions to the LLC Account, by purchases on his personal credit card, and by direct payments from his personal checking account to creditors of the LLC.

134.     From May 28 through September 13, 2015, Filippov made purchases on his own

personal credit card for the LLC as follows[7]:

| Date | Item | Amount |
|------|------|--------|
| 5/28/2015 | Intuit QuickBooks | $212.45 |
| 5/28/2015 | Intuit QuickBooks CD | $5.95 |
| 9/4/2015 | Louver for Bathroom | $30.74 |
| 9/4/2015 | Plastic Wall Plate | $1.25 |
| 9/11/2015 | 2-Way Air Register | $8.33 |
| 9/13/2015 | Motion Sensor and Bulbs | $62.45 |
| Total | | $321.17 |

135.     From May 18 through December 30, 2015, Filippov made the following direct payments,

thirty in all, from his personal checking account, either by check or by electronic transfer, on behalf of

the LLC to creditors of the LLC for carrying costs of the LLC:[8]

| Date | Loan Payments | Brookline Taxes | Brookline Fees | Insurance | Utilities | Accounting & Legal |
|------|------|------|------|------|------|------|
| 5/18/2015 | $6,333.33 | | | | | |
| 5/18/2015 | $6,333.34 | | | | | |
| 6/18/2015 | $6,544.45 | | | | | |
| 6/18/2015 | $6,544.44 | | | | | |
| 6/28/2015 | $6,544.45 | | | | | |
| 11/4/2015 | $6,333.33 | | | | | |
| 11/4/2015 | $6,650.00 | | | | | |
| 11/4/2015 | $6,649.99 | | | | | |
| 11/4/2015 | | | | | | $1,000.00 |
| 11/4/2015 | | | | | | $699.14 |
| 11/9/2015 | | $13,949.10 | | | | |
| 11/9/2015 | | $13,949.96 | | | | |
| 11/12/2015 | | | $50.00 | | | |
| 11/12/2015 | | | $50.00 | | | |
| 11/12/2015 | | | | $723.08 | | |
| 11/12/2015 | | | | $723.08 | | |
| 11/18/2015 | $6,544.44 | | | | | |
| 11/18/2015 | $6,544.45 | | | | | |
| 11/24/2015 | | | $90.09 | | | |

---

[7] In addition to these, Filippov made one credit card purchase on behalf of the LLC prior to the end of the twenty-third month: a purchase of printed checks for the LLC Account in the amount of $38.09. With this purchase, the total contributions that Filippov made by credit card purchases over the life of the project is $359.26

[8] These payments are evidenced in Exhibit 91.

| | | | | | |
|---|---|---|---|---|---|
| 11/24/2015 | | $101.62 | | | |
| 11/24/2015 | | $1,816.10 | | | |
| 11/24/2015 | | $1,215.91 | | | |
| 11/24/2015 | $6,544.45 | | | | |
| 12/17/2015 | $6,333.34 | | | | |
| 12/17/2015 | $6,333.33 | | | | |
| 12/18/2015 | | | $723.08 | | |
| 12/18/2015 | | | $723.08 | | |
| 12/23/2015 | | | | $359.31 | |
| 12/23/2015 | | | | $645.14 | |
| 12/30/2015 | $6,333.33 | | | | |
| **Totals** | $90,566.67 | $27,899.06 | $3,323.72 | $2,892.32 | $1,004.45 | $1,699.14 |

136.     These included $90,566.67 to Rockland Trust for debt service on the purchase and

construction loans, $27,899.06 to the Town of Brookline for real estate taxes, $3,323.72 to the Town of

Brookline for accruing fees, $2,892.32 for property insurance, $1,004.45 for utilities, $1,000.00 for

accountant's fees, and $699.14 for legal fees. These direct payments totaled $127,385.36.

137.     In addition, Filippov made five deposits of checks from his personal checking account

into the LLC Account as follows:

| Date | Amount |
|---|---|
| 7/16/2015 | $50,000.00 |
| 7/29/2015 | $40,000.00 |
| 8/18/2015 | $30,000.00 |
| 8/26/2015 | $10,000.00 |
| 9/15/2015 | $45,000.00 |
| **Total** | $175,000.00 |

138.     These five deposits enabled the LLC to make, and with them the LLC did make, the

following payments:

| Date | Loan Payments | Brookline Taxes | Brookline Fees | Insurance | Utilities | OC&M |
|---|---|---|---|---|---|---|
| 7/20/2015 | $3,565.00[9] | | | | | |
| 7/20/2015 | $6,333.34 | | | | | |
| 7/22/2015 | | | | $723.08 | | |

---

[9] This amount is the portion of this loan payment that was funded with contributions of Filippov and not of Kagan. The balance of this loan payment was funded with the last $2,768.33 of Kagan's contributions.

| | | | | | |
|---|---|---|---|---|---|
| 7/22/2015 | | | | $723.08 | | |
| 7/28/2015 | $6,333.33 | | | | | |
| 7/28/2015 | | | | | | $18,348.16 |
| 8/3/2015 | | | $100.00 | | | |
| 8/3/2015 | | $13,949.10 | | | | |
| 8/3/2015 | | $13,949.96 | | | | |
| 8/4/2015 | | | | | $806.89 | |
| 8/5/2015 | | | | | $2.99 | |
| 8/5/2015 | | | | | $1,859.32 | |
| 8/18/2015 | $6,544.44 | | | | | |
| 8/18/2015 | $6,544.44 | | | | | |
| 8/18/2015 | | | | $723.08 | | |
| 8/18/2015 | | | | $723.08 | | |
| 8/25/2015 | | | | | | $23,473.91 |
| 8/28/2015 | $6,544.45 | | | | | |
| 9/22/2015 | | | | | | $25,369.40 |
| **Totals** | $35,865.00 | $27,899.06 | $100.00 | $2,892.32 | $2,669.20 | $67,211.47 |

139.     The payments in the foregoing paragraph are the only payments of carrying costs by the LLC with Filippov's contributions of which Filippov has submitted evidence. I do not find that the LLC did not make further payments of carrying costs with his contributions, only that it has submitted no evidence of others (and has not attempted to prove others).

140.     The payments in the column headed OC&M are payments to the law firm of O'Connor, Carnathan & Mack.

**P.   The Filippov Promissory Note**

141.     When Filippov made each of the first five of his direct payments of carrying costs on behalf of the LLC and the five deposits into the LLC Account, he understood himself to be making an equity investment in the LLC. He did not deem any one of these payments or deposits to be a loan to the LLC.  He did not, either as managing member of the LLC or as Alex Filippov the individual, arrange to contemporaneously document any one or more of these payments or deposits as a loan from the individual to the LLC. Filippov does not contend and has not established that any of these funds he

advanced to or on behalf of the LLC prior to September 30, 2015 were advanced with an expectation on his part of receiving a promissory note from the LLC in exchange.

142.    On September 30, 2015, Filippov made a further deposit into the LLC Account in the amount of $132,788.53. Filippov made this advance of monies on the understanding that it was part of a loan of $200,000.00 to the LLC.  He did not consider this advance to be an equity investment.

143.    On the same day as this advance, he, as managing member of the LLC, executed a promissory note in favor of himself individually in the principal amount of $200,000 and executed a mortgage on the LLC's real estate to secure the promissory note.

144.    Filippov has filed a proof of claim, Claim No. 9-1, for $200,000 and accrued interest (at five percent per annum) that is based on this promissory note; the claim is asserted as a secured claim. The promissory note was attached to the proof of claim. Filippov has not introduced it into evidence.

145.    Filippov has placed in evidence the mortgage. The mortgage is dated September 30, 2015. It bears a recording stamp indicating that it was recorded in the registry of deeds on October 7, 2015, at 10:42 a.m., the same day as, but prior to, the LLC's filing of the bankruptcy petition that commenced the present bankruptcy case.

146.    At trial, Filippov indicated that the $132,788.53 deposit of September 30, 2015, was part of the $200,000 advanced as the loan for which he received the promissory note, but he was unable to specify the other advances that he contends constituted the $67,211.47 balance of the loan. His understanding was that any grouping of $200,000 in advances would constitute the loan. Notwithstanding his confusion, however, it is also clear that, when, after September 30, 2015, Filippov made further payments from his personal checking account on the Debtor's behalf, he did so with the understanding that these advances, if not any made earlier, were part of his $200,000 loan to the LLC. His payments in November 2015 on the LLC's behalf exceeded $67,211.47.

147.     Before he executed the promissory note and mortgage, Filippov discussed the matter with Lipetsker, and Lipetsker agreed that Filippov should, on behalf of the LLC, proceed with executing a promissory note and mortgage in favor of himself in exchange for a loan. Both Filippov and Lipetsker reasoned that the LLC needed money to finance its continuing carrying costs, including but not limited to the legal fees it was incurring against the Kagan parties. Filippov did not consult or meet with Kagan about the proposed loan and promissory note. He reasoned, correctly, that (i) Kagan had long before stopped responding to their inquiries, (ii) Kagan would not cooperate in a borrowing intended, in part, to fund the legal effort against him, and (iii) Filippov alone, as managing member and holder of at least 80 percent of the membership interest, and especially in combination with Lipetsker, had authority to proceed without Kagan.

148.     When Filippov advanced $132,788.53 to the LLC on September 30, 2015, he thereby increased the balance in the LLC Account to $138,062.34. Of that sum, approximately $107,000 remained in the LLC Account at the time of the LLC's bankruptcy filing on October 7, 2015.

149.     Filippov, as managing member, hired the law firm of Bass, Doherty & Finks to prepare the promissory note and mortgage. On November 4, 2015, Filippov, on behalf of the LLC, paid the firm's fee, in the amount of $699.14, from his own personal checking account.

**Q.  The ProEx Component of KDC's Claim**

150.     Through its proof of claim in this case, KDC seeks compensation for, among other things, the billings of ProEx, as an alleged subcontractor, for work it allegedly did on the project.  As set forth in KDC's proof of claim binders, Exhibits 174.1-174.4, these total $916,800.00.

151.     ProEx is a Massachusetts corporation that at all relevant time has been wholly owned by Kagan and Tatiana.  All profits from its operations flow to them.

152.    ProEx is a subcontractor that specializes in excavation. Kagan testified that he used ProEx on the Lyman-Cutler project for the excavation, concrete, masonry, and landscaping work on the project.

153.    ProEx never entered into, and does not purport to have entered into, a contract directly with the LLC. With respect to the Lyman-Cutler project, it purports to be a subcontractor of KDC.

154.    Kagan testified that he created ProEx as a separate corporation from KDC for a business reason, specifically that for the excavation part of the construction process, he did not want to have to rely on subcontractors. Having his own company would allow him to have more control over the process. On cross-examination, however, it became clear that this business reason was false. In fact, Kagan conceded that, aside from Kagan himself, whose principal work for this company is the hiring and managing of subcontractors, ProEx has no employees of its own and does all its work through subcontractors. Accordingly, the Court finds that Kagan did not create ProEx for the business purpose that he stated.

155.    Nonetheless, because Kagan, KDC, and ProEx regard ProEx as a subcontractor, they seem to have felt no obligation under the KDC Contract, which is a "cost-plus" contract, to account to the LLC for its charges, including both the amounts it paid its subcontractors and any supplemental charges in the nature of overhead, profit, and the like. Rather, KDC, in its proof of claim, has simply carried ProEx's work on the project at a fixed price.

156.    KDC and ProEx adduced evidence, from their accountant, that it would have been very difficult for ProEx to enter contracts on a cost-plus basis, because it had overhead—especially for equipment costs and insurance—that it would have been difficult to apportion on a project-by-project basis. I find this testimony not credible. KDC too has overhead, yet purported to enter into a cost-plus contract. And KDC and ProEx never explained what the difficult-to-apportion items were (what equipment and what insurance) and whether and how extensively they were involved in this project. In

any event, it is clear that many items in ProEx's contract responsibilities consisted of subcontractor

billings, and these at least could be accounted for.

157.    Kagan testified that the fixed price for each ProEx proposal was arrived at by essentially

a one-person contractual process:  before it performed the work, ProEx made written proposals to KDC

for the work it would do; and KDC accepted these proposals by employing ProEx without objection or

counteroffer to the proposals. In this contractual process, Kagan represented both parties: he made the

proposals on behalf of ProEx and he employed ProEx on behalf of KDC. There was no negotiation. In the

ProEx proposals, Kagan simply set the prices as he saw fit for both parties. This was Kagan's testimony.

158.    In this manner, Kagan testified, ProEx generated seven proposals.  The seven proposals

together total $916,800.

159.    The first of the proposals is a one-page document dated September 1, 2013. Asked

whether he had prepared this document, Kagan testified that it "was probably prepared by Ryan

O'Grady, I think." Ryan O'Grady was KDC's office manager at the time; he was not called as a witness to

verify that he had prepared it. Kagan in any event acknowledged that the proposal was based on

numbers that he, Kagan, had supplied. This proposal covers the initial phase of the project, for

demolition and removal of the house and in-ground pool that existed on the as-yet undivided property,

for a proposed total price of $43,700.00. Though Kagan testified that the proposal was made before the

work was performed, he later admitted that the new foundations were inspected no later than August

23, 2013, and therefore it is clear, and I find, that the demolition work in the September 1 proposal was

completed long before the date of that proposal. In addition, this proposal indicates that the telephone

number for ProEx is 617-610-1276. As Brusenkova testified, ProEx did not acquire this number until

February 2014 and prior to that time used Kagan's cell phone number as its telephone number. For

these reasons, I find that the demolition proposal was not made until at least February 2014, and

probably only in June 2015 when it became necessary for KDC to document and justify the amounts KDC

was demanding through its mechanic's liens. In any event, Kagan forged this document by giving it a

date of September 1, 2013, which he knew to be false, and Kagan knowingly gave false testimony by

testifying that this proposal had been made (i) before the work was commenced and (ii) on September

1, 2013.

160.     The second and third proposals, for 55 Lyman and 88 Cutler respectively, are for ProEx's

role in the construction of the new homes, each for a fixed price of $418,150.00.  Each is dated October

1, 2013.  Again, this is a date after construction had begun: although both proposals covered excavation

for the new homes and pouring of their foundations, Kagan admitted that this work was completed by

August 23, 2013.  These proposals, too, indicate that the phone number for ProEx is 617-610-1276, the

number that ProEx did not acquire until February 2014. I find that these proposals too were not made

until at least February 2014, and probably only in June 2015 when it became necessary for KDC to

document and justify the amounts KDC was demanding through its mechanic's liens. Kagan forged these

documents, too, by dating them October 1, 2013, which he knew to be false.

161.     The fourth and fifth proposals, both dated March 25, 2015, were for snow removal at

each of the two lots, for $9,500 per lot. There is no evidence that Filippov ever approved these

exorbitant sums to plow the driveways, much less of what it actually cost ProEx to subcontract this

work.

162.     The sixth and seventh proposals are for after-winter damage repair and maintenance,

for $8,500.00 and $9,200.00 respectively. Both are dated May 25, 2015, after this dispute had begun

and twelve days after Filippov had put Kagan on notice that he was taking full control of the properties.

Filippov never approved or accepted these proposals.

163.     Kagan testified that he gave a copy of the demolition proposal to Filippov and Lipetsker

when he prepared it, but Filippov and Lipetsker credibly deny that they saw any of these proposals prior

to litigation. I find that Kagan did not share the proposals with Filippov and Lipetsker until they were produced in litigation.

164.    Though ProEx is an accrual basis taxpayer, and recognizes revenue from its projects on a percentage completion basis (e.g., if forty percent of the work is done at the end of a tax reporting period, then forty percent of the revenue has to be booked or recognized for tax purposes), KDC's accountant, Jason Gordon, and its CFO, Dan Gersh, had not seen the ProEx proposals prior to the litigation. Brusenkova also had never seen the ProEx proposals prior to the litigation and had never seen a ProEx proposal like this on any of Kagan's projects. These are further reasons to find, as I do, that the proposals were not fabricated until May or June 2015, and that they served no role in ProEx's existence other than to falsely document charges that KDC was seeking to press against the LLC.

165.    I find that the various ProEx proposals did not exist until fabricated for litigation as needed in May or June 2015.

166.    The actual checks issued by ProEx for work performed by its subcontractors on the Lyman-Cutler project show a total of at most $225,958.05 in payments to subcontractors for work on this project; and this amount is likely an overstatement as 11 of the 22 checks in this accounting appear to include, in part, compensation for work on other Kagan projects. ProEx presented no evidence to support any additional expenditures on the Lyman-Cutler project, whether to subcontractors or for equipment rental or other items of overhead. The first three ProEx proposals, which covered the bulk of ProEx's billing on the project, totaled $880,000. I find that there is no basis in the record to believe that the fixed prices in the various ProEx proposals correspond to ProEx's actual costs and expenditures on the Lyman-Cutler project.

167.    ProEx does not track its expenses by project. When, in May or June of 2015, Kagan had the ProEx proposals prepared, he was in effect drafting invoices for work already completed. He did so without benefit of an accounting of ProEx's expenses for the Lyman-Cutler project. Kagan testified that

he did not know how much profit was built into the charges he had submitted through the ProEx proposals. He did not deny that the ProEx charges included profit.

168.     Brusenkova testified credibly that when Kagan had her prepare invoices for work by ProEx, he would just create an amount and have her put it in the invoice. This testimony is credible because the evidence shows that Kagan and ProEx did not track expenses by project. Because of the inadequacy of his accounting systems, Kagan appears to have had at best only a rough sense of how much a particular project was costing him or had cost him; accordingly he had to (i) guess at the cost of the project to ProEx and (ii) because the margin of error was large, pad the bill generously to ensure he wasn't operating at a loss and make such profit as he saw fit.

169.     The ProEx proposals were a means by which Kagan could (i) manipulate the total KDC contract recovery without having to account to the LLC for the underlying costs and expenses and (ii) through a fixed price recover profit for a Kagan entity and compensation for Kagan's time, notwithstanding that the Operating Agreement limited his recovery to the $2,800,000 construction budget and his fifty percent share of net proceeds.

**R.  Kagan's Modus Operandi**

170.     The Plaintiffs contend that Kagan's conduct in the Lyman-Cutler project—announcing at the last minute previously undisclosed project overages, demanding from investors a substantial adjustment in his favor of the distribution among the members upon sale, and, as leverage, threatening to tie up their investments with a mechanic's lien—is part of the method by which Kagan ordinarily does business with the various investors with whom he has built houses, and, by inference, it was also part of Kagan's plan in this instance from the start. To establish this, the Plaintiffs submitted evidence of Kagan's conduct in conjunction with four other projects.  The evidence bears out these allegations.

171.     Elena Lande invested in a Kagan project through the Yarmouth Road Development LLC, of which she, her husband, and Kagan were the three members.  As on the Lyman-Cutler project, Kagan

told her that he was sure that the construction budget they contemplated would supply all the

construction funding they would need. Nonetheless, after the house was completed and under

agreement and just before the closing, Lande credibly testified, Kagan charged her with approximately

$300,000 in alleged overruns (over and above $100,000 in overruns he had previously mentioned). The

aggregate charges included $440,000 by ProEx. When Lande initially resisted Kagan's demand, Kagan,

through Cohen, threatened to place a mechanic's lien on the property, which would effectively make it

impossible to sell the property, and would tie up her investment, until she relented. Under duress, she

did relent, recovered her entire investment, and made a substantial profit, but significantly less than she

believed she was entitled to, and she never received a satisfactory accounting of the alleged overages.

172.    Mark Kayserman and his wife invested in a Kagan project through Deborah Road, LLC.

He credibly testified that he had been "very close friends" with Kagan for years before and had

satisfactorily invested in a previous Kagan project. After construction was complete on Deborah Road

and just a few days prior to its scheduled sale, Kagan sent him an invoice for $111,000 for work done a

year earlier, primarily for work done by Kagan's excavation company. He regarded the timing and

amount as very questionable but believed fighting it was pointless. He got back his investment and a 25

percent return but believes Kagan betrayed him. They no longer speak.

173.    Vladimir Abramskiy invested in a Kagan project through the Newton-Cynthia Road LLC.

Through Cohen, Kagan initially notified Abramskiy that there were unpaid project payables of $141,900,

but when Abramsky rejected the settlement options that Cohen had offered with this notice, Kagan,

through Cohen, sent a further demand (after the project went under agreement) with notice that

overages were now $408,172.77, representing new overages of $266,272.77 of which he'd had no

previous notice. The latter demand, in May 2015, included a general contractor fee of 15% and an

"accrual fee" of 18%, neither of which Abramskiy had ever heard before; Abramskiy had never seen a

contract with KDC or talked about one with Kagan. And the demand was coupled with notice that KDC

intended to establish a mechanic's lien against the property to ensure payment of the overage, which would impede the pending sale. In the end, though Kagan had initially told him he could expect a profit of $50,000 to $60,000, Abramskiy just broke even.

174.    Dimitriy Zhukovskiy invested in a Kagan project through the Hyde Avenue LLC, with Lipetsker and Kagan as the other members. He testified credibly that just before and even after the closing of the Hyde Avenue sale in April 2014, which was eight months after construction had been completed, Kagan told him for the first time of approximately $510,000 in alleged overruns, including $170,000 in amounts allegedly owed to ProEx.

175.    This evidence of Kagan's method of doing business with his investors lends credence to certain testimony of Elena Brusenkova. Asked whether she had observed any habit or routine practice about how Kagan would bill the projects, she said that in the middle of 2013 he started billing them double. It began with a project on which, because they had hit ledge, he asked her to double the bill from $200,000 to $400,000. And then a couple of weeks later he said he needed to bill all his other investors $400,000 just to be consistent. In addition, when the investor on the first project took issue with the $200,000 increase, "He [Kagan] was swearing. And he said I'm a powerful man. I can do whatever I want to do. They cannot do anything against me. And if they will not pay me money, I will put lien and they will not get their contribution back for another several years." I find that Kagan knew that he had leverage, that his investors were poorly positioned to question his charges, that generally they had invested far more in the project than he and had more to lose by delay, and that often he could simply get away with demands that he couldn't properly account for and justify. All of which was easier when, at the end of the project, he dealt with the investors, often former friends, solely through Cohen and refused to answer to them himself, as seems to have been his pattern.

176.    From the evidence of these earlier projects, and from that of Lyman-Cutler, it is clear that Kagan's representation to Filippov and Lipetsker, in their early negotiations, that he knew exactly

how much a project would cost, was false and knowingly so. Nonetheless, he could make such a representation, and then agree to the kind of fixed-price Operating Agreement that he did in Lyman-Cutler, because he knew that in the end, he could adjust the outcome, regardless of the legalities, by making demands and threatening a mechanic's lien, and he'd likely get away with it, usually without actually needing the mechanic's lien. This was why he felt comfortable with the agreement Filippov demanded in exchange for his investment.

### S.    Bad Faith

177.    By the May 7 Letter, Kagan and KDC, through counsel, made a demand against the LLC for payment of some $800,000 in uncompensated construction costs, which costs they asserted "will be payable after repayment of the existing bank debt and before any proceeds are available to the Company's members." Kagan and KDC knew, when they sent this letter and made this demand, that the Operating Agreement limited Kagan's compensation for the construction of the homes to the supplied construction funding of $2.8 million and his fifty percent share of net profits, and that this demand to cover excess costs was in violation of the Operating Agreement. Kagan and KDC made this demand in knowing disregard of Kagan's obligations under the Operating Agreement and in bad faith, in an attempt to extort from the LLC monies to which Kagan knew he was not entitled.

178.    KDC's alleged mechanic's liens purport to be based on the KDC Contract. In the Kagan Superior Court Action, KDC brought counts against the LLC for breach of the KDC Contract and for an order establishing the validity of its mechanic's liens. In the present litigation, KDC has filed a proof of claim, Claim #1-2, that is based entirely on a contract theory, the contract in question being the KDC Contract. And in its counterclaim in the present adversary proceeding, KDC also asserts counts against the LLC for breach of the KDC Contract and related contract-based relief.

179.    As I have found, Kagan, acting for himself and on behalf of KDC, and Cohen together fabricated the KDC Contract in May and June of 2015; and, with intent to use it as evidence in Kagan's

and KDC's legal disputes with the LLC and Filippov and Lipetsker, Kagan knowingly and with intent to

deceive backdated it to June 24, 2013.

180.    Kagan then introduced the forged KDC Contract in the present proceeding to establish

the validity of its proof of claim and to prosecute KDC's counterclaims in the adversary proceeding. In

prosecuting its proof of claim in this bankruptcy case and its contract-based counterclaims in the

adversary proceeding, Kagan has knowingly and deliberately filed and prosecuted claims he knew to be

false and unfounded.

181.    To advance these false claims, Kagan further fabricated and introduced in the present

proceedings additional false evidence, including Exhibit 215 (purporting to be an email of August 2013,

but in fact fabricated in 2015), the first three ProEx proposals (if not also later ones), and Exhibit 65

(purporting to be an email of transmission from Cohen to Kagan of a pre-execution copy of the KDC

Contract on June 24, 2015).

## DISCUSSION

### 1.    Objections to Claims

Before the Court are seven objections to claims.  The burdens with respect to proofs of claim

were summarized by Judge Somma:

> A proof of claim executed and filed in accordance with the Federal Rules
> of Bankruptcy Procedure constitutes prima facie evidence of the validity
> and amount of the claim. FED. R. BANKR. P. 3001(f); *see also Juniper
> Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925
> (1st Cir.1993). In order to rebut this prima facie evidence, the objecting
> party must produce "substantial evidence." *United States v. Clifford (In
> re Clifford)*, 255 B.R. 258, 262 (D. Mass.2000) (*Hemingway Transport*,
> 993 F.2d at 925). If the objecting party produces substantial evidence in
> opposition to the proof of claim and thereby rebuts the prima facie
> evidence, the burden shifts to the claimant to establish the validity of its
> claim. *Hemingway Transport*, 993 F.2d at 925 ("Once the trustee
> manages the initial burden of producing substantial evidence . . . the
> ultimate risk of nonpersuasion as to the allowability of the claim resides
> with the party asserting the claim."). Where the proof of claim is not
> filed in accordance with the Federal Rules of Bankruptcy Procedure, the

> proof of claim does not constitute prima facie evidence of the validity and amount of the claim, and therefore the burden of proof rests at all times on the claimant.
>
> In order for a proof of claim to be executed and filed in accordance with the Federal Rules of Bankruptcy Procedure, it must satisfy (among other things) two requirements set forth in Rule 3001 itself. First, "when a claim ... is based on a writing, the original or a duplicate shall be filed with the proof of claim." FED. R. BANKR. P. 3001(c). Second, "[i]f a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected." FED. R. BANKR. P. 3001(d).

*In re Long*, 353 B.R. 1, at 13 (Bankr. D. Mass. 2006). The "substantial evidence" that the objecting party must produce in order to rebut the claim's prima facia validity is "evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Everett*, 2013 WL 3757283, at *5 (Bankr. D. Mass. July 15, 2013); *In re Alleghany International, Inc.*, 954 F.2d 167, 173-174 (3d Cir. 1991). This means that an "'objector must produce evidence equal in force to the prima facie case.'" *Tracey v. United States (In re Tracey)*, 394 B.R. 635, 639 (B.A.P. 1st Cir. 2008) (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d at 173).

As to each basis of objection, the claimant's burden of establishing the validity of its claim is not one of starting from scratch.  Rather, in view of the prima facie validity of the claim, the claimant's burden of ultimate persuasion (answering an objection supported by sufficient evidence) is a burden of persuasion only as to the particular objection, of establishing that the defect alleged in the objection either does not exist or is no defect.

### B.    Objection to Proof of Claim #1-2 of KDC

#### 1.    The Claim and Objection

In proof of claim #1-2, KDC asserts a secured claim in the amount of $2,396,914.66 for amounts owed it by the Debtor under an alleged construction contract between the Debtor and KDC, the KDC Contract, for construction of the LLC's two homes. The proof of claim indicates that the claim is secured by a statutory mechanic's lien against the two homes (now by the proceeds of the sale of the two

homes), which lien, the proof of claim indicates, was filed on June 22, 2015. The claim is supported by an

invoice, which identifies the following eight components of the claim:

| Item | Amount | Comment/Reference |
|------|--------|-------------------|
| Design Fee | $25,000.00 | "This fee is included in paragraph 7.1.1 of the construction contract." |
| Unreimbursed Costs of Construction ("Hard Costs") | $578,528.49 | "Costs for Construction still owed to KDC: $578,528.49:  $3,773,143.49 less proceeds from the LLC's construction loan ($3,194,615.00)." |
| General Contractor Construction Fee | $565,971.52 | "15% of the cost of construction.  This fee is included in paragraph 7.1.2 of the construction contract." |
| KDC Office Overhead | $59,250.00 | "This number excludes the value for time spent by Vadim Kagan, which would equal 820 hours @200/hr $164,000. It is also covered by the construction agreement. See par. 7.3.2.5. |
| Carrying Costs | $665,545.49 | "Total Carrying Costs advanced by KDC from July 1, 2013 through June 10, 2015." |
| Carrying Costs Advance Fee | $127,562.89 | "Carrying Costs advance fee @ 1.459% of total accrued monthly Carry Advance (17.5% divided by 12 months = 1.45833%). This reflects 23 months of interest. See Exhibit E, par. 7.1.3." |
| Interest | $233,865.39 | "Interest at 12% thru May 1, 2016: $233,865.39 (approximately $82,000 accrued prepetition)." |
| Administrative Fee and Expenses | $141,191.25 | "Administrative fees and expenses as provided for under the construction contract thru May 1, 2016." |

In their objection to this claim [ECF #139], as supplemented before trial through the parties'

Joint Pretrial Memorandum, and as further developed through the evidence adduced at trial, Filippov,

Lipetsker, and the Debtor ("the Objecting Parties") object to this claim on the following principal

grounds:

   i.   The KDC Contract, though dated June 24, 2013, was fabricated by Kagan only in 2015,

        after construction was completed, when KDC, which had no contract with the LLC,

        needed one to support the mechanic's liens it then was seeking to file against the

        property. In short, the contract that forms the purported basis of this claim did not exist

during the construction of the homes and, for purposes of this claim, is no contract at all.

ii.  The KDC Contract was executed by Kagan for both parties and amounted to undisclosed self-dealing by Kagan, a fiduciary of the LLC, such that, under the doctrine of entire fairness, it is presumptively voidable and should for the following reason be avoided in its entirety.  The KDC Contract (if it is found to have existed at all) should be avoided in its entirety because the Lyman-Cutler LLC Operating Agreement obligated Kagan to build the homes in exchange for $1.4 million construction funding per home and 50 percent of the net profits from each home; his compensation is limited to these two elements. Insofar as the KDC Contract purported to obligate the Debtor to pay further sums to KDC, which is wholly owned by Kagan and his spouse, it violated the terms of the Operating Agreement. This invalidity applies to the KDC contract as a whole and to each of the charges that comprise KDC's claim, each of which is based on the contract.

iii. Various of KDC's charges under the contract are intentionally inflated and false, and KDC's documentation for the charges as a whole is unreliable.

For these reasons, the Objecting Parties ask that the KDC's Claim #1-2 be disallowed in its entirety.

**2.  Prima Facie Evidence of Validity and Amount**

The claim is based on the KDC Contract, and a copy of the KDC Contract is attached to the proof of claim. The claim asserted is a secured claim, and the proof of claim is accompanied by evidence that the security interests, the asserted mechanic's liens, have been perfected, as required by Fed. R. Bankr. P. 3001(c)(1) (where an interest in property of the debtor securing the claim is based on a writing, a copy of the writing shall be filed with the proof of claim).[10] The proof of claim is executed and filed in

---

[10] The evidence of perfection is not attached to Proof of Claim #1-2, KDC's amended proof of claim, but was attached to KDC's original proof of claim, #1-1, and the relevant documents from the original are incorporated by reference in the proof of claim as amended.

accordance with Rule 3001 and, per Rule 3001(f), constitutes prima facie evidence of the validity and amount of the claim.

However, as to each of their principal objections to this proof of claim, the Objecting Parties have submitted substantial evidence that rebuts this prima facie validity. Specifically, the Objecting Parties have submitted substantial evidence (i) that the KDC Contract, on which the claim itself and the mechanic's liens allegedly securing it are based, is a fabrication and did not exist at any time prior to or during the construction of these homes, (ii) that the KDC Contract is a self-dealing contract that contradicts and violates obligations of Kagan under the Operating Agreement, and (iii) that numerous of the specific costs of construction for which KDC seeks compensation under the contract are of doubtful validity. In view of this substantial evidence, the prima facie validity that this proof of claim enjoyed has been rebutted, which shifts the burden of proving the claim wholly to the claimant, KDC.

### 3. Discussion

#### a. Lack of Contract

In each of its eight parts, the KDC proof of claim sounds in contract. It is based on the alleged KDC Contract and rights of KDC against the Debtor thereunder.

i. For the Design Fee of $25,000.00, KDC cites in its proof of claim to ¶ 7.1.1 of the KDC Contract ("For the performance of the Design Phase servlces, as defined in Paragraph 2.2, a lee of $25,000.00.").

ii. For the General Contractor Construction Fee of $565,971.52, KDC cites in its proof of claim to ¶ 7.1.2 of the KDC Contract ("For work or services performed during the Construction Phase, as defined in Paragraph 2.3, a fee of 15% fifteen percent").

iii. For KDC Office Overhead of $59,250.00, KDC cites in its proof of claim to ¶ 7.3.2.5 of the KDC Contract ("Included in the CM/GC's Fee for the Construction Phase are the following: . . . overhead or general expenses of any kind").

iv. For Unreimbursed Costs of Construction of $578,528.49, KDC relies on ¶¶ 8.1 and 8.2 of the KDC Contract ("The Owner agrees to pay the CM/GC for the Cost of the Work as defined in this Paragraph 8," and "On-site costs of the Work including [sic] General Conditions and the aggregate costs of subcontracts.").

v. For Carrying Costs of $665,545.49, KDC relies on ¶7.1.3 of the KDC Contract ("For any capital outlay advanced by the CM/GC done in order to facilitate the advancement of this agreement or the project . . . the CM/GC shall be reimbursed the full amount of the Operational Advance").

vi. For the Carrying Costs Advance Fee of $127,562.89, KDC cites and relies on ¶7.1.3 of the KDC Contract ("For any capital outlay advanced by the CM/GC done in order to facilitate the advancement of this agreement or the project . . . the CM/GC shall be reimbursed the full amount of the Operational Advance *plus a fee of 17.5%*").

vii. For Interest of $233,865.39, KDC relies again on ¶7.1.3 of the KDC Contract ("Any balance [for Operational Advances] remaining unpaid beyond 30 days after being advanced shall accrue additional interest at 12% (twelve percent) per annum compounded monthly").

viii. For Administrative Fees and Expenses of $141,191.25, KDC cites in its proof of claim to "the construction contract" in general but not to a specific paragraph.

The Objecting Parties contend that this claim in its entirety is unfounded because the contract on which it is based was not drafted and signed until after construction of the homes was complete, when it was forged as false evidence of the existence of a contract and backdated to a date near the start of construction. KDC disputes the allegations of fact on which this objection is based but not the logic of the objection itself.

The first obligation of a party seeking to establish rights under a contract is to prove the existence of a contract. I have found, as the Objecting Parties allege, that the contract in question is a fiction: it was not drafted and signed until after construction of the homes was complete, when it was forged as false evidence of the existence of a contract and backdated to a date near the start of construction. At no time during the construction of the Lyman-Cutler homes or during the period when KDC purportedly rendered services or made advances pursuant to the KDC Contract did the KDC Contract exist. The lack of a contract, the purported basis of each part of the claim, requires denial of the claim as a whole.

### b.    Mechanic's Liens

By Proof of Claim #1-2, KDC seeks a determination that the claim it asserts is secured by Massachusetts mechanic's liens against (originally) the Debtor's two properties and (now) the remaining proceeds from their sale. Under the law of the Commonwealth of Massachusetts, whose law the parties agree applies here, the establishment of a mechanic's lien requires that the entity seeking to establish the lien be a party to a written contract with the owner of the property on which the lien would be established. MASS. GEN. LAWS ch. 254, § 2 ("A person entering into a written contract with the owner of any interest in real property . . . shall have a lien . . . ."). The Massachusetts mechanic's lien statute requires strict compliance in order to obtain relief. *Ng Bros. Const., Inc. v. Cranney*, 436 Mass. 638, 642 (2002), citing *Mullen Lumber Co. v. Lore*, 404 Mass. 750, 752, 537 N.E.2d 123 (1989). For lack of a written contract, KDC's efforts to establish mechanic's liens on the Debtor's properties were ineffective. Any claim that KDC may have against the Debtor is accordingly unsecured.

### c.    Entire Fairness

In the alternative, the Objecting Parties argue that if the Court finds that Kagan created the KDC Contract when that contract purports to have been executed, in June 2013, the contract should nonetheless be avoided in its entirety because it involved self-dealing on Kagan's part, in violation of his

fiduciary obligations to the Debtor LLC and of the terms of the Operating Agreement, and has not been

shown to be entirely fair, and indeed has been proven to be quite unfair. The Objecting Parties here rely

on the doctrine of entire fairness. Although I have found that the KDC Contract did not exist at all, I will

address this argument, too, for the sake of thoroughness; and for purposes of this argument I will

assume (contrary to fact) that the KDC Contract was entered into prior to the start of construction, in

June 2013.

Under Massachusetts law, members of a limited liability company owe each other fiduciary

duties. *Allison v. Eriksson,* 479 Mass. 626, 635-36 (2018). As a member of the Debtor limited liability

company, Kagan had fiduciary obligations to the Debtor and the other members.

"Endorsing Delaware's conception of fairness as 'closely related to the views expressed in

[Massachusetts] decisions,' the SJC has explained that 'where one stands on both sides of a transaction,

he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the

courts.'" *In re PHC, Inc. S'holder Litig.*, 894 F.3d 419, 431 (1st Cir. 2018), citing and quoting from *Coggins*

*v. New Eng. Patriots Football Club*, 397 Mass. 525, 531 (1986) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d

701, 710 (Del. 1983)). The burden of establishing entire fairness comes into play, and displaces the

deference inherent in the business judgment rule, when the plaintiff first meets its initial burden of

demonstrating that the fiduciary "appeared on both sides of [a] transaction or derived a personal

benefit from a transaction in the sense of self-dealing." *See Bergeron v. Ridgewood Sec. Corp.*, 610 F.

Supp. 2d 113, 136 n.14 (D. Mass. 2009) (applying Delaware law). A transaction benefitting a fiduciary's

spouse is a type of transaction that would be subject to entire fairness review. *See, e.g., Pereira v.*

*Cogan*, 294 B.R. 449, 532 (S.D.N.Y. 2003), vacated and remanded on other grounds, 413 F.3d 330 (2d Cir.

2005) (loans director caused company to make to his wife subject to entire fairness). This standard of

review would also apply to a fiduciary's ability to set his own salary. *Bos. Children's Heart Found., Inc. v.*

*Nadal-Ginard*, 73 F.3d 429, 433 (1st Cir. 1996) (applying Massachusetts law and explaining that

"fairness" standard applies to fiduciary's ability to set own salary).

When Kagan, acting on behalf of the Debtor, entered into the KDC Contract, he was entering

into a self-dealing transaction. He acted for both parties to the contract. KDC, the counterparty to the

contract, was wholly owned by himself and his wife, and he accordingly stood to gain from it. The gain

was substantial and fundamentally at odds with the provisions of the Operating Agreement as to the

extent, manner, and priority of Kagan's being compensated for his undertaking to build the homes. The

gain and self-dealing were compounded by the fact that, upon KDC's entry into the KDC Contract, Kagan

and KDC intended to and did subcontract with ProEx, another entity wholly owned by Kagan and his

wife, on a fixed-price basis that would, by design, generate further profit for the Kagans, on a priority at

odds with the Operating Agreement, and insulate ProEx compensation from review. Whether alone or in

conjunction with the ProEx subcontract, it is abundantly clear that the KDC Contract involved self-

dealing that shifts the burden of proving entire fairness onto Kagan and KDC. The Objecting Parties have

met their initial burden in this regard.

A fiduciary who engages in a self-dealing transaction must prove that the transaction is entirely

fair. *Coggins v. New Eng. Patriots Football Club*, 397 Mass. 525, 531 (1986) ("[t]he requirement of

fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the

burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts")

(quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701). "The concept of fairness has two basic aspects: fair

dealing and fair price." *Coggins*, 397 Mass. at 531.  The aspect of fair dealing "embraces questions of

when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors,

and how the approvals of the directors and the stockholders were obtained." *Weinberger v. UOP, Inc.*,

457 A.2d at 711. A corporate officer engaging in self-dealing must fully and honestly disclose any

information relevant to the transaction, thereby permitting a disinterested decision maker to exercise

informed judgment. *See Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 531, (1997) (to satisfy the duty of loyalty, a fiduciary wishing to engage in a self-dealing transaction must disclose details of the transaction and the conflict of interest to the corporate decisionmakers); *Puritan Medical Ctr. Inc. v. Cashman*, 413 Mass. 167, 172, (1992) (self-dealing not ratified in absence of full disclosure); *Dynan v. Fritz*, 400 Mass. 230, 242-43 (1987) (in the context of the repurchase of company stock from an officer-director, good faith requires a full and honest disclosure of all relevant circumstances to permit a disinterested decision maker to exercise its informed judgment). The aspect of fair price relates to the economic and financial considerations of the transaction, including all relevant factors. *Weinberger v. UOP, Inc.*, 457 A.2d at 711. Notwithstanding its two aspects, "the test for fairness is not a bifurcated one[.]" *Id.* "All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.* Still, a failure of disclosure may by itself be dispositive and obviate inquiry into the fairness of the price. *Bos. Children's Heart Found., Inc. v. Nadal-Ginard*, 73 F.3d at 434 (applying Massachusetts law: "When . . . a court finds that an officer failed to act in good faith, it follows that a fiduciary breach exists, and the need to determine whether or not an officer's salary is objectively reasonable is obviated."). The fairness of the transaction is evaluated as of the time it was entered into. *Demoulas*, 424 Mass. at 185.

On the issue of fair dealing, Kagan's creation of the KDC Contract was a lesson in how not to proceed. The proposed contract was conceived of, drafted, and executed entirely by Kagan (with Cohen's assistance) without discussion of its merits with either Filippov or Lipetsker. Nor did he even notify them that he had entered into it at any time until after construction was complete and litigation had commenced. The other members were afforded no opportunity whatsoever to be heard on its merits or to vote or take other action on it, notwithstanding that Filippov alone, and certainly in conjunction with Lipetsker, had sufficient membership interest to effectively veto the contract, and that Filippov, as managing member, needed to know of its existence in order to carry out his duties properly.

On the issue of fair price, the KDC Contract fares no better. The three members had negotiated an Operating Agreement under which Kagan was obligated to build the homes, in consideration of which he would be supplied with $2.8 million of construction funding and receive compensation in the form of a fifty percent share of the net profits. The KDC Contract fundamentally altered Kagan's compensation by (i) obligating the LLC to fund the hard costs of construction (materials and subcontractors) not just to the extent of $2.8 million but without limit, (ii) adding to these hard costs a 15 percent surcharge (the General Contractor Construction Fee) and a $25,000 Design Fee, both payable to KDC, (iii) obligating the LLC to repay as debt monies advanced on behalf of Kagan to fund carrying costs, although the Operating Agreement includes no such provision, (iv) obligating the LLC to pay the in-house remedial accounting expenses—790 hours at $75/hour—necessitated because KDC did not in the first instance keep its accounts in a manner adequate to the "cost-plus" demands of this very contract, and (v) obligating the LLC for a fee of 17.5 percent plus interest at 12 percent per annum on any advance of carrying costs (notwithstanding that the Operating Agreement makes no such provision), all payable by the LLC to KDC, and inuring to the benefit of Kagan, before any distribution at all to members. The KDC Contract enriches KDC, ProEx, and Kagan, shifts the risk of loss from Kagan to the other members, compensates Kagan for work he agreed to undertake for only his fifty percent share of net profits, and substantially reduces the profitability of the project to the LLC, all for no new value.

KDC contends that the KDC Contract was fair in price because there was evidence that, on the open market, the LLC could not have had the houses built for a better price. I need make no finding about that evidence because the fairness of the KDC Contract is not being evaluated by comparison to the open market. Rather, it is being compared to the deal the LLC had, as embodied in the Operating Agreement. It is that deal that the KDC Contract virtually turned upside down. That's why Kagan created it, and why he told no one that he had. The KDC Contract is not fair in price to the LLC. As Kagan and KDC

have shown neither fair dealing nor fair price, they have failed to carry their burden of proving entire fairness.

It follows that Kagan's entering into the KDC Contract was a breach of his fiduciary duty to the LLC. "If a breach of fiduciary duty is found, equity allows the court to order appropriate equitable relief." *In re PHC, Inc. Shareholder Litigation*, 894 F.3d 419, 435 (1st Cir. 2018), applying Massachusetts law and citing *Allison v. Eriksson*, 479 Mass. 626, 98 N.E.3d 143, 154 (2018) and *Demoulas*, 428 Mass. at 580-81. "The hallmark of equitable relief is its protean nature and—within wide limits—a court sitting in equity may tailor relief to fit the circumstances of a particular case." *In re PHC, Inc. Shareholder Litigation*, 894 F.3d at 435, citing *Allison*, 479 Mass. 638-39, and *Demoulas*, 428 Mass. at 580-81. "Within this remedial realm, it is standard fare for a court to fashion remedies that deny a breaching fiduciary undue gain or advantage received by virtue of his position." *In re PHC, Inc. Shareholder Litigation*, 894 F.3d at 435. In particular, rescission may be ordered to avoid unjust enrichment of the fiduciary at the expense of a beneficiary. *Demoulas*, 428 Mass. at 580–81. The case for this relief is particularly strong where, as in this instance, the undue gain to the breaching fiduciary is entirely wrongful loss to the wronged company.

The appropriate remedy here is to rescind or avoid the KDC Contract in its entirety. As to each component of the KDC claim, the real party in interest is Kagan, who, by virtue of rescission, is left with such rights as he had before the KDC Contract was entered into.[11] This is not an instance in which the counterparty to the contract, KDC, can be said to have, in good faith, extended benefits to the LLC on the basis of the contract. KDC entered into the contract knowing precisely what Kagan knew about it: that it had not been vetted by or even mentioned to the other members, that it altered wholesale the compensation scheme embodied in the Operating Agreement, and indeed that this was its purpose.

---

[11] Kagan has not filed a claim for such relief in his own name, even as a contingent claim (contingent on denial of this KDC claim).

Accordingly, if I were to find that the KDC Contract came into existence in June 2013, I would, as a

matter of equitable relief, treat it entirely as a nullity and, for that reason, deny all relief thereunder.

### d.    Alternative Theories of Recovery

In the alternative—that is, if the Court deems the KDC Contract unenforceable—KDC asserts

claims for all eight components of its Proof of Claim #1-2 on theories of promissory estoppel, unjust

enrichment, and quantum meruit. It is not clear whether KDC asserts the arguments in support of these

claims as alternate bases of the claim asserted in Proof of Claim #1-2 (as opposed to merely as support

for their counterclaims on these theories against the Debtor in the Adversary Proceeding). For the sake

of thoroughness, I will treat them as offered in part as alternate bases for the proof of claim. For the

reasons below, each is wholly lacking in merit.

### i.    Promissory Estoppel

In Massachusetts a plaintiff seeking to establish promissory estoppel "must allege and prove '(1)

a representation intended to induce reliance on the part of a person to whom the representation is

made; (2) an act or omission by that person in reasonable reliance on the representation; and (3)

detriment as a consequence of the act or omission.'" *Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 14

(1st Cir. 2014), citing *Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court*, 448 Mass. 15, 27–28,

858 N.E.2d 699 (2006). "The doctrine of estoppel is not applied except when to refuse it would be

inequitable. All of the elements of estoppel must be present and the party asserting the estoppel theory

has a heavy burden to prove that all [three] elements are present." *Wilson*, 744 F.3d at 14 (internal

quotations and citations omitted). To establish the first element, KDC asserts, conclusively, that "the LLC

promised it would pay for services." It does not indicate when, where, and in what words the LLC made

this promise. Knowing of no other promise, I assume here that KDC is referring to the promise of

payment in the KDC Contract itself. Having found that no such contract came into existence at any time

prior to the construction and advances of money for which this proof of claim seeks compensation, I find

that the LLC made no such promise, much less one intending to induce reliance (as the performance for which it seeks compensation had already been rendered).  In addition, it would not be inequitable to refuse to apply that theory here; to the contrary, as I determined above, equity here in fact requires rescission of the KDC Contract, meaning nonenforcement of the LLC's promises therein. There is no basis here for application of promissory estoppel.

### ii.        Quantum Meruit

To recover on the theory of quantum meruit in Massachusetts, the claimant must prove three things: (1) that it conferred a measurable benefit upon the defendant; (2) that the claimant reasonably expected compensation from the defendant; and (3) that the defendant accepted the benefit with the knowledge, actual or chargeable, of the claimant's reasonable expectation. *Finard & Co., LLC v. Sitt Asset Mgmt.*, 79 Mass. App. Ct. 226, 229 (2011). KDC contends that these elements are satisfied as to each of the eight components of its claim. I will consider the eight components in three groups: those pertaining to construction; those pertaining to advances of money for carrying costs; and those labeled "overhead" and "administrative fees and expenses."

The first three components are charges for construction work: (i) the Unreimbursed Costs of Construction of $578,528.49, (ii) the Design Fee of $25,000.00, and (iii) the General Contractor Construction Fee of $565,971.52. The first is KDC's quantification of the amount by which the costs of construction exceeded the construction loan proceeds it obtained from the LLC to fund the construction. The latter two are surcharges by KDC that are intended to fund overhead and profit. As to these, it is unnecessary to determine the extent to which KDC conferred a measurable benefit on the LLC, because KDC has not shown that it reasonably expected this compensation from the LLC for that benefit or that the LLC accepted the benefit with the knowledge, actual or chargeable, of any such expectation. At all relevant times, Kagan understood that he was obligated to construct the homes for a fixed price, consisting of $2.8 million in construction funding and his fifty percent share of net profits. As Kagan was

the principal of KDC, KDC's expectation in this matter was the same as Kagan's. The expectation was not

altered by the KDC Contract, which I have found did not exist at any time during construction, when KDC

contends it was conferring measurable benefits on the LLC. Nor would it have been reasonable for

Kagan and KDC to have expected compensation in the nature of these three components of the KDC

claim. Certainly the LLC did not accept the benefit with knowledge, actual or chargeable, of any

expectation by KDC of such compensation. Filippov and Lipetsker understood Kagan's compensation to

be fixed and had no knowledge of any expectation of compensation by KDC at all, whether based in

contract or otherwise. They were not privy to (i) whether and how and to what extent Kagan

understood himself to be using KDC in this project and (ii) the arrangements he'd made (if any) between

himself and KDC to compensate KDC for its contribution to the effort. To the extent that the LLC can be

charged with Kagan's knowledge, even his knowledge does not satisfy this third requirement of

quantum meruit: Kagan's understanding at all relevant times was that his compensation was fixed. For

these reasons, KDC is not entitled to any portion of these three components on the basis of quantum

meruit.

The second set of components pertains to carrying costs: (i) carrying costs allegedly advanced by

KDC, quantified by KDC at $665,545.49, (ii) a 17.5 percent Carrying Costs Advance Fee, quantified by KDC

at $127,562.89, and (iii) interest on the advances at 12 percent, commencing after the thirtieth day after

the advance, quantified by KDC at $233,865.39 through May 1, 2016 (but at only approximately $82,000

through the date of the bankruptcy filing). The advances for carrying costs fall into two categories: those

made through the twenty-third month, and those made after.

During the first twenty-three months, I have found, KDC made no direct payments of carrying

costs. All payments of carrying costs in this period were made by the LLC from the LLC Account, not by

KDC. Nonetheless, at various times, when funds in the LLC account were insufficient to make payments

coming due, KDC deposited funds into the LLC Account to enable the LLC to timely meet its carrying cost

obligations—primarily debt service, real estate taxes, and insurance—and the LLC did apply these advances for that purpose. These deposits by KDC totaled $126,100. As I further found above, however, KDC has more than recouped this amount. Accordingly, to the extent that these advances created a reasonable expectation on the part of KDC that it would be repaid, that expectation has already been fully satisfied.

As I found above, after the first twenty-three months, KDC, on Kagan's behalf, paid $145,175.26 to the LLC for carrying costs accrued after that date. Kagan caused KDC to make these payments to the LLC pursuant to his obligation in § 8.1 of the Operating Agreement ("In the event that the property is not sold within twenty three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold."), which he honored for approximately five months. The Operating Agreement makes no provision for the LLC's reimbursing Kagan for such carrying costs as he funds pursuant to § 8.1; the whole point of this provision was to relieve the LLC from the burden of these costs. Kagan caused an obligation to repay to be baked into the KDC Contract, but that contract was a forgery, created after the advances at issue here were made. It cannot be the basis of recovery on a quantum meruit theory, but neither KDC nor Kagan has articulated any other basis on which KDC might reasonably have expected compensation from the LLC for these advances. I conclude that there is no basis for recovery under quantum meruit for the advances after the first twenty-three months.

The other two components in this group are the Carrying Costs Advance Fee of $127,562.89, and interest of $233,865.39. For these, KDC cites and relies on ¶7.1.3 of the KDC Contract: "For any capital outlay advanced by the CM/GC done in order to facilitate the advancement of this agreement or the project . . . the CM/GC shall be reimbursed  the full amount of the Operational Advance plus a fee of 17.5%"; and "Any balance [for Operational Advances] remaining unpaid beyond 30 days after being advanced shall accrue additional interest at 12% (twelve percent) per annum compounded monthly."

Although KDC calculated the amount of the advance fee as if it were interest, it is a one-time fee, not interest. Its amount is 17.5 percent of carrying costs advanced. This fee is in addition to interest at 12 percent that begins to run on the amounts advanced thirty days after each advance. The sole cited basis for assessing either of these is the KDC Contract, but that contract was a forgery, created after the advances at issue here were made. It cannot be the basis of recovery on a quantum meruit theory, but neither KDC nor Kagan has articulated any other basis on which KDC might reasonably have expected payment by the LLC of a 17.5 percent fee on carrying costs advanced or interest on the advances at 12 percent, much less both in combination.

I conclude that there is no basis for recovery under quantum meruit of the carrying cost advances, whether in the first twenty-three months or after, or of advance fees and interest thereon.

The third set of components is comprised of "administrative fees and expenses" of $141,191.25 and "KDC office overhead" of $59,250.00. Regarding the administrative fees and expenses, KDC's proof of claim quantifies these at $141,191.25 but does not itemize the fees and expenses comprising this sum; nor are these fees and expenses identified or itemized anywhere else in the record or in KDC's post-trial briefing. The proof of claim indicates that these fees and expenses are "as provided for under the construction contract," but KDC cites no particular section of that contract, and I find none for items labeled "administrative." KDC has cited no basis other than the KDC Contract for having a reasonable expectation of recovering these fees and expenses from the LLC, and I find no such basis in the record. There is no basis for KDC's recovering administrative fees and expenses in any amount on a quantum meruit theory.[12]

---

[12] Through the interest component, KDC seeks to recover interest through May 1, 2016, a date after the bankruptcy filing. If interest were recoverable, the postpetition part of the interest would have to be denied.  11 U.S.C. § 502(b)(2) (requiring determination and allowance of a claim as of the date of the bankruptcy filing, "except to the extent that such claim is for unmatured interest").

The component for KDC office overhead of $59,250 is not explained or itemized in KDC's proof of claim or in any of KDC's post-trial briefing. The proof of claim indicates what this amount *is not* for (it "excludes the value for time spent by Vadim Kagan") but not what it *is* for, except that an invoice attached to the proof of claim indicates that the amount of this component reflects 790 hours at $75.00 per hour. For this item, the proof of claim cites to § 7.3.2.5 of the KDC Contract, which states that "included in" KDC's "construction phase fee," which KDC has been referring to in this proof of claim as its General Contractor Construction Fee, are "off site costs for general management of the project, including . . . overhead or general expenses of any kind, except as may be expressly included in paragraph 8." It is not clear to the Court that this language permits charging for overhead; it seems instead to suggest that overhead is covered by the General Contractor Construction Fee and not separately billable.  But even if the KDC Contract did permit recovery of overhead as a separate item, the KDC Contract was a forgery, created after the construction and advances at issue here were complete. It cannot be the basis of recovery on a quantum meruit theory, but neither KDC nor Kagan has articulated any other basis on which KDC might reasonably have expected payment by the LLC of its overhead in general or this particular overhead.

There is a further reason to deny recovery of this component by quantum meruit. This component appears to be a carrying forward into the claim of an identical item in the KDC invoice dated June 1, 2015, which was drafted for KDC by Joseph Cohen. Gersh testified that Cohen had asked him how many hours he had worked on Lyman-Cutler, and he (Gersh) had replied approximately 790 hours. He added that this was an estimate, as KDC did not keep time records. Gersh, KDC's chief financial officer and bookkeeper, was not employed by KDC until after construction of the homes was complete. It is clear from his testimony that the vast majority of the time he spent on Lyman-Cutler was spent from May through September 2015, to document an itemized claim under an open-ended contract, specifically the KDC Contract. I have found that the contract is a forgery and did not exist until May or

June of 2015, such that the claim advanced thereunder was and is a false and fraudulent claim.[13] KDC

can have had no reasonable expectation of compensation from the LLC for accounting services rendered

in support of a claim known to Kagan and KDC to be false. Under the Operating Agreement, KDC's

obligation was essentially a fixed price, for which Gersh's work on documenting every penny allegedly

expended by KDC on the Lyman Cutler project was wholly unnecessary. Quantum meruit, which is based

in equity and requires of its seeker clean hands, is not available for overhead incurred to support a

fraudulent claim.

I also find that there has been no evidence adduced to support the $75/hour rate at which

Gersh's hours are being charged here. In view of the fact that compensation is being sought for 790

hours of work for someone whose annual salary, for approximately 2000 hours of work, was $70,000,

the rate of $75/hour is grossly excessive.

For these reasons, the theory of quantum meruit provides no basis for the various components

of Proof of Claim #1-2.

### iii.    Unjust Enrichment

"Unjust enrichment" is the name by which is known an equitable remedy of restitution

available to a plaintiff against a defendant who has been unjustly enriched to the plaintiff's detriment.

*Salamon v. Terra*, 394 Mass. 857, 859 (1985). It relies heavily on reasons of justice, equity, and good

conscience. S*antagate v. Tower*, 64 Mass. App. Ct. 324, 329 (2005) ("With no other test than what,

under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or

unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed to

examine the circumstances and the conduct of the parties and apply this standard."). Though sometimes

referred to as quasi-contractual, is not based on contract or the expressions of assent on which

---

[13] The evidence does not support a finding that Gersh had knowledge of the fabrication of the contract or of the use to which his extensive accounting efforts on KDC's behalf were being put. Based on my findings, Kagan knew that the claim he was having Gersh support was fraudulent.

contracts are based. *Id.* Being equitable in nature, it is available only where the plaintiff has no remedy

at law. "To satisfy the elements of unjust enrichment, a plaintiff must show: (1) an enrichment; (2) an

impoverishment; (3) a relation between the enrichment and the impoverishment; (4) an absence of

justification and (5) the absence of a remedy provided by law." *Massachusetts v. Mylan Laboratories*,

357 F.Supp.2d 314, 324 (D. Mass. 2005).

Restitution for unjust enrichment is plainly not available here. KDC did very little that might be

said to have enriched the LLC. The vast majority of the material and subcontracting charges were paid

for with the LLC's monies, not KDC's. The extent of "unreimbursed" obligations, obligations in excess of

those so funded, is unclear, in large part because KDC, ProEx, and Kagan did not see fit to account for

amounts expended by ProEx, a Kagan insider, on the project; and in any event is has not been shown

that these unreimbursed obligations are KDC's and not Kagan's, as Kagan and KDC almost never entered

into written contracts with subcontractors before they commenced their work, and therefore it is

unproven that these subcontractors were retained by KDC and not Kagan. The Design Fee and General

Contractor Construction Fee are assessed for work provided by Kagan pursuant to the Operating

Agreement, not by Kagan as an employee of KDC; no reason has been adduced why KDC should be

treated as the provider of Kagan's non-KDC work. The KDC Office Overhead charge is for work done by

Gersh only to support a claim under the KDC Contract, which is a false claim; this work cannot plausibly,

or in good faith, be said to have enriched the LLC. The Administrative Fees and Expenses have not been

itemized or otherwise identified; KDC having failed to identify them, it has also not shown that they

provided any benefit to the LLC. As I explained above, the Carrying Costs advanced by KDC during the

first twenty-three months have already been recouped, and, as the KDC Contract was forged in May or

June of 2015, KDC had no contractual right to assess an advance fee and interest for those advances it

did make in this period. Those Carrying Costs advanced after the twenty-third month were advanced for

Kagan under the Operating Agreement, which affords him no right of reimbursement, much less a right

to charge interest and an advance fee, for those advances. Kagan chose to make those advances

through KDC, but his doing so gave KDC no better right of reimbursement than Kagan himself had under

the Operating Agreement. For these reasons, the KDC Proof of Claim #1-2 seeks compensation for items

for which no showing of enrichment of the LLC has been shown.[14] Therefore, KDC has failed to carry its

burden as to the first two requirements of recovery for unjust enrichment: an enrichment of the LLC and

a corresponding impoverishment of KDC.

Nor has KDC satisfied the fourth requirement, an absence of justification. The relationship and

deal between Kagan and the LLC was defined in the first instance by the Operating Agreement. By May

2015, Kagan decided he no longer liked that deal and so fabricated the KDC Contract precisely to insert

himself, through KDC, into the deal at a higher priority. The KDC Contract is the primary basis for this

proof of claim, and KDC has articulated no other basis why the various items in the claim may fairly be

assessed by KDC.  Far from showing an absence of justification, the denial of compensation for the

various items appears to be fully justified, the claim itself being false and fraudulent. Justice, equity,

good conscience—none of these is on the side of KDC. For these reasons, KDC has not shown

entitlement to restitution for unjust enrichment.

### e.   Conclusion as to Claim #1-2 of KDC

For these reasons, the Objecting Parties' objection to KDC's Claim #1-2 must be and hereby is

sustained; and accordingly Claim #1-2 will be disallowed in its entirety.

---

[14] The sole benefit that KDC provided to the LLC is in the work of its office staff in processing invoices from and making payments to material suppliers (especially through American Express) and subcontractors.  But KDC does not seek compensation for this work in its proof of claim and has not in any event shown the value of the service so provided.

### C.    Objection to Proof of Claim #4-1 of KDC

#### 1.    The Claim and Objection

In a further proof of claim, #4-1, KDC asserts a nonpriority unsecured claim whose amount is

indicated as "undetermined."[15] The basis of the claim is identified as indemnification rights that KDC has

as an agent of a member of the Debtor, presumably Kagan, under the Debtor's organizational and

operating documents and agreements. Though this claim is based on the Operating Agreement, which is

a writing, the Operating Agreement is not attached to the proof of claim.

The Objecting Parties object to this claim, and ask that it be disallowed in its entirety, for two

reasons: that KDC is not an indemnified party under the Lyman-Cutler Operating Agreement; and, even

if it is an indemnified party, it is not entitled to indemnification because it has not acted in good faith on

behalf of the Debtor LLC but has precipitated the legal action against it with willful misconduct and gross

negligence.

#### 2.    Prima Facie Evidence of Validity and Amount

"A proof of claim executed and filed in accordance with these rules shall constitute prima facie

evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). This proof of claim has in

two respects not been executed and filed in accordance with these rules. First, its amount is unspecified

and indeterminate, meaning that it cannot have prima facie effect as to any amount. Second, the claim

---

[15] In an addendum to this proof of claim, and in identical addenda to the other three proofs of claim for indemnification by the Kagan Parties (#5-1 of Tatiana, #6-1 of Kagan, and #7-1 of ProEx), the claimants state:

> The amount claimed hereunder is undetermined. The Claimant's claim shall include, without limitation, the full scope and amount of indemnification (including all rights or reimbursement of legal and other expenses (incurred to date and in the future)) to which it is entitled for any claims that have been or may be asserted against Claimant by Lyman-Cutler LLC (prepetition), the Debtor, on behalf of its estate, or by any other person or entity, including the action pending in Middlesex Superior Court (Civil Action No. 1581CV03977), contested matters in the Bankruptcy Case (Case No. 15-13881) and any Adversary Proceeding commenced in the Bankruptcy Case. To date, the Claimant, together with the other defendants in the case pending in the Middlesex Superior Court, has incurred legal costs of at least $250,000.

is based on a writing, the Operating Agreement, that was not filed with the claim. "When a claim is

based on a writing," Rule 3001(c)(1) requires (subject to an exception not applicable here) that "a copy

of the writing shall be filed with the claim." Fed. R. Bankr. P. 3001(c)(1). Accordingly, this proof of claim

cannot and does not enjoy prima facie validity, and therefore the full burden of proof as to each

element of the claim rests from the start on the claimant.

### 3. Discussion

The indemnification claims advanced here by KDC and the other Kagan Parties are based on

section 10.2 of the Operating Agreement.

> The Company shall indemnify and hold harmless the Members and their
> respective employees and authorized agents from and against any loss,
> damage or claim incurred by reason of any act or omission performed or
> omitted by such Member, employee or authorized agent in good faith
> on behalf of the Company and reasonable (sic) believed to be within the
> scope of authority conferred by this Agreement, except that no
> Member, employee or authorized agent shall be entitled to be
> indemnified or held harmless from or against any loss, damage or claim
> incurred by reason of such Member's, employee's or authorized agent's
> gross negligence or willful misconduct[.]

Operating Agreement, § 10.2. To recover under this provision, the claimant must show (i) that it is a

member or a member's employee or authorized agent (ii) who incurred a loss, damage, or a claim (iii) by

reason of any act or omission performed or omitted by such member, employee, or authorized agent

(iv) in good faith on behalf of the Company and reasonably believed to be within the scope of authority

conferred by the Operating Agreement.  As an affirmative defense, an objecting party may prove that

the loss, damage, or claim in question was incurred by reason of such member's, employee's, or

authorized agent's gross negligence or willful misconduct.

Indemnification must be denied for four reasons. First, KDC contends that it is indemnified as an

agent of a member, Kagan. The evidence does not support a determination that KDC was an agent of

Kagan. Neither KDC nor Kagan contends that KDC participated in the Lyman Cutler project as an agent of

Kagan. Their position throughout has been that KDC participated as the counterparty to the KDC

Contract, under a contractual relationship with the LLC. This alleged role was false, a pretense under a

fabricated contract, but the pretense makes clear that KDC did not purport to be involved as Kagan's

agent.

Second, KDC has not identified the loss, damage, or claim for which it seeks indemnification.

This is not a matter of having failed to produce evidence of the attorney's fees and costs for which it

now seeks compensation, which, by pretrial direction, I permitted the Kagan Parties to present after

trial, if liability for indemnity were shown at all. Rather, it is a failure to identify the legal proceedings

and efforts and losses for which KDC seeks indemnification, and to show how each of these satisfied the

third and fourth requirements outlined above. In its posttrial submissions, KDC has supplied nothing of

this nature.

Third, the claimant has failed to carry its burden of showing that those of its acts that

precipitated the claims and losses at issue were committed in good faith on behalf of the Company and

were reasonably believed to be within the scope of authority conferred by the Operating Agreement.

Quite to the contrary, the evidence shows, and I have found, that the acts that precipitated all this

litigation were committed by Kagan and KDC in bad faith and with knowledge that they were contrary to

Kagan's authority and obligations under the Operating Agreement and to his fiduciary duty to the LLC.

Fourth, all of the losses, damages, and claims that KDC might possibly be referring to here—

starting with the LLC State Court Action, then the Kagan State Court Action, and then the present claims

and adversary proceeding in the Bankruptcy Court—were precipitated by the willful misconduct of

Kagan and KDC. The willful misconduct consisted in Kagan's and KDC's sending the May 7 Letter, filing

documents to establish mechanic's liens, prosecuting the Kagan State Court Action, prosecuting the

claims in this bankruptcy case, especially but not limited to KDC Claim #1-2, and prosecuting its

counterclaims in the present adversary proceeding. In each instance, KDC was asserting claims that,

through its principal, Kagan, it knew to be false claims, based on a forged contract whose creation by

Kagan (with KDC's complicity) constituted a willful and knowing breach by Kagan and KDC of Kagan's

fiduciary duty to the LLC and its other members.  The Objecting Parties have carried their burden as to

this affirmative defense.

For these reasons, the Objecting Parties' objection to KDC's Claim #4-1 must be sustained;

accordingly Claim #4-1 will be disallowed in its entirety.

### D.   Objection to Proof of Claim #5-1 of Tatiana Kagan

#### 1.   The Claim and Objection

In Proof of Claim #5-1, Tatiana asserts a nonpriority unsecured claim whose amount is indicated

as "undetermined." The basis of the claim is identified as indemnification rights that Tatiana may have

as an agent of a member of the Debtor, presumably Kagan, under the Debtor's organizational and

operating documents and agreements. Though it asserts rights under the Operating Agreement, the

Operating Agreement is not attached.

The Objecting Parties object to this claim on the following three grounds. First, Tatiana is not an

indemnified agent under the Lyman-Cutler Operating Agreement. Second, even if she is an indemnified

party, she is not entitled to indemnification because the Operating Agreement excludes any

indemnification rights for losses arising from a member's or agent's gross negligence or willful

misconduct; and, the Objecting Parties allege, Tatiana has not acted in good faith on behalf of the

Debtor LLC but precipitated the legal action against her (the action for which she seeks indemnification)

with willful misconduct and gross negligence. Third, the claim should further be denied because of lack

of specificity as to the amount of damages and complete lack of back up for her alleged losses.

In response, Tatiana states: (i) that she is an agent of the Debtor, and therefore an indemnified

party under the Operating Agreement, by virtue of having been engaged by the Debtor, through the real

estate brokerage for which she worked, to sell the Debtor's properties; (ii) that the Objecting Parties

have neither specified nor presented evidence of the gross negligence and willful misconduct that they

allege; and (iii) that her damages consist almost exclusively of attorney's fees and litigation costs that continue to accrue, and the amount of the claim can be verified upon completion of the matters that give rise to the indemnification.

### 2. Prima Facie Evidence of Validity and Amount

For the same reasons as indicated with respect to Proof of Claim #4-1 above—that the amount is unspecified and that the writing on which the claim is based is not attached—this proof of claim does not enjoy prima facie validity, and therefore the full burden of proof as to each element of the claim rests from the start on the claimant.

### 3. Discussion

Indemnification must be denied as to Tatiana for the following reasons. First, she is not an indemnified party. The Operating Agreement extends the right of indemnification to "the Members and their respective employees and authorized agents." Operating Agreement, § 10.2. She is not and does not purport to be either a member or an employee of a member. The only remaining option is an authorized agent of a member. She is inconsistent as to the manner in which she purports to qualify as an agent of a member: "as an agent of the Debtor" [Tatiana's Response to Objection to Her Proof of Claim, ¶ 3]; "as an authorized agent of the members of the LLC," [Defendants' Requests for Rulings of Law, ¶ 295]; "as the broker and authorized agent of the LLC" [Defendants' Post-Trial Brief, p. 64]; and as someone "working for the member [Kagan]" [Transcript of Closing Arguments, at p. 171].[16] The Operating Agreement does not extend rights of indemnification to agents of the LLC as a whole, only to agents of the individual members. No evidence has been adduced that Tatiana acted as an agent of Kagan.[17] When Kagan signed each of the two listing agreements with the real estate brokerage by which

---

[16] In her proof of claim, she does not actually claim to be an indemnified party in any capacity. Rather, she states only: "If Tatiana Kagan ("Claimant") were determined to be authorized agent of any member of the Debtor Lyman-Cutler LLC (the "Debtor"), Claimant has indemnification rights under the organizational and operating documents and agreements of the Debtor." Proof of Claim #5-1, p. 4.

[17] She does not purport to have been an agent of another member.

Tatiana's agency, Century 21 Commonwealth, was employed, he did so on behalf of the LLC; the LLC, not

Kagan, was the contracting party. Tatiana's role in this drama was limited to the work she did for the LLC

under the LLC's listing agreements with Century 21 Commonwealth. For these reasons, Tatiana has not

established that she is an indemnified party.

Second, Tatiana has not identified the loss, damage, or claim for which she seeks

indemnification. This is not a matter of having failed to produce evidence of the attorney's fees and

costs for which she seeks compensation, which, by pretrial direction, I permitted the Kagan Parties to

present after trial, if liability for indemnity were shown at all. Rather, it is a failure to identify the legal

proceedings and efforts and losses for which Tatiana seeks indemnification and to show how each of

these satisfied the third and fourth requirements outlined above. In her posttrial submissions, Tatiana

has supplied nothing of this nature.

For these reasons, the Objecting Parties' objection to Tatiana's Claim #5-1 must be sustained;

accordingly Claim #5-1 will be disallowed in its entirety.

### E.   Objection to Proof of Claim #6-1 of Vadim Kagan

#### 1.   The Claim and Objection

In Proof of Claim #6-1, Kagan asserts a nonpriority unsecured claim whose amount is indicated

as "undetermined." The basis of the claim is identified as indemnification rights that Kagan has under

the organizational and operating documents and agreements of the Debtor. Though it asserts rights

under the Operating Agreement, the Operating Agreement is not attached.

The Objecting Parties object to this claim on two grounds.  First, the Operating Agreement

excludes any indemnification rights for losses arising from a member's gross negligence or willful

misconduct; and, the Objecting Parties allege, Kagan has not acted in good faith on behalf of the Debtor

LLC but precipitated the legal action against him (the action for which he seeks indemnification) with

willful misconduct and gross negligence. Second, the claim should further be denied because of lack of specificity as to the amount of damages and complete lack of back up for the alleged losses.

In response, Kagan states (i) that the conduct alleged to constitute gross negligence and willful misconduct does not rise to the level of gross negligence or willful misconduct; (ii) that such conduct consists entirely of action taken by Kagan as the principal of KDC; and (iii) that his damages consist almost exclusively of attorney's fees and litigation costs that continue to accrue, and the amount of the claim can be verified upon completion of the matters that give rise to the indemnification.

### 2. Prima Facie Evidence of Validity and Amount

For the same reasons as indicated with respect to Proof of Claim #4-1 above—that the amount is unspecified and that the writing on which the claim is based is not attached—this proof of claim does not enjoy prima facie validity, and therefore the full burden of proof as to each element of the claim rests from the start on the claimant.

### 3. Discussion

Kagan, like KDC, seeks indemnification under § 10.2 of the Operating Agreement, whose requirements I need not repeat but instead incorporate by reference. Kagan is a member of the LLC and therefore satisfies the first of the four enumerated requirements. His claim for reimbursement nonetheless fails on three grounds.

First, he has not identified the loss, damage, or claim for which he seeks indemnification. This is not a matter of having failed to produce evidence of the attorney's fees and costs for which he now seeks compensation, which, by pretrial direction, I permitted the Kagan Parties to present after trial, if liability for indemnity were shown at all. Rather, it is a failure to identify the legal proceedings and efforts and losses for which Kagan seeks indemnification and to show how each of these satisfied the third and fourth requirements outlined above. In his posttrial submissions, Kagan has supplied nothing of this nature.

Second, Kagan has failed to carry his burden of showing his acts that precipitated the claims and loss at issue were committed in good faith on behalf of the Company and that he reasonably believed them to be within the scope of authority conferred by the Operating Agreement. To the contrary, the evidence shows, and I have found, that the acts that precipitated all this litigation were committed by Kagan and KDC in bad faith and with knowledge that they were contrary to Kagan's authority and obligations under the Operating Agreement and to his fiduciary obligations to the LLC.

Third, all of the loss, damages, and claims that Kagan might possibly be referring to here— starting with the LLC State Court Action, then the Kagan State Court Action, and then the present claims and adversary proceeding in the Bankruptcy Court—were precipitated by the willful misconduct of Kagan and, at Kagan's direction, KDC. The willful misconduct consisted in Kagan's sending the May 7 Letter, filing documents to establish mechanic's liens, prosecuting the Kagan State Court Action, prosecuting the claims in this bankruptcy case, especially but not limited to KDC Claim #1-2, and prosecuting his counterclaims in the present adversary proceeding. In each instance, Kagan was asserting claims that he knew to be false claims, based on a forged contract whose creation by Kagan constituted a willful and knowing breach by Kagan of his fiduciary duty to the LLC and its other members. I reject out of hand Kagan's contention that his conduct does not rise to the level of willful misconduct but instead amounts at worst to mere negligence.  His misconduct was not a mere lack of due care; it was a deliberate, knowing, and carefully and extensively orchestrated scam and powerplay, perpetrated in knowing disregard of his fiduciary obligations to the LLC and Filippov and Lipetsker. Nor is it the case that his misconduct consisted entirely of acts he took as principal of KDC. Kagan involved KDC in this scheme, through the KDC Contract, precisely to avoid and violate his own obligations and responsibilities as a member of the LLC.  The Objecting Parties have carried their burden as to this affirmative defense.

For these reasons, the Objecting Parties' objection to Kagan's Claim #6-1 must be sustained; and accordingly Claim #6-1 will be disallowed in its entirety.

### F.    Objection to Proof of Claim #7-1 of ProEx

#### 1.    The Claim and Objection

In proof of claim #7-1, ProEx asserts a nonpriority unsecured claim whose amount is indicated as "undetermined." The basis of the claim is identified as indemnification rights that KDC has as an agent of a member of the Debtor, presumably Kagan, under the Debtor's organizational and operating documents and agreements. Though this claim is based on the Operating Agreement, which is a writing, the Operating Agreement is not attached to the proof of claim.

The Objecting Parties object to this claim and ask that it be disallowed in its entirety for two reasons: that ProEx is not an indemnified party under the Lyman-Cutler Operating Agreement; and, even if it is an indemnified party, it is not entitled to indemnification because it has not acted in good faith on behalf of the Debtor LLC but precipitated the legal action against it with willful misconduct and gross negligence.

#### 2.    Prima Facie Evidence of Validity and Amount

For the same reasons as indicated with respect to Proof of Claim #4-1 above—that the amount is unspecified and that the writing on which the claim is based is not attached—this proof of claim does not enjoy prima facie validity, and therefore the full burden of proof as to each element of the claim rests from the start on the claimant.

#### 3.    Discussion

Indemnification must be denied for four reasons. First, ProEx contends that it is indemnified as an agent of a member, Kagan. The evidence does not support a finding that ProEx was an agent of Kagan. Neither ProEx nor KDC nor Kagan contends that ProEx participated in the Lyman Cutler project as an agent of Kagan. Their position throughout has been that ProEx participated as a subcontractor to

KDC, which itself purported to be the counterparty to the LLC under the KDC Contract. This alleged role

was false, a pretense under a fabricated KDC contract and fabricated ProEx proposals, but the pretense

makes clear that ProEx did not purport to be involved as Kagan's agent.

Second, ProEx has not identified the loss, damage, or claim for which it seeks indemnification.

This is not a matter of having failed to produce evidence of the attorney's fees and costs for which it

now seeks compensation, which, by pretrial direction, I permitted the Kagan Parties to present after

trial, if liability for indemnity were shown at all. Rather, it is a failure to identify the legal proceedings

and efforts and losses for which ProEx seeks indemnification and to show how each of these satisfied

the third and fourth requirements outlined above. In its posttrial submissions, ProEx has supplied

nothing of this nature.

Third, ProEx has failed to carry its burden of showing that those of its acts that precipitated the

claims and loss at issue were committed in good faith on behalf of the LLC and were reasonably believed

to be within the scope of authority conferred by the Operating Agreement. Quite to the contrary, the

evidence shows, and I have found, that the acts that precipitated all this litigation were committed by

Kagan, KDC, and ProEx in bad faith and with knowledge that they were contrary to Kagan's authority and

obligations under the Operating Agreement.  I concluded above that the alleged contractual relationship

between the LLC and KDC was (in addition to being fabricated and false) a breach of Kagan's fiduciary

duty to the LLC, both because of Kagan's failure to disclose that agreement to Filippov and Lipetsker,

and because in substance it was entirely contrary to the agreement among the members as to Kagan's

compensation. The alleged subcontractual relationship between KDC and ProEx simply extended the

self-dealing in the KDC Contract to another Kagan entity. It fails the test of entire fairness for the same

reasons as does the KDC Contract. No less than the KDC Contract, it was a violation by Kagan of his

fiduciary obligations to the LLC. And ProEx's willful misconduct in the matter is compounded by the fact

that ProEx, through Kagan, knowingly fabricated and backdated the ProEx proposals to help support KDC's claims.

Fourth, and on the basis of this same analysis, it is clear that all of the loss, damage, and claims that ProEx might possibly be referring to here—starting with the amended complaint in the LLC State Court Action, and then the present claims and adversary proceeding in the Bankruptcy Court—were precipitated by the willful misconduct of Kagan, KDC, and ProEx. The Objecting Parties have carried their burden as to this affirmative defense.

For these reasons, the Objecting Parties' objection to ProEx's Claim #7-1 must be sustained; accordingly Claim #7-1 will be disallowed in its entirety.

### G.   Objection to Proof of Claim #2-2 of O'Connor, Carnathan & Mack LLC

#### 1.   The Claim and Objection

In Proof of Claim #2-2, the law firm of O'Connor, Carnathan & Mack LLC ("OC&M") asserts a nonpriority unsecured claim in the amount of $35,329.95 for legal services it provided to the Debtor prior to its bankruptcy filing.

The Kagan Parties object to this claim on the following grounds.  First, they contend that the services for which payment is sought were rendered wholly for the benefit of Filippov and Lipetsker, not the Debtor. Second, they contend that the Debtor's retention of OC&M was "brought about without consultation of the members by means of a convened meeting or pursuant to any provision in the Operating Agreement, and there is no indication of a vote authorizing OC&M to be engaged," such that the firm's services are properly characterized as personal obligations of Filippov and Lipetsker, not of the Debtor. Third, they contend that the proof of claim lacks prima facie validity because it fails to set forth the facts necessary to support the claim.

In response, OC&M states: (i) that the services for which compensation is sought were in fact rendered to and for the benefit of the Debtor; (ii) that the Operating Agreement specifically authorized

Filippov, as managing member, to hire OC&M as counsel for the LLC and initiate the litigation without

the need for calling a meeting[18]; (iii) that, in any event, a meeting was held on July 16, 2015 at which the

members voted to authorize the suit and hire OC&M as counsel for the LLC[19]; and (iv) that detailed

invoices attached to the response supply any necessary support.

### 2.   Prima Facie Evidence of Validity and Amount

It is not necessary to determine whether this proof of claim enjoys prima facie validity. Even if

OC&M is deemed to bear the burden of proof as to all elements, it clearly has satisfied its burden.

### 3.   Discussion

I begin with the objection that the retention of OC&M was unauthorized. In their posttrial

briefing, the Kagan Parties seek no finding or ruling concerning their objection that Filippov's retention

of OC&M was unauthorized. Accordingly, I deem this basis waived. In any event, as OC&M argues, the

Operating Agreement did permit Filippov, as managing member, to retain an attorney without a

meeting and vote of the members. Operating Agreement § 6.1(b)(1) (managing member is authorized

"to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as

may be deemed necessary or advisable by Managing Member"). It further authorized the managing

member to commence litigation as he saw fit, through OC&M in the LLC State Court Action, without a

meeting and vote of the members. Operating Agreement, § 6.1(b)(5) (managing member is authorized

to "take such other actions and to incur such reasonable expenses on behalf of the Company as may be

---

[18] OCM cites Operating Agreement § 6.1(b)(1) (providing Managing Member authority "to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as may be deemed necessary or advisable by Managing Member"); § 6.1(b)(5) (Managing Member has authority to "take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company"); and § 7.4 ("The Members may, but shall not be required to, meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement").

[19] OCM states in support: "Mr. Kagan sent a representative to represent his interests rather than appearing personally. The meeting was held at OCM's offices, with counsel for the LLC and the Objectors physically present during the entire meeting. The Objectors' statement that 'there is no indication of a vote authorizing OCM to be engaged' is preposterous."

necessary or advisable in connection with the conduct of the affairs of the Company"). And, in any

event, as I have found, on July 16, 2015, the members met and voted to ratify the actions that Filippov

as managing member had taken to hire OC&M and to bring the LLC Superior Court Action.

The second basis of objection is that the services rendered by OC&M benefited only Filippov and

Lipetsker and not the LLC. I have found that this objection is unfounded as a matter of fact. The services

OC&M rendered in the LLC Superior Court Action were entirely to and for the benefit of the LLC. Filippov

and Lipetsker would have benefitted from that representation as members of the LLC, but there is no

evidence that their participation as additional plaintiffs resulted in billings for work that did not benefit

the LLC.

The third basis of objection is that the proof of claim lacks prima facie validity because it fails to

set forth the facts necessary to support the claim. By this objection, I understand the Kagan Parties to

contend that, in order to have prima facie validity, the proof of claim needed to include, as an

attachment, a copy of the firm's billing records for the services in question. Even if the objecting parties

are correct on this issue—I would hold that they are not—OC&M has now introduced into evidence

their billing records for the services at issue, and on the basis thereof I have found that as of the LLC's

bankruptcy filing on October 7, 2015, OC&M was owed in excess of $35,329.95 for the services it had

performed in the Superior Court action.

As brought by KDC, Tatiana, and ProEx, there is further cause to overrule this objection:  that, in

view of the denial of their claims, they have no stake in the disposition of the OC&M claim and therefore

no standing to object to it.[20]

---

[20] Though Kagan's claim, too, has been denied, Kagan has standing to object to the OC&M claim by virtue of his
equity interest.

For these reasons, the Kagan Parties' objection to proof of claim #2-2 of OC&M, must be overruled; accordingly, proof of claim #2-2 will be allowed as a nonpriority unsecured claim in the amount of $35,329.95.

### H.  Objection to Proof of Claim #9-1 of Alexander Filippov

#### 1.  The Claim and Objection

In Proof of Claim #9-1, Filippov asserts a secured claim in the amount of $208,333.00 for principal of $200,000 and interest of $8,333.00 due on a promissory note from the Debtor to Filippov, secured by mortgages on the Debtor's properties (now the proceeds thereof). The promissory note is attached to the proof of claim; the mortgages are not.

The Kagan Parties object to this claim on three grounds. First, they allege that the loan evidenced by the promissory note was a self-dealing transaction designed to recover from the Debtor amounts Filippov had advanced not for the Debtor's benefit but his own. Second, they argue that the proof of claim was filed late and for that reason must be denied. Third, they contend that the proof of claim enjoys no prima facie validity because it fails to set forth the necessary supporting facts.

In response, Filippov states: (i) that the proof of claim is for money he lent the Debtor to help it defend against the fraudulent attacks and attempted extortion perpetrated by the Kagan Parties, and therefore it was for the Debtor's benefit; (ii) that the proof of claim includes a copy of the promissory note and a breakdown of the interest owed and therefore is not deficient and does enjoy prima facie validity; and (iii) that the claim is not untimely, as the cited bar date was for proofs of interest, not proofs of claim, and no deadline has been set for the latter.

After trial, the Kagan Parties have not reiterated their argument that Filippov's proof of claim was filed late. I deem that basis of objection waived and further note that, as Filippov correctly states, the Court set no bar date in this case for the filing of proofs of claim, only a deadline for the filing of proofs of interest.

110

## 2.   Prima Facie Evidence of Validity and Amount

"A proof of claim executed and filed in accordance with these rules shall constitute prima facie

evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). This proof of claim was in at

least one respect not executed and filed in accordance with "these rules." "[W]hen a claim, *or an*

*interest in property of the debtor securing the claim*, is based on a writing, a copy of the writing shall be

filed with the claim." Fed. R. Bankr. P. 3001(c)(1) (emphasis added).  This claim purports to be secured

by a mortgage, but no copy of a mortgage was filed with the claim. Accordingly, this proof of claim does

not enjoy prima facie validity. The full burden of proof as to each element of the claim rests from the

start on the claimant.

## 3.   Discussion

As a preliminary matter, I begin with the issue of standing to object. The present objection to

claim is filed by the four Kagan Parties. Their claims have now been disallowed in their entirety.

Accordingly, they no longer have claims against the estate that might be affected by the allowance or

disallowance of Filippov's proof of claim.  Lacking a stake in the matter, KDC, Pro Ex, and Tatyana lack

standing to object to Filippov's claim, and their objections to Filippov's claim must for that reason be

overruled. As an equity holder in the Debtor, Kagan continues to have a stake in this matter; the

distribution he seeks on account of his equity interest in the Debtor would (or at least might) be affected

by the disposition of Filippov's proof of claim.  Accordingly, I will address this objection, but only as

advanced by Kagan as an equity interest holder.

Filippov bears the burden of proof as to all elements of his claim. As to most, the fundamentals

of the claim, he has sustained his burden of proof. Accordingly I have found that he entered into a loan

agreement with the LLC under which he advanced $200,000 to or on behalf of the LLC, and in exchange

the LLC gave him a promissory note in the principal amount of $200,000, with interest at five percent

per annum, secured by a mortgage on the LLC's real property. The advanced funds include the

$132,788.53 that Filippov deposited into the LLC Account on September 30, 2015, plus the next $67,211.47 in carrying costs that Filippov advanced on behalf of the LLC from November 4 through November 24, 2015.

The sole remaining issue, which is the focus of the Kagan's objection, is the issue of entire fairness. He argues that the loan was a self-dealing transaction that cannot pass the test of entire fairness because (i) it was made without notice to or discussion with Kagan, (ii) it was unnecessary because the LLC had no monetary needs at the time other than the funding of its carrying costs, which Filippov was obligated to fund, and (iii) it was intended to place Filippov's right to repayment ahead of KDC's unsecured claim. Filippov replies that (i) the loan was discussed and vetted with Lipetsker, who approved it, and it was not discussed with Kagan because that clearly would have been pointless, and in any event the monies were needed in large measure to oppose him and protect the LLC from him, (ii) the LLC needed the loan to fund continuing carrying costs, including not only debt service and taxes but also attorney's fees to defend against Kagan's attempted extortion, (iii) the rate of return, five percent, was the same as he would have been entitled to under the Operating Agreement had he instead invested the loaned $200,000 in the LLC, and (iv) the only impact of the mortgage was to put repayment ahead of other claims.

I have set forth the requirements of the doctrine of entire fairness above.  The first issue is to determine whether the transaction was self-dealing. Clearly here it was. Filippov as managing member for the LLC entered into a loan agreement with Filippov the individual, and in his individual capacity he derived a personal benefit from the transaction—interest at five percent, treatment of these advances on behalf of the LLC as debt instead of investment, and the security and priority of a mortgage.

As a fiduciary who engaged in a self-dealing transaction, Filippov must prove that the transaction was entirely fair. The analysis is made as of the time when the loan was made and has two aspects.

The first is fair dealing, which is concerned with how the transaction was initiated, negotiated, and disclosed, and how its approval was obtained. I have found that before he executed the promissory note and mortgage, Filippov discussed the matter with Lipetsker, and Lipetsker agreed that Filippov should, on behalf of the LLC, proceed with executing a promissory note and mortgage in favor of himself in exchange for a loan. Filippov did not consult or meet with Kagan about the proposed loan and promissory note. He and Lipetsker reasoned that Kagan had long before stopped responding to their inquiries and, in any event, would not cooperate in a borrowing intended, in part, to fund the legal effort against him. In both of these particulars they were surely correct. It is also true, as Filippov and Lipetsker knew, that Filippov alone, as managing member and holder of at least 80 percent of the membership interest, and especially in combination with Lipetsker, had authority to proceed without Kagan's vote, and that, in view of the line of opposition between Kagan on the one side and Filippov and Lipetkser on the other, the result was a foregone conclusion. It is also relevant, as Filippov was keenly aware, that during this period, Kagan's principal concern was not with the interests of the LLC, against which he had set himself in opposition, but with a claim that he was advancing on behalf of KDC as a creditor against the LLC. In making the decision to proceed with this loan, Filippov and Lipetsker, as fiduciaries of the LLC, were under no obligation to include KDC in the decision making of the LLC or to make it easier for Kagan to undermine their efforts to protect the LLC.

On these facts, I cannot conclude that it was unfair, as a matter of process and dealing, for Filippov to proceed without notice to or consultation with Kagan. The decision-making authority resided in him as managing member and as 80 percent interest holder, especially in combination with Lipetsker. He had vetted the matter with Lipetsker, who supported the proposed loan. Kagan had no power on his own to alter the result. And Kagan had shown himself to be principally motivated by his interest as principal of KDC, in opposition to the interests of the LLC, not by his interest as a member of the LLC.

The second aspect of the entire fairness inquiry is fair price, the substantive, financial merits of the transaction from the perspective of the LLC and its members. The relevant considerations are the following.

First, when Filippov made this loan, the LLC had continuing obligations to pay carrying costs. These included the usual debt service, taxes, insurance, and utilities, which collectively were averaging about $25,000 per month. They also included the attorney's fees being incurred to address Kagan's demands on behalf of KDC against the LLC. It is undisputed that the LLC had no funds with which to pay these. The need was real and legitimate. The loan was intended to address this need for a time.

Second, the Operating Agreement obligated Kagan to fund these carrying costs.  After the first 23 months, it placed the obligation to fund carrying costs in the first instance squarely not on Filippov but on Kagan: "In the event that the property is not sold within twenty three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold." Operating Agreement, § 8.1. This provision does not give Kagan the option of walking away from this obligation, yet after funding carrying costs for five months, Kagan refused to advance further carrying costs and simply defaulted. The Operating Agreement anticipated this situation by further providing: "If Mr. Kagan fails to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs, and subsequently his capital contribution and percentage interest in the company shall increase by the same amount and percentage, and at the same time, will trigger a reduction of Mr. Kagan's share of capital contribution by the same amount." Operating Agreement, § 8.1. By this provision, Filippov became obligated to fund carrying costs ("*shall* be responsible to contribute the necessary carrying costs") and to do so by equity investment ("his capital contribution . . . shall increase"). But this provision also left the ultimate burden of these advances on Kagan by causing Filippov's equity investment to increase, and Kagan's to decrease, in the amount of

Filippov's advances for carrying costs under this provision. Kagan's initial equity contribution was $250,000.

Third, as managing member, Filippov had discretion to cause the LLC to borrow money as the need arose. See Operating Agreement, §§ 6.1(b)(2) (managing member has authority to "authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreement, instruments or document relating to or affecting such matters") and 6.1(b)(5) (managing member has authority to "take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company"). It is not clear whether this power was one that Filippov had discretion to employ where the specific need for the funds was covered by the mandate in § 8.1 that Filippov make the payments that Kagan has defaulted on.  Arguments can be made in both directions. On the one hand, § 8.1 is not discretionary: "Mr. Filippov *shall* be responsible to contribute the necessary carrying costs" (emphasis added). On the other, Kagan's malfeasance had necessitated carrying costs in the nature of attorney's fees on a scale that the members had not foreseen, with no end in sight, and the ready source of recoupment, Kagan equity contribution, was partly depleted and not infinite.  The parties have not briefed the issue.  In any event, it is clear that Filippov had authority to borrow. And it is also clear that the present issue is not whether Filippov was obligated by the Operating Agreement to proceed by way of equity contributions but whether it was fair to the LLC and its other members that he opted instead to proceed with a loan.

Fourth, as Filippov contends, the cost of the borrowing to the LLC, five percent per annum, is the same as the interest to which Filippov would have been entitled under § 8.2 of the Operating

Agreement for the same advances had they been made as equity contributions. The loan is therefore no more lucrative to Filippov than would have been an equity contribution.

Fifth, also per § 8.2 of the Operating Agreement, had Filippov made the loan advances instead as equity contributions, the five percent per annum return to Filippov would have been paid entirely out of Kagan's share of net profits. Where he made those same advances instead as a loan, the payor is the LLC as a whole, and the payments, though they reduce the net profits available for distribution to all members, do not redirect net profits from Kagan to Filippov. In other words, Kagan, being entitled to fifty percent of net profits, effectively bears only half the burden of interest. In this respect, the loan arrangement is more generous to Kagan than he was entitled to under the Operating Agreement.

Sixth, per § 8.1 of the Operating Agreement, had Filippov made the loan advances instead as equity contributions to fund carrying costs, each dollar so invested by Filippov would have increased Filippov's capital contribution and, by the same amount, decreased Kagan's capital contribution. The advances having been made instead as a loan, they do not increase Filippov's capital contribution or decrease Kagan's. In this respect, too, the loan arrangement is more generous to Kagan than he was entitled to under the Operating Agreement.

Seventh, Kagan's contention that Filippov's promissory note, being secured by a mortgage, was an unfair attempt to give Filippov's claim priority over the claims of the Kagan Parties, is inapposite. The entire fairness analysis is concerned with the fairness of the self-dealing transaction vis-à-vis the LLC and the other members of the LLC, those to whom Filippov had fiduciary obligations, not vis-à-vis creditors of the LLC. And in any event the claims of the Kagan Parties have been disallowed, and the remaining universe of unsecured creditors is small, as evidenced by the claims in this case; unsecured creditors will be paid in full, regardless of the disposition of this claim. Moreover, the largest of the Kagan Party claims at the time of this loan was KDC's; and, as far as Filippov knew, KDC's claim was—to the extent that it

was valid at all—secured by a mechanic's lien to which Filippov's mortgage would be later and therefore *junior* in priority.

On the basis of these considerations, I find that Filippov has shown the loan to be fair in price. He would have been justified in instead paying carrying costs through equity investments, but it is clear that the loan arrangement he chose was far more generous to Kagan than would have been the alternate arrangement; and it involved no unfair advantage or profiteering on the part of Filippov at the expense of the LLC. Precisely because of its unmerited generosity to Kagan, it was less fair to Filippov and Lipetsker, but they put it in place, and neither is asking me to treat Filippov's advance of $200,000 under this loan as equity. For these reasons in combination with my conclusions above as to fair dealing, I conclude that Filippov has carried his burden of showing entire fairness. Accordingly, the Kagan Parties' objection to Filippov's Proof of Claim #9-1 is overruled; and the claim is allowed as a secured claim in the amount $200,000, plus interest of five percent per annum, which shall run from November 24, 2015, the date on which Filippov advanced the last of the loaned funds.

### 2. Equitable Subordination Count

In Count VIII of the Amended Complaint in the Adversary Proceeding, Filippov and Lipetsker seek equitable subordination of the claims of the Kagan Parties to the claims of Filippov and Lipetsker pursuant to 11 U.S.C. § 510(c)(1). As I have disallowed the claims of the Kagan Parties, this count, for subordination of claims to claims, is now moot.

### 3. Proofs of Interest and Objections

#### a. Order of Distribution

The members have filed proofs of interest in which they seek quantification of their membership interests. As a preliminary matter, however, I must address an argument made by Kagan, which, if accepted, would render the quantification of membership interests moot. Specifically, Kagan argues that even if I were to disallow each of the Kagan Party claims in full (as I have done), Kagan would

still be entitled, on account of his membership interest, to fifty percent of all sale proceeds remaining in

the estate after satisfaction of all allowed claims in the case. He argues that, under § 8.1 of the

Operating Agreement, Kagan is entitled to fifty percent of the net proceeds of the sale, the profit. More

importantly, he contends that the allocation mandated by this provision applies to all monies remaining

in the estate after satisfaction of bankruptcy administrative expenses and creditor claims but before any

return to the members of their equity contributions. He argues that this priority is dictated by § 9.2 of

the Operating Agreement, governing dissolution and winding up of the LLC. Filippov and Lipetsker

disagree with this reading of the Operating Agreement, arguing that § 8.2 mandates first return to the

members of their equity contributions and, only then, distribution of net profits per the allocation in §

8.1; essentially they argue that "net" profits or proceeds, as used in § 8.1, means net of the members'

capital contributions.

Kagan is arguing that the Operating Agreement effectively mandates only one distribution to

members as members, that being the allocation in § 8.1 of fifty percent to Kagan, forty percent to

Filippov, and ten percent to Lipetsker, a distribution that, Kagan further contends, applies to all monies

in the estate after satisfaction of creditors' claims. Because it would apply to the entire remaining estate

and distribute all of it (50% + 40% + 10% = 100%), it would leave no money for distribution on account of

members' equity contributions.

This construction runs into three problems. First, the Operating Agreement clearly does

contemplate a distribution or return to members of their equity interests. At § 8.2, it states: "The

distribution to members shall be in accordance with their respective Capital Contributions first[.]"[21]

Moreover, the Operating Agreement includes two provisions under which Capital Contributions are to

---

[21] in its entirety, § 8.2 states: "The distribution to members shall be in accordance with their respective Capital
Contributions first, however, an additional five percent per annum based upon Members' respective Capital
Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after
twenty three (23) months of acquisition." Operating Agreement, § 8.2.

be adjusted: in § 8.2, by the addition of interest in certain circumstances ("however, an additional five

percent per annum based upon Members' respective Capital Contributions shall be paid out of Mr.

Kagan's net profit share for each day that the property is not sold after twenty three (23) months of

acquisition," Operating Agreement, § 8.2); and in § 8.1, by increase of Filippov's contribution, and

decrease of Kagan's, for Filippov's payment of carrying costs after 23 months after the date of

acquisition.[22] But under Kagan's proposed construction, there would never be a distribution on account

of interests, only a distribution of all remaining sale proceeds (after payment of creditors) according to

the 50:40:10 allocation. This would render all these provisions meaningless, a result that should be

avoided in the interpretation of any contract.

Second, § 8.2 clearly requires that the distribution on account of member's Capital

Contributions happen first: "The distribution to members shall be in accordance with their respective

Capital Contributions *first*[.]" Operating Agreement, § 8.2 (emphasis added). Kagan contends that § 9.2

requires a different result, but his construction of §9.2 is incorrect. Article IX of the Operating

Agreement governs the dissolution and winding up of the LLC, and § 9.2 deals specifically with winding

up. In relevant part, it states that assets shall be applied first to payment of the liabilities of the company

and of the expenses of liquidation, then to payment of loans made by members to the company. Then,

in the language on which Kagan relies, it states: "All assets then remaining shall be distributed to the

Members in accordance with their respective Capital Accounts after giving effect to all contributions,

distributions and allocations for all periods." Kagan argues that this language establishes the priority of

the allocation of net profits because it dictates that the winding-up distribution shall of be of the

---

[22] Section 8.1 states (in relevant part): "In the event that the property is not sold within twenty three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold. If Mr. Kagan fails to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs, and subsequently his capital contribution and percentage interest in the company shall increase by the same amount and percentage, and at the same time, will trigger a reduction of Mr. Kagan's share of capital contribution by the same amount, and subsequently his/her percentage interest in the company." Operating Agreement, § 8.1.

members' Capital Accounts "*after* giving effect to all . . . allocations." Kagan here is unduly selective

about the words he appropriates. Section 9.2 actually says not "after giving effect to allocations" but

"after giving effect to all contributions, *distributions* and allocations for all periods." Operating

Agreement, § 9.2 (emphasis added). The import of this language is that, for purposes of making the

winding-up distribution on member Capital Accounts, the distribution—both the return of Capital

Contributions and then the distribution of profits—should be determined after giving effect to all

contributions, distributions, and allocations as have been made to date. It doesn't give priority at all.

Even if it were viewed as giving priority, it would give equal priority to allocations (under § 8.1) *and*

*distributions in accordance with Capital Contributions* (under § 8.2): *both* are to be "giv[en] effect." And

to determine the priority between these, one would still have to consider the priority given in § 8.2 to

distributions in accordance with Capital Contributions. I see no reason to read § 9.2 as altering, for

purposes of the winding-up distribution, the priority of distributions in member equity interests; the

purpose of the cited language in § 9.2 appears to be only to ensure that prior distributions and

allocations be given effect.  Essentially it requires consistency with the distribution requirements in §§

8.1 and 8.2; the whole point is *not* to implement a new distribution scheme unique to the winding-up

situation. In summary, whether the contemplated distribution through the chapter 7 trustee to the

members on account of their interests be viewed as occurring under § 9.2 or otherwise, the result is the

same: first a distribution to the members according to their Capital Contributions under § 8.2, and then

an allocation of the net profit under § 8.1.

　　　Third, and most fundamentally, the allocation in § 8.1 applies not to all proceeds of a sale but

only those that are "net profits, net cash flow and net proceeds of any sale[.]" Operating Agreement, §

8.1.[23] Profit, cash flow, and proceeds are three different things. None of them is defined in the

---

[23] "The net profits, net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (40%), Mr. Nickolay Lipetsker (10%), and Mr. Kagan (50%)." Operating Agreement, § 8.1.

Operating Agreement. Profit to a member is what, at the end of the day, the member recovers in excess

of his or her capital contribution; and profit to the LLC is what the LLC recovers in excess of its expenses

and its member's combined contributions. This was the definition of net profit that Kagan himself used

in the spreadsheets he circulated while the project was still being negotiated: net profit was what was

left after the total initial investment had been subtracted/repaid. For that reason and because it is the

common sense meaning of net profit, especially for a business whose purpose is over upon sale of its

homes, it was the understanding the members worked with as they fashioned the Operating

Agreement. The same concept is implicit in the word "net," which is common to the three phrases in §

8.1—"net profits, net cash flow and net proceeds." Net of what? Again the Operating Agreement does

not say. Kagan would answer net of expenses only, not of equity contributions.  But equity contributions

were used in purchasing the property, which in turn secured the construction loans. They were

consumed in the production of the homes. No definition of *net* profit, or *net* cash flow or *net* proceeds is

adequate in this situation that does not look at the extent by which the total recovery exceeded not only

the expenses of the project but also the equity investment. I therefore conclude that the allocation

called for by § 8.1 applies only to net profits, that is, the amount remaining in the bankruptcy estate

after payment of unsecured nonpriority claims in full and of the members' Capital Contributions.

As the extent of their Capital Contributions is not moot, I will proceed to adjudicate the

objections to the members' proofs of interest, and in doing so quantify their respective Capital

Contributions.[24]

---

[24] The members seek to quantify their Capital Contributions not only by dollar amount but also by percentage of
the entire membership interest. The Court is quantifying the member's interests, and adjudicating the objections
to proofs of interest, for purposes of the distribution of the surplus—the portion of the estate remaining after
payment of all administrative and prepetition claims—to the members. The Operating Agreement dictates that
"[t]he distribution to members shall be in accordance with their respective Capital Contributions first[.]" Operating
Agreement, § 8.2. For this purpose, it is important to know the dollar amount of the member's respective
contributions, and therefore that will be my focus. Percentage interests, though easily calculable once the
member's capital contributions are determined and relevant for control and voting purposes, appear to be
irrelevant for the present purpose.

### b.   Proof of Interest of Nickolay Lipetsker

By his proof of interest, Lipetsker asserts an equity contribution amounting to a 10 percent ownership interest in the LLC, based on his initial contribution of $250,000. Kagan has filed a limited objection to Lipetsker's proof of interest, arguing that, to the extent that the Court finds that the interest of Filippov or Kagan has increased, then Lipetsker's would be diluted proportionately.

Kagan does not dispute, and I find, that Lipetsker made an initial contribution in the amount of $250,000. Lipetsker does not claim to have made further contributions of equity after the initial. Accordingly, I conclude that Lipetsker's equity contributions total $250,000.[25]

Under § 8.2 of the Operating Agreement, Lipetsker is entitled to interest on his equity contributions at five percent for each year that the property is not sold after twenty-three months of acquisition. Operating Agreement, § 8.2.  The twenty-third month after the date of acquisition ended on November 30, 2014, and sale of the properties was completed on March 11, 2016. Interest thus accrued for a period of one year and 101 days, or 1.28371 years. The interest accrued on Lipetsker's equity contribution under § 8.2 is accordingly $16,046.38 [$250,000 x 0.05/yr x 1.28371 yrs = $16,046.38].

### c.   Proof of Interest of Alex Filippov

By his proof of interest, Filippov asserts equity contributions totaling $2,435,533.95. This total is comprised of his initial contribution of $2,000,000 plus some forty-three further contributions that Filippov itemized in a spread sheet attached to his proof of interest.  Kagan has filed an objection to Filippov's proof of interest, setting forth the following grounds of objection: (i) certain of the payments that Filippov contends were payments of carrying costs—payment of legal fees for promissory note to Filippov, QuickBook licensing fees, minor repairs to the properties, payment to accountant for preparation of tax returns—were not in fact for carrying costs; (ii) Filippov has also filed a secured claim for a loan to the Debtor and, though entitled to at best a single recovery, improperly seeks double credit

---

[25] As percentage interests are irrelevant here, Kagan's concern with dilution is likewise irrelevant.

for certain advances he claims to have made under that loan, first through the secured claim as repayment of loan advances, and again as an increase in his equity contributions through this proof of interest; (iii) the spreadsheet that Filippov attached to his proof of claim to itemize the contributions that he contends must be included in his total equity is not self-explanatory and is submitted without explanation or analysis; (iv) the proof of interest fails to  account for payments of carrying costs that Kagan funded; (v) Filippov made some but not all of the payments of carrying costs that accrued after Kagan stopped paying them and therefore "cannot now claim the benefit that would have inured to him had he fully performed"; and (vi) Kagan objects to any increase of Filippov's interest beyond his initial 80 percent, and, if anything, his interest should be reduced to reflect additional contributions by Kagan and/or KDC.

I first address the issue of double-counting.  The itemized list of contributions that Filippov attached to his proof of interest does include the $200,000 in items that I have found were the advances he made under his $200,000 loan to the LLC. Though entitled to only a single recovery, Filippov was free to seek to recover these amounts in two ways; I do not understand him to be seeking a double recovery. He was simply preserving his right to recover these advances as equity contributions if his proof of claim #9-1, for the loan, had been disallowed. I have allowed Filippov's loan claim and recognized the advances thereunder as advances of loan proceeds. Accordingly, they are not equity contributions.

The second issue is whether certain of Filippov's equity contributions should not be recognized as equity contributions because, according to Kagan, they were not used to fund carrying costs. In short, Kagan does not dispute that Filippov made the contributions he itemized in his proof of claim; Kagan disputes only that they were used for expenses that constitute carrying costs. The alleged deficiency— that the payments weren't used for carrying costs—is irrelevant to whether these admitted contributions are contributions of equity. See Operating Agreement, § 4.4 ("To the extent consistent with such regulations [under the Internal Revenue Code of 1986], there shall be credited to each

Member's Capital Account the amount of any contribution of capital and carrying costs made by such

Member to the Company."). The use of a particular contribution for carrying costs (or not) is relevant to

whether, pursuant to § 8.1 of the Operating Agreement, that contribution also triggers a corresponding

reduction in *Kagan's* Capital Contributions. Nothing in the Operating Agreement requires that a

contribution be used for carrying costs in order to increase the contributing member's capital account.

Third, Kagan objects on the basis that the proof of interest fails to account for payments of

carrying costs that Kagan funded. Kagan does not explain what difference Kagan's payments for carrying

costs should make in calculating *Filippov's* total equity contributions. I see no relevance.

Fourth, Kagan objects that Filippov made some but not all of the payments of carrying costs that

accrued after Kagan stopped paying them and therefore "cannot now claim the benefit that would have

inured to him had he fully performed." Nowhere does Kagan explain what he means by "the benefit that

would have inured to [Filippov] had he fully performed." If he means that it was necessary for Filippov to

fund every last carrying cost in order to receive credit for the carrying costs he did fund, I find no

support for that proposition in the Operating Agreement. For the carrying costs he funded, he gets

credit.[26] See again Operating Agreement, § 4.4.

Fifth, Kagan objects to Filippov's itemization of his contributions as less than self-explanatory.

This objection itself is vague, but I am in any event bound to determine whether the evidence

demonstrates that Filippov made the contributions he said he did. I find, and it is undisputed, that

Filippov made an initial contribution of $2,000,000. I further find that Filippov's evidence at trial shows

that he made the following additional contributions: (i) from July 16 through September 15, 2015, he

made direct deposits into the LLC Account of $175,000; (ii) from May 18 through June 25, 2015, he paid

from his personal account bank interest on the construction and purchase loans totaling $32,000.01; (iii)

---

[26] The same rule applies to Kagan, who gets credit for the contributions he did make after the twenty-third month
notwithstanding that he defaulted as to carrying costs that accrued after May 2015.

from November 24 through December 30, 2015, he funded from his personal account carrying costs

totaling $27,873.88; and (iv) from February 11, 2013 through September 13, 2015, he made purchases

for the  LLC on his personal credit card totaling $359.26.  These payments total $235,233.15 and do not

include the deposit of $132,788.53 and the subsequent payments totaling $67,211.47 that funded

Filippov's loan to the LLC. Accordingly, I conclude that Filippov's equity contributions total

$2,235,233.15.[27]

Under § 8.2 of the Operating Agreement, Filippov is entitled to interest on his equity

contributions at five percent for each year that the property is not sold after twenty-three months of

acquisition. Operating Agreement, § 8.2.  The twenty-third month after the date of acquisition ended on

November 30, 2014, and sale of the properties was completed on March 11, 2016. Interest thus accrued

for a period of one year and 102 days, or 1.28371 years, on the contributions he made before the end of

the twenty-third month, a total of $2,000,038.09. The interest accrued on these contributions is

accordingly $128,373.45 [$2,000,038.09 x 0.05/yr x 1.27869 yrs = $127,871.44]. To this must be added

the interest that accrued on the contributions he made on diverse dates after the end of the twenty-

third month through March 11, 2016, a further $6,660.31. Filippov is therefore entitled to total interest

on his contributions of $134,531.75.

### d.  Proof of Interest of Vadim Kagan

By his proof of interest, Kagan asserts equity contributions amounting to "at least a 10 percent

ownership interest" in the LLC.  He adds: "Under Schedule A of the Operating Agreement, Mr. Kagan

holds a 10% interest in the Debtor. In the event that any payments made on behalf of the Debtor (e.g.,

carrying costs or other payments) are considered to be capital contributions by Mr. Kagan, then his

---

[27] The total of $235,233.15 accounts for all but $300.80 of the $235,533.95 in non-loan, itemized contributions for which Filippov claims credit. A small portion of the discrepancy is attributable to Filippov's overstating by .40 and .39 two payments to the Town of Brookline for taxes.  I find no explanation for the remaining $300.01 discrepancy. The evidence shows contributions of $235,233.15. The balance is disallowed.

equity interest would increase. Additionally, the Operating Agreement provides that Mr. Kagan will
receive 50% of the profits upon liquidation of the Debtor (Section 8.1)."

Filippov and Lipetsker have filed an objection to Kagan's proof of interest, asserting two
separate objections. First, pursuant to § 8.1 of the Operating Agreement, Kagan's equity interest must
be reduced by the amount of carrying costs that Filippov contributed after 23 months from the date of
acquisition. Second, Kagan having asserted false and fraudulent claims against the Debtor and engaged
in other related wrongdoing and breached his fiduciary duties as a member of the LLC, his proof of
interest should be rejected or equitably subordinated to the interests of Filippov and Lipetsker.

Kagan's claimed contributions to the LLC fall into three categories: his initial contribution of
$250,000; the contributions he claims to have made through KDC prior to the end of the twenty-third
month to cover carrying costs; and the payments he made after the end of the twenty-third month to
cover carrying costs. It is undisputed that Kagan made an initial equity contribution of $250,000. The
remainder of his asserted equity contributions are not itemized in his proof of interest. I turn then to
what the evidence shows, beginning with his alleged contributions during the first twenty-three months.

To be clear, Kagan himself does not purport to have made a contribution to the LLC during the
first twenty-three months. Rather, he contends, through KDC's Proof of Claim #1-2, that KDC made
advances of carrying costs to the LLC from July 1, 2013 through June 10, 2015 totaling $665,545.49; and
he suggests that these advances should inure to his benefit. On the basis of findings above, I have found
that, of the $665,545.49 in carrying cost advances that KDC claims to have made, it has proven that it
made only two advances totaling $908.27, one of which, for $408.27 was for construction costs, not
carrying costs, and the other of which, for $500.00, though a carrying cost, has already been reimbursed.
The advance of $408.27 cannot constitute an equity contribution because it was made for a construction
cost; Kagan's sole sources of compensation for building the homes were the construction budget of $2.8
million and his fifty percent share of net profits. Monies he advanced for construction cannot constitute

equity investments. Accordingly, the alleged advances by KDC of $665,545.49 yield no investment on the part of Kagan.

I further found above that, from time to time in the first twenty-three months, when funds in the LLC Account were insufficient to meet an upcoming carrying cost obligation, Filippov or Arina would notify Kagan of the shortage and ask him to deposit funds; and in response, Kagan caused KDC to deposit a total of $126,100 into the LLC Account to permit the LLC to meet its debt service obligations timely. As to these advances, however, I have further found that (i) KDC has already fully recouped them through transfer payments from the LLC Account to KDC, (ii) that each advance essentially enlarged the pool of monies available for construction by an equal amount, and that KDC, having appropriated that entire pool of money, thereby recouped all these advances, and (iii) the need for these funds was not caused by an overage of carrying costs—in fact carrying costs during the first twenty-three months were $75,909.56 less than the LLC had borrowed to cover, all of which excess KDC used for construction—but by KDC's prior appropriation of funds for construction that should have been reserved for carrying costs. For these reasons, I conclude that KDC's deposits totaling $126,000 in this period are, if contributions at all, contributions he has already withdrawn through distributions. They do not increase his Capital Account.

Next are the contributions that Kagan made after the first twenty-three months, during which period he was obligated to pay the carrying costs.  As I have found, Kagan did not pay any portion of the carrying costs himself, but he did cause KDC during this period to deposit $175,515.26 into the LLC Account. Most but not all was intended and used for carrying costs. The balance was deposited by KDC and intended by Kagan for use on construction costs; and, by checks written by Kagan against the LLC Account, Kagan diverted this balance, totaling $30,340.00, to pay construction obligations. The portion deposited by KDC that was used for carrying costs, $145,175.26 [$175,515.26 - $30,340.00 = $145,175.26], constitutes a contribution by Kagan of equity. See Operating Agreement, § 4.4 ("To the

127

extent consistent with such regulations [under the Internal Revenue Code of 1986], there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company.").

The remainder, having been directed by Kagan to payment of construction costs, cannot constitute an equity contribution. Kagan's sole sources of compensation for building the homes were the construction budget of $2.8 million and his fifty percent share of net profits. He is entitled to no further compensation for construction from the LLC in any form. Monies he advanced for construction cannot constitute equity investments. I therefore conclude that Kagan's investments through KDC during this period increased Kagan's Capital Account by $145,175.26.

Per § 8.1 of the Operating Agreement, Kagan's Capital Account was also decreased during this period:

> In the event that the property is not sold within twenty three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold. If Mr. Kagan fails to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs, and subsequently his capital contribution and percentage interest in the company shall increase by the same amount and percentage, and at the same time, will trigger a reduction of Mr. Kagan's share of capital contribution by the same amount, and subsequently his/her percentage interest in the company.

Operating Agreement, § 8.1. After May 2015, Kagan ceased making contributions to fund carrying costs, and Filippov began funding carrying costs himself. Under § 8.1, in order for a contribution by Filippov to result in a decrease in Kagan's capital account, it must have been made by an equity contribution and not through his loan of $200,000 to the LLC—the loan is not an equity contribution—and it must have been used for carrying costs.

Filippov made contributions for payment of carrying costs in three ways: by direct payments from his personal checking account; by use of his personal credit card; and by deposits into the LLC

account. I will first quantify these and then address objections by Kagan as to whether certain uses of

these contributions qualify as carrying costs.

   During this period, Filippov made the following direct payments, totaling $60,295.07, from his

personal checking account:

| Date | Loan Payments | Insurance | Utilities |
|---|---|---|---|
| 5/18/2015 | $6,333.33 | | |
| 5/18/2015 | $6,333.34 | | |
| 6/18/2015 | $6,544.45 | | |
| 6/18/2015 | $6,544.44 | | |
| 6/28/2015 | $6,544.45 | | |
| 11/24/2015 | $6,544.45 | | |
| 12/17/2015 | $6,333.34 | | |
| 12/17/2015 | $6,333.33 | | |
| 12/18/2015 | | $723.08 | |
| 12/18/2015 | | $723.08 | |
| 12/23/2015 | | | $359.31 |
| 12/23/2015 | | | $645.14 |
| 12/30/2015 | $6,333.33 | | |
| Totals | $57,844.46 | $1,446.16 | $1,004.45 |

Also during this period, Filippov made the following contributions, totaling $321.17, by charging

purchases for the LLC to his personal credit card:

| Date | Item | Amount |
|---|---|---|
| 5/28/2015 | Intuit QuickBooks | $212.45 |
| 5/28/2015 | Intuit QuickBooks CD | $5.95 |
| 9/4/2015 | Louver for Bathroom | $30.74 |
| 9/4/2015 | Plastic Wall Plate | $1.25 |
| 9/11/2015 | 2-Way Air Register | $8.33 |
| 9/13/2015 | Motion Sensor and Bulbs | $62.45 |
| Total | | $321.17 |

   Also during this period, Filippov made the following contributions, totaling $175,000, from his

personal checking account into the LLC Account:

| Date | Amount |
|---|---|
| 7/16/2015 | $50,000.00 |
| 7/29/2015 | $40,000.00 |
| 8/18/2015 | $30,000.00 |

| | |
|---|---|
| 8/26/2015 | $10,000.00 |
| 9/15/2015 | $45,000.00 |
| **Total** | $175,000.00 |

These five deposits enabled the LLC to make, and with them the LLC did make, the following payments,

totaling $136,617.05, that Filippov contends are carrying costs:

| Date | Loan Payments | Brookline Taxes | Brookline Fees | Insurance | Utilities | OC&M |
|---|---|---|---|---|---|---|
| 7/20/2015 | $3,565.00[28] | | | | | |
| 7/20/2015 | $6,333.34 | | | | | |
| 7/22/2015 | | | | $723.08 | | |
| 7/22/2015 | | | | $723.08 | | |
| 7/28/2015 | $6,333.33 | | | | | |
| 7/28/2015 | | | | | | $18,348.16 |
| 8/3/2015 | | | $100.00 | | | |
| 8/3/2015 | | $13,949.10 | | | | |
| 8/3/2015 | | $13,949.96 | | | | |
| 8/4/2015 | | | | | $806.89 | |
| 8/5/2015 | | | | | $2.99 | |
| 8/5/2015 | | | | | $1,859.32 | |
| 8/18/2015 | $6,544.44 | | | | | |
| 8/18/2015 | $6,544.44 | | | | | |
| 8/18/2015 | | | | $723.08 | | |
| 8/18/2015 | | | | $723.08 | | |
| 8/25/2015 | | | | | | $23,473.91 |
| 8/28/2015 | $6,544.45 | | | | | |
| 9/22/2015 | | | | | | $25,369.40 |
| **Totals** | $35,865.00 | $27,899.06 | $100.00 | $2,892.32 | $2,669.20 | $67,191.47 |

Kagan contends that certain uses of these payments, charges, and contributions do not qualify

as "carrying costs" within the meaning of § 8.1 of the Operating Agreement.  He does not take issue with

the loan payments (debt service), the real estate taxes to the Town of Brookline, or insurance on the

real estate. He does take issue with QuickBook licensing fees and the purchases for minor repairs to the

---

[28] This amount is the portion of this loan payment that was funded with contributions of Filippov and not of Kagan. The balance of this loan payment was funded with the last $2,768.33 of Kagan's contributions.

properties, both appearing on Filippov's list of credit card charges, and to the payments to OC&M for its legal work.[29] Kagan offers no explanation as to why these should not be deemed carrying costs.

"Carrying Costs" are defined in the Operating Agreement: "Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 77 Lyman Road, Brookline, Massachusetts." Operating Agreement, § 4.2. The definition expressly includes mortgage payments, taxes, and insurance but also makes clear that the enumerated list is not exclusive ("but not limited to"). I find that it was the members' intent to exclude construction costs from the list of items to which funds set aside for carrying costs might be used. These were the two fundamental categories of the LLC's anticipated costs. Carrying costs were intended to comprise all those costs that were not construction costs and that the LLC would have to fund to reach the end of its project, through sale of the property, disbursement of the proceeds, and wind up of the LLC.

The hiring of and payments to OC&M were necessary, and reasonably deemed necessary by Filippov as managing member, to address the challenges posed to the LLC and its project of selling its two homes by Kagan's and KDC's demand letter of May 7, 2015, by Kagan's signing of listing agreements on the part of the LLC that attempted to override the managing member's prerogative under the Operating Agreement to remove the broker, and by KDC's steps to establish mechanic's liens and to obtain a state court judgment consistent therewith, all on the strength of a forged contract. The hiring of counsel to address these threats was not a construction cost but was necessary to achieve the purposes of the LLC.  A business organization, being a creature of law, regulation, and commerce, sometimes has to employ professionals for any number of reasons, some small and relatively common and foreseeable, such as to file tax returns, and some not. The OC&M fees are in the latter category, to address exigencies of a nature and scale that at least two of the three members did not foresee from the

---

[29] He also takes issue with payment of legal fees for the promissory note to Filippov and payments to the accountant for preparation of tax returns, but these were paid from another source and are not implicated in the present scrutiny of the uses of Filippov's payments, charges, and contributions.

start. They are carrying costs, and no less so for being less foreseeable or of greater magnitude than other fees of professionals.

Kagan also disputes the charges on Filippov's credit card, $218 for QuickBook software/licensing fees, and approximately $100 in repair items purchased at a Home Depot. Both are carrying costs. A business needs accounting, and Filippov's investment in accounting software was appropriate and necessary to the business of the LLC. The few items purchased for repairs were also necessary. These repair needs arose after construction was complete and therefore were not construction costs—and if they were construction costs, they were Kagan's responsibility, and, for that reason if no other, he cannot now challenge the propriety of their being charged to him.

It is not clear whether Kagan disputes the propriety of treating utility payments as carrying costs. I have treated utilities according to the period in which they were incurred:  before and after construction, they were carrying costs; during construction, they were part of the construction effort and appropriately treated as construction costs. I continue to follow that rule here and conclude that the utilities that Filippov funded during this period were carrying costs.

For these reasons, I find that the disputed payments were in each instance for carrying costs within the meaning of Operating Agreement §§ 8.1 and 4.2.  Accordingly, Filippov's contributions of carrying costs in this period, which total $197,233.29 [$60,295.07 + $321.17 + $136,617.05 = $197,233.29], operate under § 8.1 of the Operating Agreement to reduce Kagan's Capital Account by the same amount.

In summary, Kagan's Capital Account started out at $250,000, was increased by his contributions of $145,175.26 after the twenty-third month to $395,175.26, and then was decreased by operation of Filippov's contributions for carrying costs by $197,233.29 to its ending balance of $197,941.97.

Under § 8.2 of the Operating Agreement, Kagan, too, is entitled to interest on his equity contributions at five percent for each year that the property is not sold after twenty-three months of

acquisition. Operating Agreement, § 8.2. However, as the interest is to be paid out of Kagan's net profit

share, the payment of interest on Kagan's Capital Account amounts to nothing more than transferring

money from one Kagan bucket to another.  I therefore see no purpose to be served in calculating it, a

complex task, given the frequency with which the balance on which interest is to be calculated changed

during the operative period. I will therefore count Kagan's interest as $0 and leave that sum (whatever it

is) in his share of net profits.

Filippov and Lipetsker object to Kagan's proof of interest on a further basis: because Kagan has

failed to pay the carrying costs as required by the Operating Agreement and has otherwise breached the

agreement and his fiduciary duties and engaged in fraud, his proof of interest should be rejected or his

equity interest should be equitably subordinated to their interests. Consistent with Filippov and

Lipetsker's Proposed Finding and Conclusions (at pars. 107-113), I understand this as a demand for

equitable subordination of Kagan's interest to the interests of Filippov and Lipetsker.  The Court will

overrule this basis of objection for the following reasons. A proceeding to subordinate an allowed

interest is an adversary proceeding. Fed. R. Bankr. P. 7001(8). Accordingly, it is governed by the Rules of

Part VII of the Federal Rules of Bankruptcy Procedure. Fed. R. Bankr. P. 7001. The rules of Part VII

require, among other things, articulation of the demand in a complaint. Fed. R. Civ. P. 3 ("A civil action is

commenced by filing a complaint with the court."), made applicable by Fed. R. Bankr. P. 7003 ("Rule 3 FR

Civ P applies in adversary proceedings."), and service of process. In this instance, Filippov and Lipetsker

did commence an adversary proceeding and file in it an amended complaint that included a count for

equitable subordination, but that amended complaint sought only the subordination of the Kagan

Parties' claims to the claims of Filippov and Lipetsker. It did not request subordination of Kagan's

interest to their interests. The present demand for subordination of interest to interests was articulated

not in an adversary complaint, or even in a simple motion filed in the bankruptcy case per Fed. R. Bankr.

P. 9014(a) ("In a contested matter not otherwise governed by these rules, relief shall be requested by

motion[.]"), but only in what is essentially a responsive pleading, Filippov and Lipetsker's objection to

Kagan's proof of interest. This process was not sufficient to put the matter in contest. Accordingly, this

basis of objection is overruled.

### e.  Summary of Interests

On the basis of the above rulings, the Court's conclusions as to the members' equity interests

and their rights to distribution on account thereof are as follows.  The estate remaining after satisfaction

of nonpriority unsecured claims, with interest, must be distributed first to the members on account of,

and to the extent of, their Capital Contributions as determined above:  $2,235,233.15 to Filippov;

$250,000.00 to Lipetsker; and $197,233.29 to Kagan. If funds are insufficient to make this first level of

distribution in full, the Capital Contributions shall be made on a *pro rata* basis. The remainder of the

estate shall be distributed as follows:  to Kagan, fifty percent of the remainder, minus the interest to be

paid to Filippov and Lipetsker on their Capital Contributions pursuant to § 8.2 of the Operating

Agreement; to Filippov, forty percent of the remainder, plus $134,531.75, the interest payable on his

Capital Contribution under § 8.2 of the Operating Agreement; and to Lipetsker, ten percent of the

remainder plus $16,046.38, the interest payable on his Capital Contribution under § 8.2 of the Operating

Agreement.

**CONCLUSION**

For the reasons set forth above, the Court will, by separate orders, disallow in their entirety the

claims of the Kagan Parties, allow the claims of Filippov and of OC&M, allow the members' interests as

quantified and specified above, and dismiss the adversary proceeding for lack of subject matter

jurisdiction as to most counts and for mootness as to the count for equitable subordination.


Date:  August 3, 2021

_Frank J Bailey_
_____
Frank J. Bailey
United States Bankruptcy Judge